**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FERRELLGAS PARTNERS, L.P.
SECURITIES LITIGATION

Civil Case No. 16-cv-07840 (RJS)

Hon. Richard J. Sullivan

**CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ................................................................................2

II.  JURISDICTION AND VENUE ........................................................................12

III.  PARTIES ...........................................................................................................12

    A.  Lead Plaintiffs ........................................................................................12

    B.  Defendants ..............................................................................................13

        1.  Ferrellgas Partners, L.P. .............................................................. 13

        2.  Ferrellgas, Inc. and its Board of Directors ................................. 14

        3.  The Individual Defendants ........................................................... 14

    C.  Relevant Non-Parties .............................................................................15

        1.  Bridger, LLC ............................................................................... 15

        2.  Jamex, LLC ................................................................................. 17

        3.  Monroe Energy ............................................................................ 17

        4.  Eddystone Rail Company ............................................................. 18

IV.  BACKGROUND ...............................................................................................19

    A.  Ferrellgas' Master Limited Partnership Structure .................................19

    B.  Ferrellgas' Foray into Midstream Crude Oil Logistics .........................21

    C.  The Bridger Acquisition .........................................................................22

V.  DEFENDANTS' SCHEME ...............................................................................29

    A.  Bridger's Success Depended Upon Its "Take-Or-Pay" Contracts ........30

    B.  Bridger's Contract with Monroe Unravels .............................................34

    C.  Bridger's Truck Transportation of Crude Oil Declines .........................38

    D.  Defendants Falsely Affirm Bridger's Success .......................................40

i

E.      Defendants Falsely Assure Investors That the Monroe COSA and
        Monroe TLA Are Still in Place................................................................41

VI.     DEFENDANTS' MATERIALLY FALSE OR MISLEADING
        STATEMENTS..........................................................................................42

        A.      June 1, 2015 Misrepresentations and Omissions ....................................43

        B.      September 29, 2015 Misrepresentations and Omissions .........................45

        C.      December 9, 2015 Misrepresentations and Omissions ...........................47

        D.      March 10, 2016 Misrepresentations and Omissions ...............................49

        E.      The Previously Misrepresented and Concealed Truth Gradually
                Emerges..................................................................................................51

VII.    SUMMARY OF SCIENTER ALLEGATIONS ........................................61

VIII.   LOSS CAUSATION..................................................................................65

IX.     THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE
        APPLIES ..................................................................................................82

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
        DOCTRINE ARE INAPPLICABLE.........................................................83

XI.     CLASS ACTION ALLEGATIONS ..........................................................84

XII.    CAUSES OF ACTION...............................................................................86

XIII.   PRAYER FOR RELIEF .............................................................................91

Court-appointed Lead Plaintiffs, Susan Batai ("Batai"), Joel Brenner (individually and as trustee for the Joel Brenner MPP Plan & Trust ("Brenner"), Kevin Gaberlavage ("Gaberlavage"), and Lazy Dogs Partnership LLLP ("Lazy Dogs") (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action on their own behalf and on behalf of all other persons and entities who purchased or otherwise acquired Ferrellgas Partners, L.P. ("Ferrellgas" or the "Company") common units ("FGP Units") during the period from June 1, 2015 through November 22, 2016 (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, among other things, the ongoing investigation that Court-appointed Lead Counsel is conducting under Lead Plaintiffs' supervision. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that Ferrellgas filed with the United States Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about the Company; (iii) transcripts of Ferrellgas conference calls; (iv) Company press releases; (v) media reports concerning Ferrellgas, including online news sources; (vi) interviews with former Ferrellgas employees (indicated herein as confidential former employees ("CFE") and with current and former employees of entities with which Ferrellgas transacted business during the Class Period; and (vii) filings in other court proceedings[1] concerning Ferrellgas and/or the matters alleged herein. Lead Plaintiffs believe that substantial additional evidentiary support will

---

[1] These proceedings include: (i) *Eddystone Rail Company, LLC v. Jamex Transfer Services, LLC*, 1:16-mc-00295-P1 (Society of Maritime Arbitrators); (ii) *Eddystone Rail Company, LLC v. Ferrellgas Partners, L.P.*, 1:16-mc-00295-P1 (S.D.N.Y.); (iii) *Eddystone Rail Company, LLC v. Monroe Energy, LLC*, 1:16-mc-00426-P1 (S.D.N.Y.); and (iv) *Eddystone Rail Company, LLC. v. Bridger Logistics, LLC, et al., L.P.*, 2:17-cv-00495-RK (E.D.P.A.).

exist for the allegations set forth herein after Lead Plaintiffs have had a reasonable opportunity to conduct discovery.

## I.     NATURE OF THE ACTION

1.     Ferrellgas is a Master Limited Partnership ("MLP") in the energy sector, and FGP Units are listed and publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "FGP."  MLPs, like Ferrellgas, are structured as pass-through partnerships to enable the payment of dividends, commonly known as "distributions," to persons and entities that own securities, or "units," in the MLP.  Investors, like the Class members here, purchase MLP Units primarily to receive the MLP's distribution payments, which are typically made on a quarterly basis.

2.     From its initial public offering in 1994 until the beginning of the Class Period on June 1, 2015, Ferrellgas' primary business was commercial and residential propane distribution. Ferrellgas' traditional propane business, however, was subject to weather-related uncertainties. For example, if winter temperatures were mild, Ferrellgas' propane sales for heating dropped significantly, adversely impacting revenues.  Moreover, leading into the Class Period, Ferrellgas faced increasing costs for sourcing its propane, which further compressed the Company's margins.  To offset these strains on revenues, the Company sought to diversify into other energy market segments through a strategic acquisition.  In particular, Ferrellgas was exploring merger and acquisition opportunities with entities operating in the "midstream" MLP segment, which primarily involves gathering, storing, and transporting oil and gas from extraction sites to refineries.

3.     Ferrellgas' quest to diversify its business culminated in the acquisition of Bridger Logistics, LLC ("Bridger Logistics" or "Bridger"), which focused on transporting crude oil by

rail and by truck from wellheads to refineries in North America. Ferrellgas disclosed certain details of this $837.5 million transaction funded through a combination of cash and securities (the "Bridger Acquisition") in a Form 8-K filed with the SEC on June 1, 2015 and during a conference call with analysts and investors, and accompanying slide presentation, on the same day (the "June 1, 2015 Conference Call").

4.     In promoting the Bridger Acquisition to Class members, Defendants represented, among other things, that it would generate $100 million in earnings before interest, tax, depreciation, and amortization ("EBITDA") for Ferrellgas for the next twelve months ("NTM"), and would be "a dramatic improvement to the [Ferrellgas] growth profile." As a result of the Bridger Acquisition, Ferrellgas also announced that it was increasing its annual distribution to FGP Unit holders by $0.05 per Unit—the first FGP Unit distribution increase since the Company's 1994 initial public offering.

5.     The core of Bridger Logistics' business at the time of the Bridger Acquisition was a Transportation and Logistics Services Agreement with Monroe Energy, LLC ("Monroe") to transport by rail at least 65,000 barrels of crude oil per day from the Bakken region of North Dakota to Monroe's refinery in Trainer, Pennsylvania (the "Monroe TLA"). Pursuant to the Monroe TLA, which Defendants represented during the Class Period was responsible for no less than 50% of the EBITDA that Bridger would generate for Ferrellgas, Bridger was responsible for, among other things, shipping Bakken crude oil by train to a facility that would transload the oil from railcars to barges that would then carry the oil to Monroe's refinery via the Delaware River.

6.     To fulfill its obligations under the Monroe TLA, Ferrellgas' midstream operations segment (Bridger Logistics) obtained Bakken crude oil from Bridger Marketing, LLC ("Bridger

Marketing"), a Bridger, LLC subsidiary that Ferrellgas *did not acquire* in the Bridger Acquisition. In turn, Bridger Marketing (renamed Jamex Marketing, LLC ("Jamex Marketing") after the Bridger Acquisition) had its own Crude Oil Supply Agreement with Monroe (the "Monroe COSA") whereby Jamex Marketing agreed to sell specified amounts of Bakken crude oil to Monroe.

7.      In connection with performing their respective obligations under the Monroe COSA and the Monroe TLA, Jamex Marketing and Bridger Logistics entered into a ten-year take-or-pay transportation and logistics agreement on or about June 23, 2015 (the "Jamex TLA"), whereby Ferrellgas (through its Bridger Logistics segment) would be the exclusive provider of crude oil logistics services to Jamex Marketing to support Jamex Marketing's obligations under the Monroe COSA. The Jamex TLA provided, among other things, that Jamex Marketing would be required to make volume deficiency payments to Bridger Logistics if Jamex Marketing failed to purchase for Monroe the minimum crude oil volumes required under the Monroe COSA.

8.      Additionally, because Monroe's refinery did not have direct rail access, Bridger Logistics, through its subsidiary Bridger Transfer Services, LLC ("BTS"), had entered into a February 2013 agreement with a transloading facility owned by Eddystone Rail Company, LLC ("ERC") that could transfer the crude oil that Bridger Logistics brought by rail to barges for shipment downriver to Monroe's refinery: the Eddystone Rail Facilities Services Agreement (the "RFSA"). Pursuant to the RFSA, BTS agreed to, among other things:  (i) deliver a minimum volume of seven (7) trains per week with a minimum capacity of 65,000 barrels of oil per train (equivalent of 64,750 barrels of crude oil per day) each month; and (ii) pay deficiency charges to

ERC if monthly volumes delivered to its transloading facility fell short of the minimum volume commitment.

9.       In addition to the crude-by-rail transportation services, Bridger Logistics also operated crude oil trucking services.  At the time of the Bridger Acquisition, Bridger Logistics' trucking business was supported by contracts with two main customers – Shell Oil Company ("Shell"), and Occidental Energy Marketing, Inc. ("Occidental"), which was the largest oil producer in the Permian Basin located in Texas/New Mexico.  In announcing the Bridger Acquisition on June 1, 2015, Defendants represented that Bridger Logistics' contracts to transport crude oil by truck would generate approximately 30% of the $100 million NTM EBITDA that Ferrellgas' new midstream operation segment (Bridger Logistics) would generate for the Company.

10.       Almost immediately after the Bridger Acquisition, however, Ferrellgas' new midstream operations segment (Bridger Logistics) began foundering, leading current Ferrellgas CEO, James Ferrell, to aptly describe the Bridger Acquisition as Ferrellgas' "midstream misadventure" after the end of the Class Period.  Rather than making complete and truthful disclosures of material information to Lead Plaintiffs and other Class members, Defendants concealed adverse facts from investors and misrepresented facts on the ground.  As alleged herein, Defendants made a series of false or misleading statements concerning, among other things:  (i) the benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the integration of the Bridger Logistics entities into Ferrellgas' business; (iv) the performance of the parties to the inter-related Monroe contracts (Monroe COSA and Monroe TLA) and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck

transportation of crude oil to Ferrellgas customers.  Defendants' materially false or misleading statements and omissions of material fact created and/or maintained artificial inflation in the price of FGP Units during the Class Period.

11.     For example, Defendants represented throughout the Class Period that Ferrellgas' midstream operations were not susceptible to commodity price fluctuations, such as changes in oil prices.   Instead, Defendants claimed that the Bridger segment was "insulated from commodity prices" because, putatively, "***Bridger's contract coverage and the strategic location of our operations result in a business that performs well throughout the commodity price cycles***."  These statements were false.  In truth, by no later than September 2015, Ferrellgas' truck transportation of crude oil began a steady and unceasing decline based, primarily, upon oil price changes.  Rather than disclosing the severe downturn in Ferrellgas' truck transportation of crude oil, Ferrellgas instead attempted to revive its truck transportation of crude oil in December 2015 by acquiring for $10.7 million the crude oil trucking assets South C&C Trucking, LLC, a trucking company with contracts that served Shell.  This acquisition, which Defendants did not disclose to investors until September 28, 2016, failed to salvage the Company's truck transportation of crude oil, which continued to suffer business losses based upon the very commodity price fluctuations against which Defendants' claimed Ferrellgas' midstream operations were insulated.

12.     Moreover, oil price changes began derailing the critical Monroe contracts (the Monroe COSA and Monroe TLA) by no later than November 2015.  In this regard, the profitability of the arrangements pursuant to which Ferrellgas delivered Bakken crude oil from North Dakota to Monroe's refinery in Trainer, Pennsylvania depended upon the price differential between the lower priced Bakken crude and imported crude oil, as reflected in the West Texas

Intermediate to Brent ("WTI-Brent") spread.  When the WTI-Brent spread is large, there is an economic incentive to purchase Bakken crude oil transported by rail to East Coast refineries. When that spread narrows, as it did during the fall of 2015, it is more profitable for refineries like Monroe to obtain oil from overseas.

13.     In fact, Monroe's demand for Bakken crude oil provided by Ferrellgas (and Jamex Marketing) under the Monroe TLA (and Monroe COSA) substantially decreased by the fall of 2015.  Consequently, Jamex Marketing, which contracted to purchase set amounts of oil under the Monroe COSA for Ferrellgas to deliver to Monroe under the Monroe TLA, was forced to purchase less than the minimum requirements of crude oil, triggering Jamex Marketing's responsibility to pay large and virtually insurmountable deficiency payments to Ferrellgas' Bridger Logistics subsidiary under the Jamex TLA.  By the fall of 2015, Jamex Marketing was so financially strained that it was unable to secure financing to meet its payment obligations to Bridger Logistics under the Jamex TLA.  As a result, both Ferrellgas and Jamex Marketing were looking for ways out of their respective deals.

14.     At the same time, Monroe—with an excess of less expensive imported crude readily available for delivery by tanker—was receptive to Jamex Marketing's and Ferrellgas' desire to terminate performance on their respective agreements with Monroe.  As a result, Monroe, Jamex Marketing, and Ferrellgas, which were no longer willing or able to meet their respective minimum volume commitments, entered into a series of secret agreements on January 13, 2016 to suspend performance under their respective agreements (the "January 2016 Side Letters").  Pursuant to these secret deals negotiated by Defendant Rios, all Ferrellgas rail shipments of Bakken crude oil for ultimate delivery to Monroe stopped by no later than February 1, 2016 at Rios' direction.  Since that time, Ferrellgas has not delivered a single barrel of oil by

rail pursuant to the Monroe TLA that Class members were informed was responsible for at least 50% of the EBITDA that Ferrellgas' midstream operations would generate for the Company.

15.     Ferrellgas' secret agreements to cease delivering oil by rail to Monroe's refinery caused its subsidiary, BTS, to amass volume deficiency payments to ERC under the RFSA. Recognizing that BTS' volume deficiency payments would only increase based upon its undisclosed decision to stop transporting oil by rail for delivery to Monroe's refinery, Ferrellgas hatched a plan to try to extinguish its liability to ERC under the RFSA.  On or about February 1, 2016, Ferrellgas clandestinely stripped BTS of all of its assets and sold BTS to Jamex Marketing for a mere $10.00.  The worthless BTS was renamed Jamex Transfer Services, LLC ("JTS"), and left ERC with a functionally insolvent counterparty to the RFSA that had been integral to Ferrellgas' ability to earn any money from delivering crude oil by rail from North Dakota to Pennsylvania–which it never did after executing this series of secret agreements.

16.     As alleged below in Section VI, rather than disclose any of these material facts to investors, Defendants lied and concealed the truth.  For example, on March 10, 2016, Defendant Wambold represented that:  (i) "[w]ith best-in-class capabilities and durable long-term take-or-pay contacts with blue-chip customers, our midstream operations are not dependent on commodity prices"; and (ii) "*[w]e continue to navigate the lower crude pricing environment with success* and expect to capitalize on opportunities created by these lower prices in the future."  Similarly, Defendant Rios claimed "*[t]he long term nature of our agreements, the stable and consistent revenue generated by our take-or-pay contracts, and the quality of our key customers make Bridger uniquely durable and valuable*."  As alleged above and herein, at the time of these statements, and based specifically upon commodity price fluctuations, Defendants, Jamex Marketing, and Monroe had executed a series of secret agreements to

suspend Ferrellgas' oil deliveries by rail from North Dakota to Pennsylvania, and Rios had ordered that Ferrellgas' rail cars be "parked" indefinitely.

17.     Moreover, on June 8, 2016, Ferrellgas misleadingly disclosed that Jamex Marketing, which had been in financial trouble since no later than November 2015 and had lacked the financial resources to either purchase any oil pursuant to the Monroe COSA or to make required deficiency payments since mid-January 2016, "*may not have the financial resources sufficient to satisfy its payment obligations*."   In addition to this misleading partial disclosure of previously misrepresented and concealed facts, Rios falsely assured FGP Unit investors that:  (i) "*we are operating within our contractual arrangements with Monroe and with Jamex today, and both agreements are in effect*"; and (ii) "[t]he volume of crude that we're delivering to them is something that is between us and Monroe, but *you can rest assured we are still operating within our contractual arrangements.*"   Additionally, Defendant Wambold falsely stated that "Bridger is on pace and fulfilling our expectations of $100 million in adjusted EBITDA for the Partnership in FY16"–an impossibility based upon the suspension of the Monroe TLA.  Although the questions concerning Jamex's ongoing ability to perform under the Monroe arrangements caused the price of FGP Units to decline, Defendants' ongoing misrepresentations contained the fall as the price of FGP Units dropped by $0.97 per unit, or 5.15%, from a closing price of $18.85 on June 7, 2016 to a closing price of $17.88 on June 8, 2016 on heavy trading volume.

18.     As alleged below in Section VIII, following Defendants' partial, but still misleading, disclosure of previously misrepresented and concealed facts on June 8, 2016, the truth was gradually revealed in a series of partial disclosures of new information that corrected Defendants' material misrepresentations and omissions and/or caused the foreseeable risks

concealed by Defendants' fraud to materialize. Each of these partial disclosures removed a portion of the artificial inflation in the price of FGP Units created and/or maintained by Defendants' material misrepresentations and omissions.

19. For example, on September 28, 2016, Ferrellgas announced its financial results for its 4Q16 and its full fiscal year, ended July 31, 2016, by filing a Form 10-K and Form 8-K with the SEC. In its FY16 Form 8-K, Ferrellgas disclosed, among other things, *a net loss of $665.4 million, primarily consisting of "a one-time non-cash impairment charge of $628.8 million in our Midstream operations – Crude oil Logistics segment*." During a conference call conducted with analysts and investors the same day, in which Wambold did not participate because he had "resigned" the day before (the "September 28, 2016 Conference Call"), Ferrellgas confirmed that the $628.8 million impairment charge arose from testing conducted "[a]s a result of the decline in our future cash flows [from the Monroe TLA], as well as sustained decline in crude oil prices and the resulting decrease in crude oil production in the regions in which we operate"—commodity price fluctuations as to which Ferrellgas had repeatedly claimed its midstream operations were insulated.

20. In its FY16 Form 10-K, Ferrellgas also disclosed, among other things, that the Company *had not delivered a single barrel of oil under the Monroe TLA since February 2016* and that Ferrellgas had been unable to find another entity that would replace Jamex Marketing in sourcing the crude oil necessary for Ferrellgas to continue operating under the Monroe TLA. As a result, Ferrellgas disclosed that it *no longer anticipated "any material contribution to revenue or EBITDA" from the Monroe TLA*. The Company further revealed that the decline in crude oil prices "significantly impacted our trucking operations during the three months ended July 31, 2016." Primarily as a result of the failures in its midstream operations, as well as the debt that it

10

assumed in financing the Bridger Acquisition, the Company announced that it was implementing a strategy to reduce its debt to assure compliance with the leverage ratio requirements of its credit and securitization facilities and that "*[t]his strategy may include a reduction in our annual distribution [for FGP Units]*," and further indicated that "our board believes it is possible that the annual distribution rate [for FGP units] may be reduced from $2.05 to approximately $1.00 per common unit. In response to the new information concerning Ferrellgas disclosed on September 28, 2016, the price of FGP Units declined over the next two trading days by $4.73 per unit, or 28.67%, from a closing price of $16.50 on September 27, 2016 to a closing price of $11.77 on September 29, 2016 on heavy trading volume.

21. Finally, after the close of trading on November 22, 2016, the Company issued a press release entitled, "Ferrellgas Partners, L.P. Declares First Quarter 2017 Cash Distribution" (the November 22, 2016 Press Release"). In this press release, the Company announced "the declaration of its first quarter cash distribution of $0.10 ($0.40 annualized rate) per partnership common unit," and made clear that the dramatic reduction in FGP investors' distribution amounts resulted from "*headwinds in our midstream business primarily due to the loss of our largest customer [Monroe]*."

22. In response to the disclosure of the massive 80% cut in the annual distribution payments to FGP Unit holders, which Ferrellgas attributed "primarily" to the loss of the Monroe contracts, the price of FGP Units declined by $0.68 per unit, or 9.28%, from a closing price of $7.33 on November 22, 2016 to a closing price of $6.65 on November 23, 2016 on heavy trading volume.

23.     By the end of the Class Period, the price of FGP Units had declined by ***more than 71%*** from its Class Period high price of $23.52 per FGP Unit to close at a price of $6.65 per FGP Unit, causing Lead Plaintiffs and other Class members to suffer damages.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

26.     Ferrellgas' FGP Units are listed and trade on the NYSE, Ferrellgas publicly offered FGP Units in this District, and certain of the acts that constitute the violations of law complained of herein, such as the dissemination of materially false or misleading information to the investing public, including in Ferrellgas' filings with the SEC, occurred in and/or were issued from this District.

27.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.     Lead Plaintiffs

28.     Lead Plaintiff Susan Batai purchased FGP Units during the Class Period, as set forth in the certification attached hereto as Exhibit A, and suffered damages as a result of the federal securities law violations alleged herein.

29.     Lead Plaintiff Joel Brenner (individually and as trustee for the Joel Brenner MPP Plan & Trust purchased FGP Units during the Class Period, as set forth in the certification attached hereto as Exhibit B, and suffered damages as a result of the federal securities law violations alleged herein.

30.     Lead Plaintiff Kevin Gaberlavage purchased FGP Units during the Class Period, as set forth in the certification attached hereto as Exhibit C, and suffered damages as a result of the federal securities law violations alleged herein.

31.     Lead Plaintiff Lazy Dogs Partnership LLLP purchased FGP Units during the Class Period, as set forth in the certification attached hereto as Exhibit D, and suffered damages as a result of the federal securities law violations alleged herein.

### B.     Defendants

#### 1.     Ferrellgas Partners, L.P.

32.     Defendant Ferrellgas Partners, L.P. is a limited partnership incorporated in Delaware and headquartered in Overland Park, Kansas.  Ferrellgas is a MLP in the energy market with its common units listed and publicly traded on the NYSE under the ticker symbol "FGP".  Ferrellgas periodically reports its earnings using a fiscal year ("FY") beginning on August 1 and ending on July 31.

33.     Ferrellgas is a holding company with no employees of its own.  The Company is run by Ferrellgas, L.P., the "operating partnership" of Ferrellgas.  Ferrellgas is the sole limited partner of the operating partnership, Ferrellgas, L.P., through which Ferrellgas conducts all of its business operations.

34.     Ferrellgas is primarily engaged in the business of commercial and residential propane distribution, including the Blue Rhino® brand of propane tank exchange.  As alleged herein, during the Class Period, Ferrellgas undertook to expand and diversify its traditional

13

propane business by acquiring Bridger Logistics, LLC to serve as the cornerstone of Ferrellgas'

new midstream operations – crude oil logistics business segment.

### 2.      Ferrellgas, Inc. and its Board of Directors

35.     Defendant Ferrellgas, Inc. is the general partner of both Ferrellgas and its

operating partnership, Ferrellgas, L.P.   All management powers over Ferrellgas' business and

affairs are exclusively vested in Ferrellgas, Inc., which performs all management functions

required by the partnership, including conducting, directing, and managing all of Ferrellgas'

activities.   All actions and decisions of Ferrellgas and its operating partnership are made by

Ferrellgas, Inc.    To carry out Ferrellgas' business, Ferrellgas, Inc. employs the persons

responsible for managing and operating Ferrellgas on a daily basis, including members of the

Board of Directors of Ferrellgas, Inc. (the "Board").

36.     The primary role of the Board is to oversee the business affairs of Ferrellgas and

its operating partnership, Ferrellgas, L.P.   The Board is responsible for, among other things,

determining whether Ferrellgas, Inc. has the appropriate command and control structure in place.

Further, the Board is responsible for supervising and directing the management of Ferrellgas,

Inc. for the benefit of Ferrellgas and FGP Unit holders.   To that end, the Board has various

duties, including:  (i) overseeing the business of Ferrellgas and its operating partnership; (ii)

reviewing and approving major financial objectives, plans and actions of the Company and its

operating partnership; and (iii) assessing risks relating to the performance of Ferrellgas, Inc.,

Ferrellgas, and Ferrellgas, L.P.

### 3.      The Individual Defendants

37.     Defendant Stephen L. Wambold ("Wambold") served as Ferrellgas' President and

Chief Executive Officer ("CEO") throughout much of the Class Period.   From September 2009

to September 27, 2016, Wambold served as the Company's CEO, and he served as its President

from April 26, 2006 to September 27, 2016.  During his tenure as CEO, Wambold led the company through a series of acquisitions, including the $837.5 million acquisition of Bridger Logistics, which closed on or about June 24, 2015.  Wambold abruptly "resigned" from the Company on September 27, 2016–the day before the Company announced that it was cutting FGP Unit distributions by more than 80% based upon failures in Ferrellgas' midstream operations, as alleged further herein.

38.     Defendant Julio E. Rios II ("Rios") served as Executive Vice President of the Company, and as the CEO and President of Bridger Logistics, LLC (Ferrellgas' midstream operations segment) from June 24, 2015 through the end of the Class Period.  Prior to the Company's acquisition of Bridger Logistics, Rios was the co-founder, President and CEO of Bridger, LLC from July 1, 2013 to June 23, 2015.  On October 21, 2016, Rios delivered to the Company a notice of "good reason" to resign, noting that Ferrellgas had materially diminished his responsibilities and stating that he would resign if the Company did not cure the situation within thirty (30) days.  On December 1, 2016, the Company disclosed that Rios had resigned from the Company on November 28, 2016.

39.     Defendants Wambold and Rios are referred to herein as the "Individual Defendants."  The Individual Defendants, together with Ferrellgas and Ferrellgas, Inc., are referred to herein as "Defendants."

## C.     Relevant Non-Parties

### 1.  Bridger, LLC

Bridger, LLC was founded in 2010 by Rios, James Ballengee ("Ballengee"), and Jeremy Gamboa ("Gamboa") and is headquartered in Dallas, Texas.  Rios, Ballengee, and Gamboa self-funded the company.  At its inception, Bridger, LLC, through its subsidiary entities, provided crude oil trading and marketing services, as well as the purchase, sale, storage, and transportation

of crude oil by truck, rail car, terminal, and pipeline.  Bridger, LLC's business was divided into two segments: (i) crude oil logistics and (ii) crude oil trading and marketing services. The two main subsidiaries of Bridger, LLC were Bridger Logistics, LLC and Bridger Marketing, LLC.  A diagram of the pertinent entities of Bridger, LLC's organizational structure before Ferrellgas acquired Bridger Logistics in June 2015 is attached as Exhibit E.

40.     Bridger Logistics, LLC is a limited liability company with its corporate headquarters in Carrollton, Texas.  Bridger Logistics, through its own sub-entities including Bridger Rail Shipping, LLC, Bridger Marine, LLC, and Bridger Transfer Services, LLC, provided logistics services for the transport of crude oil from wellheads to end markets in North America.  These services included crude-by-rail transportation services and crude oil trucking services.

41.     As alleged herein, Ferrellgas purchased Bridger Logistics on June 24, 2015 (the "Bridger Acquisition"), in an attempt to diversify from its traditional propane business to also provide midstream operations, i.e., crude oil logistics through Bridger Logistics.  Upon the closing of this transaction, Rios and Gamboa each:  (i) acquired certain FGP Units as partial consideration for Bridger Logistics, valued at $27.1 million and $13.6 million, respectively (based upon the price of FGP Units when the Bridger Acquisition closed); and (ii) joined Ferrellgas as Executive Vice Presidents responsible for running Ferrellgas' midstream operations.  For his part, Bridger, LLC co-founder Ballengee retained the remaining Bridger, LLC entities and renamed the company Jamex, LLC.  The relationships of the pertinent entities of Bridger, LLC after the Bridger Acquisition are shown in the diagram attached as Exhibit F.

42.     Bridger, LLC and its Bridger Marketing, LLC subsidiary were retained by Ballengee following the Bridger Acquisition.  Bridger Marketing was responsible for the crude

oil trading and marketing services of Bridger, LLC.  After the Bridger Acquisition, Ballengee owned and operated Bridger, LLC and Bridger Marketing, and renamed them Jamex, LLC and Jamex Marketing, LLC, respectively.

### 2.  Jamex, LLC

43.     Jamex, LLC is owned and operated by Ballengee, the remaining co-founder of Bridger, LLC who did not join Ferrellgas.  In connection with the Bridger Acquisition, the former Bridger Marketing entity, which Ferrellgas did not acquire, was renamed Jamex Marketing and continued to operate in the crude oil marketing and trading business.  As alleged in more detail below, as part of Defendants' scheme, Ferrellgas sold BTS to Jamex, LLC in February 2016.  Attached hereto as Exhibit G is the organizational structure of the former Bridger, LLC entities following the Bridger Acquisition, including the sale of BTS to Jamex in February 2016.

44.     Jamex Marketing continued its business of purchasing crude oil and taking title of the crude oil that it purchased until such oil was delivered to the ultimate purchaser.  For example, as alleged in greater detail below, as part of the Bridger Acquisition, Jamex Marketing and Bridger Logistics entered into an agreement whereby Jamex Marketing would source Bakken crude oil from North Dakota to enable Ferrellgas to deliver such oil to a Pennsylvania refinery operated by Monroe Energy.  As part of its consideration for Bridger Logistics and pursuant to a June 2015 Stock Sale Agreement, Jamex Marketing received 9,542,895 FGP Units. As a result, Jamex Marketing (owned by Ballengee) became the holder of 9.5% of the Ferrellgas' common Units at that time.

### 3.  Monroe Energy

45.     Monroe Energy, LLC is an energy company based in Trainer, Pennsylvania, engaged in the oil refinery business.  Incorporated in 2011, Monroe is a subsidiary of Delta Air

Lines, Inc., specializing in the production of jet fuel, as well as other products, such as gasoline, diesel, and home heating oil.  On July 1, 2014, Monroe entered into a Crude Oil Supply Agreement with Bridger Marketing, LLC whereby Bridger Marketing would purchase crude oil from the Bakken oil fields in North Dakota for delivery and sale to Monroe's refinery on the Delaware River in Trainer, Pennsylvania.  On May 26, 2015, just prior to the announcement of the Bridger Acquisition, (i) the Monroe COSA was amended and (ii) Monroe entered into a Transportation and Logistics Services Agreement with Bridger Logistics pursuant to which, as alleged herein, Bridger Logistics agreed to transport by rail specified volumes of Bakken crude oil for ultimate delivery to Monroe's refinery.  After the Bridger Acquisition, on June 24, 2015, (i) the Monroe COSA was further amended by letter agreement to reflect Jamex Marketing's new name and (ii) the Monroe TLA was assumed by Ferrellgas.

### 4.    Eddystone Rail Company

46.    Eddystone Rail Company is a joint venture between Enbridge Rail LLC and Canopy Prospecting, Inc. that was formed in November 2012 for the purpose of owning and operating a crude oil transloading facility in Eddystone, Pennsylvania, on the Delaware River southeast of Philadelphia.  Because Monroe's refinery did not have direct rail access, in order for Bridger Marketing to perform under the Monroe COSA, Bridger Marketing required access to a transloading facility to transfer the crude oil it brought on rail cars to barges for shipment downriver to Trainer.  As such, in February 2013, ERC entered into the Eddystone Rail Facilities Services Agreement with Bridger subsidiary BTS under which ERC agreed to construct and operate the Eddystone, Pennsylvania facility that provided BTS the exclusive ability to transfer crude oil from rail cars to river barges as part of Bridger's overall business to supply Bakken crude oil to Monroe's Trainer, PA refinery.  Defendant Rios signed the agreement on behalf of BTS.  Therein, BTS agreed, *inter alia*, to:  (i) a minimum volume commitment of seven (7)

trains per week with a minimum capacity of 65,000 barrels of oil per train (equivalent to 64,750 barrels of crude oil per day) each month from the facility's completion until June 2019; and (ii) a deficiency charge of $1.75 per barrel by which the required monthly volume fell short of the minimum volume commitment.

## IV.   BACKGROUND

### A.   Ferrellgas' Master Limited Partnership Structure

47.     Ferrellgas is a publicly-traded MLP.

48.     MLPs are partnerships that trade on public exchanges or markets (e.g., the NYSE).  MLPs are structured as pass-through partnerships to enable the payment of dividends, commonly known as "distributions," to persons and entities that own securities, or "units," in the MLP.  Investors, like the Class members here, purchase MLP Units to receive the MLP's distribution payments, which are typically made on a quarterly basis.

49.     Ordinarily, a publicly traded MLP consists of a decision-making general partner ("GP") and limited partnership ("LP") interests (units) traded on a public exchange and could include a sponsor:

- The GP usually holds a minor equity stake in the MLP (typically about 2%), but has full management responsibility of the business.

- The LPs have a passive interest in the partnership, have no role in daily operations, provide all the capital, receive cash distributions, and have limited or no voting rights.

50.     Here, Ferrellgas is the publicly traded MLP entity and Ferrellgas, L.P. is the operating partnership.  Ferrellgas, Inc. is the GP and holds a minority stake in both Ferrellgas and Ferrellgas, L.P., but Ferrellgas, Inc. has full management control of both Ferrellgas and its operating partnership, Ferrellgas, L.P.

51.     The economic structure of an MLP is unique relative to other publicly traded entities because the economic structure of an MLP revolves around cash flow.  Indeed, MLPs are typically traded based on a multiple of cash flow—not net income.  As such, an MLP is required (and incentivized) to distribute all of its "available cash" to its unit holders.  The requirement to distribute all available cash is usually defined in the MLP's partnership agreement.

52.     The value of MLP units is based upon investor expectations of cash distributions from the MLP.

53.     There are three market segments in which energy MLPs operate: upstream, midstream, and downstream.

54.     Upstream MLPs are primarily involved in the exploration, recovery, development and production of crude oil, natural gas, and natural gas liquids.  In practical terms, upstream MLPs are the companies that search for, locate, and extract natural resources, then work to refine them into finished or near-finished goods.

55.     Midstream MLPs are primarily involved in gathering, storing, and transporting oil and gas extracted and refined by upstream MLPs.  For instance, companies that maintain oil and gas pipelines are midstream MLPs because they transport finished oil and gas products supplied by the upstream MLPs that extract them.  Similarly, rail or truck-based oil and gas transportation is performed by midstream MLPs.

56.     Downstream MLPs commonly consist of companies engaged in the business of refining petroleum crude oil and the purification of raw natural gas.  Downstream MLPs market and distribute finished oil and gas products to retailers and consumers.  The most common products are gasoline, kerosene, jet fuel, diesel oil, heating oil, fuel oils, lubricants, waxes, asphalt, natural gas, liquefied petroleum gas, and propane.

### B.       Ferrellgas' Foray into Midstream Crude Oil Logistics

57.     Ferrellgas' history dates back to 1939 when it was the "A.C. Ferrell Butane Gas Company" located in Atchison, Kansas.  While initially successful, the company struggled in the mid-1950s through the mid-1960s despite attempts to diversify by also selling furniture and televisions.  By 1965, the company pared back to focus on its core propane business and James Ferrell ("Ferrell") took charge and renamed the company "Ferrellgas".   Under Ferrell's leadership, the company significantly expanded by acquiring a number of local and regional propane dealers.

58.     In 1994, Ferrellgas became a publically traded MLP and continued to expand its propane distribution operations nationwide.  As part of its initial public offering, Ferrellgas declared that it would pay quarterly dividends of $0.50/unit, ($2.00/unit annually).  Since that time, Ferrellgas' distribution remained unchanged, until the Bridger Acquisition, when  the Company announced that it expected to raise the quarterly distribution—to $0.55/unit per quarter.

59.     Historically, Ferrellgas was considered to be a downstream MLP focused on the commercial and residential propane market.  In 2004, Ferrellgas acquired Blue Rhino®, the primary business of which involved the production and exchange of 20-pound barbeque grill propane tanks.  Blue Rhino® is currently the leading national provider of propane tank exchange services, with displays at over 45,000 retail locations in all 50 U.S. States and Puerto Rico.

60.     Ferrellgas' concentration on the propane market subjected the Company and FGP Unit holders to  weather-related uncertainties.   For  example, if winter  temperatures were moderate or mild, Ferrellgas' propane sales for heating dropped significantly, adversely impacting revenues.  Moreover, if cool temperatures shortened the traditional "grilling season," Ferrellgas' Blue Rhino® propane tank sales would decline due to decreased demand.  In addition,

leading into the Class Period, Ferrellgas had been experiencing increasing costs for sourcing its propane from the larger energy market, which further compressed the Company's margins. To offset these strains on revenues, the Company endeavored to diversify into other energy market segments.

61.     Throughout 2014, Ferrellgas discussed with investors its plans to diversify "strategically" into "non-propane" fields with the paramount criterion being that any acquisition "must be immediately accretive to earnings."  To carry out this plan, Ferrellgas created a new position of Senior Vice President of Strategic Development and hired Todd Soiefer to fill it. During a March 2014 earnings call, Ferrellgas management signaled to investors that the Company was exploring merger and acquisition opportunities in the midstream MLP segment.

### C.     The Bridger Acquisition

62.     Bridger, LLC, was founded in 2010 by Rios, Ballengee and Gamboa.  At its inception, Bridger, LLC, through its subsidiary entities, provided crude oil trading and marketing services, as well as the purchase, sale, transportation, and storage of crude oil by truck, rail car, terminal, and pipeline.  Bridger, LLC's business was divided into two segments:  (i) midstream crude oil logistics; and (ii) crude oil trading and marketing services.  The two main subsidiaries of Bridger, LLC were Bridger Logistics and Bridger Marketing.

63.     CFE1 worked as a safety and compliance specialist for Bridger Logistics before and during the Class Period.  CFE1 was responsible for internal and external data management and reporting on various Department of Transportation-required statistics.  CFE1 worked at Bridger Logistics' headquarters in Carrolton, Texas.  Bridger Logistics had about twenty-five employees all of whom worked in a single room.  The employees were not separated by cubicles, but instead all sat together at a large desk.  CFE1 recalls that there were approximately six or

seven offices off of the main room and that Defendant Rios and Gamboa, among others, occupied these offices.

64.    Bridger Logistics, LLC, through its own sub-entities including Bridger Rail Shipping, LLC, Bridger Marine LLC, and BTS, provided logistics services for the transport of crude oil from wellheads to end markets in North America.  These services included crude-by-rail transportation services and crude oil trucking services.  To support these services, Bridger purchased 1,394 new rail cars in 2014 (with about 999 delivered by the time of the Bridger Acquisition), leased another 395 rail cars, and also owned a fleet of 617 trucks and 644 tank trailers.

65.    At the time of the Bridger Acquisition, Bridger Logistics' crude-by-rail transportation business was supported by two long term take-or-pay contracts (expiring in June 2019) with a single customer, Monroe:   (i) the Monroe TLA with Bridger Logistics and (ii) the Monroe COSA with Bridger Marketing (a Bridger entity that Ferrellgas did not acquire in the Bridger Acquisition).   "Take-or-pay" contracts are routinely used in the oil logistics industry, and typically require the party receiving the oil to take the product from the supplying party or pay a penalty that is defined in the contract.  The Monroe TLA contained a minimum volume and payment obligation from Monroe to Bridger Logistics for delivery of 65,000 barrels per day. However, in any month in which Bridger Logistics provided less than an average of 35,000 barrels per day, Monroe's obligation would be suspended.   To fulfill its obligations under the Monroe TLA, Bridger was responsible for:  (i) having the crude oil loaded onto railcars at a North Dakota facility; (ii) shipping such oil by train to a transloading facility; and (iii) ensuring that the oil was transloaded from railcars to a barge on the Delaware River that would carry the crude oil to Monroe's refinery.  To commence this process, Bridger Marketing, pursuant to the

Monroe COSA, purchased the crude oil in North Dakota that Bridger Logistics then transported by rail to the Philadelphia region.

66.     To transfer the Bakken oil shipped by rail to barges necessary to deliver such oil downriver to Monroe's Trainer, Pennsylvania refinery, Bridger's subsidiary BTS negotiated the RFSA, an exclusive agreement for the use of a rail and maritime facility operated by ERC. Relying upon Bridger's long-term contract with Monroe, ERC agreed to construct (at a cost of approximately $170 million) and operate a rail facility to transfer crude oil from railcars to river barges.  Therein, BTS agreed, *inter alia*, to (i) a minimum volume commitment of seven (7) trains per week with a minimum capacity of 65,000 barrels of oil per train (equivalent of 64,750 barrels of crude oil per day) each month from the facility's completion until June 2019 and (ii) a deficiency charge should monthly volumes fall short of the minimum volume commitment. Bridger, as BTS' parent, provided funds to BTS to make payments to ERC under the RFSA.

67.     Depicted in the attached Exhibit H are the primary steps required for Bridger Logistics to perform under the Monroe contracts (Monroe COSA and Monroe TLA), such that Ferrellgas could earn revenues.

68.     Bridger Logistics' assets in support of the Monroe TLA included 1,394 railcars, used exclusively to transport Bakken crude oil for ultimate delivery to the Monroe refinery.

69.     CFE1 explained that Bridger Logistics' Monroe business was run by Defendant Rios and Bridger Logistics' Vice President of Rail and Maritime.  CFE1 further stated that Defendant Rios and Gamboa travelled regularly (at a minimum, bi-weekly) to Ferrellgas' Kansas City, Missouri headquarters to meet with Defendant Wambold.  This was common knowledge among Bridger Logistics employees because the Bridger Logistics office was small and employees communicated regularly.

70.     In addition to the crude-by-rail transportation services, Bridger Logistics also operated crude oil trucking services.  CFE1 described Bridger Logistics' trucking business as central to the company's operations.  While the Monroe business was a "big deal" because it represented the first time that oil was being moved from North Dakota to Pennsylvania by rail, CFE1 believes that Bridger Logistics' trucking operations were also an important component of Bridger Logistics' overall business.  CFE1 explained that at the time of the Bridger Acquisition, Bridger Logistics' trucking business was supported by two main customers–Shell and Occidental, which was the largest oil producer in the Permian Basin.

71.     CFE2 worked as an operations manager for Bridger Logistics before and during much of the Class Period.  CFE2 was responsible for managing operations on Bridger Logistics' trucking contracts.  CFE2 reported to Vice President of Trucking, Dan Smith ("Smith") who CFE2 believed reported directly to Defendant Rios.  CFE2 likewise stressed the importance to Bridger Logistics of its trucking business.  CFE2 confirmed that Bridger Logistics' two main trucking customers were Shell and Occidental.

72.     According to public records, the contract with Occidental, executed on June 20, 2014, was an "acreage dedication" contract—an agreement in which the crude oil producer agrees to use the transportation provider, in this case Bridger Logistics, to transport the crude oil produced from a specified acreage of land within the Permian Basin in Texas/New Mexico.  Pursuant to the contract with Occidental, Bridger Logistics provided trucking services for the crude oil marketing business of Occidental, and as part of that agreement, Bridger Logistics acquired Occidental's "tractors and trailers that are currently serving the Permian Basin." Bridger Logistics' contract with Occidental was to run four years, until 2018.

73.     On June 1, 2015, Ferrellgas issued a press release (the "June 1, 2015 Press Release") announcing that it had entered into a "definitive purchase and sale agreement to acquire Bridger Logistics, LLC," which the Company represented, was "a fast-growing crude logistics provider with a strategic portfolio of mid-stream assets."   Ferrellgas would acquire Bridger Logistics for $837.5 million—a purchase price funded by the combination of a 11.2 million of the Company's Units (worth about $275 million) issued directly to the sellers (which included Bridger, LLC's co-owners Rios, Gamboa, and Ballengee), and $562.5 million in cash funded through a public offering of 6,325,000 FGP Units (which would raise $145.5 million), and $400 million in borrowings from the Company's revolving credit facility.

74.     In announcing the Bridger Acquisition, Defendants represented that its new midstream crude oil logistics segment, Bridger Logistics, was projected to generate $100 million EBITDA for the next twelve months ("NTM"), which was expected to offset the debt that Ferrellgas would assume in financing the transaction.   Moreover, the Company informed investors that Bridger, LLC's "core executive team" would join Ferrellgas and would operate the acquired Bridger entity as a standalone division.   This core team included Rios (former CEO of Bridger, LLC) and Gamboa (former COO of Bridger, LLC).   Rios and Gamboa realized at least $27.1 million and $13.6 million, respectively, from the Bridger Acquisition (based on the price of the FGP Units each received as of the date on which the Bridger Acquisition closed).

75.     On June 1, 2015, Ferrellgas' management team, along with Rios and Gamboa, held a conference call (the "June 1, 2015 Conference Call") to discuss the Bridger Acquisition. Rios explained on the call that both he and Gamboa had already signed employment agreements with the Company, and each would be "taking a significant portion of stock in Ferrellgas" as part of the Bridger Acquisition.

76.     During the June 1, 2015 Conference Call, Wambold touted the Bridger Acquisition: "[q]uite frankly, this is the deal we have been looking for since day one.  We're very pleased with this acquisition."  Bridger Logistics was a platform midstream acquisition and was a "large step forward in our plans to strategically diversify our revenues."  Bridger Logistics' revenue streams were described to be "[h]ighly contracted fee-based cash flow" with "substantially all" of the cash flow fee-based that would be "*a dramatic improvement to the [Ferrellgas] growth profile*."

77.     In addition to promoting the putative diversification benefits that Bridger Logistics would provide, Defendants also revealed that Ferrellgas would increase its annual distribution to FGP Unit holders by $0.05 per Unit—the first distribution increase since the Company's 1994 initial public offering.  Analysts reacted favorably.  For example, JPMorgan upgraded Ferrellgas after the announcement of the Bridger Acquisition because "we see a more balanced risk/reward proposition at [Ferrellgas] as the deal diversifies the partnership and could provide a platform for continued distribution growth."

78.     In the June 1, 2015 Press Release and during the June 1, 2015 Conference Call, Ferrellgas also provided its investors with a set of slides discussing Bridger Logistics' business. Among other things, Ferrellgas told investors that the Bridger Acquisition was projected to generate $100 million NTM EBITDA.  Ferrellgas' slide presentation concluded with seven key takeaways, including that the Bridger Acquisition would provide "*increased distributions for unit holders*."

79.     The slide presentation also identified Bridger Logistics' portfolio of midstream crude oil transportation assets:  (i) trucks; (ii) pipeline terminals; (iii) pipeline; (iv) rail; and (v) maritime.  *See* attached Exhibit I.

27

80.     The slide presentation further broke down the estimated NTM EBITDA from the Bridger Acquisition, with the rail and trucking lines responsible for 80% of the NTM EBITDA from Bridger's operations.   Specifically, Bridger's trucking contracts represented 30% of the expected NTM EBITDA (or $30 million), and the Monroe TLA represented 50% of Bridger Logistics' overall expected NTM EBITDA (or $50 million).   As alleged below, until it was effectively abandoned, the Monroe TLA was responsible for the greatest percentage of Bridger Logistics' estimated and actual addition to Ferrellgas EBITDA.   *See* attached Exhibit J.

81.     The Bridger Acquisition, however, would split Bridger, LLC because Ferrellgas only acquired the Bridger Logistics side of the business.   Bridger, LLC co-founder Ballengee retained ownership of Bridger, LLC and Bridger Marketing following the Bridger Acquisition, renaming them Jamex, LLC and Jamex Marketing, respectively.   Also, in connection with the Bridger Acquisition, Ballengee received a 9.5% ownership of Ferrellgas.   Thus, after the Bridger Acquisition closed, Jamex, LLC and its subsidiary Jamex Marketing were both related parties to Ferrellgas (as the Company confirmed, *inter alia*, in its FY15 Form 10-K filed with the SEC on September 29, 2015).   At the same time, both Jamex and Ferrellgas were financially dependent on the Monroe contracts (Monroe COSA and Monroe TLA), both of which were amended to reflect the ownership change.

82.     Thereafter, Jamex Marketing was responsible for the acquisition and sale of Bakken crude oil to Monroe pursuant to the Monroe COSA.   In addition, Jamex Marketing and Bridger Logistics entered into a ten-year take-or-pay transportation and logistics agreement (the "Jamex TLA") where Ferrellgas (through its Bridger Logistics segment) would be the exclusive provider of crude oil logistics services to Jamex Marketing to support Jamex Marketing's obligations under its Monroe COSA.

83.     The Monroe TLA contained a minimum volume and payment obligation from Monroe to Bridger Logistics for delivery of 65,000 barrels per day. However, in any month which Bridger Logistics provided less than an average of 35,000 barrels per day, Monroe's obligation would be suspended and Jamex Marketing would be responsible for volume deficiency payments to Bridger Logistics.  Upon the Bridger Acquisition, Jamex Marketing became ultimately responsible for the purchase of oil that Bridger Logistics would transport to Monroe. Because Bridger Logistics relied on Jamex Marketing to meet Bridger Logistics' minimum volume commitment to Monroe, the terms of the Jamex TLA provided that if Jamex Marketing provided less than 35,000 barrels per day to Bridger Logistics for transport and delivery to Monroe, Jamex Marketing would become responsible for Monroe's volume deficiency payments to Bridger Logistics.  In order to continue to facilitate the Monroe COSA, the Monroe TLA and the Jamex TLA, Ferrellgas' BTS subsidiary continued to have access to ERC's transloading facility in Eddystone, Pennsylvania pursuant to its RFSA with ERC. Likewise, BTS (and Ferrellgas) remained responsible for any volume deficiency payments to Eddystone if BTS failed to deliver the minimum volume of crude.

## V.     DEFENDANTS' SCHEME

84.     The prosperity of Ferrellgas' foray into midstream crude oil logistics depended upon the success of Bridger Logistics' contracts to transport crude oil, particularly the Monroe TLA, and the contracts supporting the Company's trucking business with Shell and Occidental. Although, these deals began to sour almost immediately after the Bridger Acquisition, Defendants not only concealed the adverse facts from investors, but also misrepresented the facts on the ground.  As alleged below, Defendants misled FGP Unit purchasers concerning, among other things:  (i) the benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the

integration of the Bridger entities into Ferrellgas' business; (iv) the performance of the parties to the Monroe TLA and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck transportation of crude oil to Ferrellgas customers.

### A.    Bridger's Success Depended Upon Its "Take-Or-Pay" Contracts

85.    Prior to and during the Class Period, the financial health of Bridger Logistics' midstream operations was directly tied to the success of its purported take-or-pay contracts, primarily those with Monroe and those pursuant to which Bridger Logistics transported crude oil by truck.  Accordingly, Ferrellgas attributed virtually the entire value of the Bridger Acquisition to these contracts, stating in its June 1, 2015 Form 8-K and Press Release, as well as during its June 1, 2015 Conference Call, that long-term take-or-pay contracts, such as the Monroe TLA, accounted for "60% of [Bridger's] EBITDA," and "it is likely that Bridger's largest revenue-generating contract will be its contract with Monroe Energy."   Ferrellgas further explained during the June 1, 2015 Conference Call that Bridger Logistics' rail business—which was exclusively dedicated to serve the Monroe TLA—accounted for 50% of Bridger's estimated NTM EBITDA.

86.    Further, during the June 1, 2015 Conference Call, the Company produced a slide presentation representing, among other things, "Select Contractual Relationships with Key Counterparties Underscore Bridger Value Proposition."  The Company further represented that a key Bridger Logistics trucking contract was worth "30% of estimated NTM EBITDA by business line," and was with the "largest oil producer in the Permian Basin," which was Occidental.  Based upon these arrangements, Rios represented, "[w]e are one of the largest for-hire crude oil carriers in the United States."

87.     On the June 1, 2015 Conference Call, Defendants also directed investors to the Monroe TLA as the cornerstone of Bridger Logistics' business.  In this regard, Rios represented that 100% of Bridger Logistics' rail business—all 1,394 rail cars—were dedicated to supporting the Monroe TLA.

88.     Thus, Defendants informed Class members that Bridger Logistics' contracts with Occidental and Monroe Energy accounted for approximately 80% of Bridger's EBITDA.

89.     Concerning the Monroe TLA, Defendants explained during the June 1, 2015 Conference Call that Bridger's railcars were used to supply crude oil from the Bakken fields to a "Major East Coast" refinery in the Philadelphia, Pennsylvania region by way of rail facilities in North Dakota and Eddystone, Pennsylvania.  Ferrellgas' management touted that the rail operations were supported by "long-term take-or-pay" contracts to transport 65,000 barrels per day of Bakken crude to the refinery.  The "value chain" is shown in the attached Exhibit K.

90.     During the June 1, 2015 Conference Call, Defendant Wambold introduced Rios and Gamboa:  "This is a wonderful management team with over 80 years of collective mid-stream experience, and we are very excited to have Julio Rios, Jeremy Gamboa, and the rest of the Bridger employees join the organization."  With that introduction, Defendant Wambold turned the presentation over to Defendant Rios to explain Bridger Logistics' business and assets. Defendant Rios, who already had signed an employment agreement with Ferrellgas, was asked by *Height* Analyst James Schampel to identify the "chief risks" to Bridger Logistics' business going forward.  In response, Rios claimed that Bridger had "contracted with our customers to mitigate that risk under long-term agreements", and assured investors that "***it's difficult for me to tell you what our risk could be, because I've contracted all my risk away***."  Neither Wambold nor anyone else at Ferrellgas corrected this statement.

31

91.     As alleged herein, throughout the Class Period, Defendants consistently impressed upon investors the importance of the Monroe TLA.  For example, in the Company's FY15 Form 10-K filed with the SEC on September 29, 2015, Defendants claimed that "Bridger's *largest customer contract* is with a refinery pursuant to which it transports crude oil via rail and barge from the Bakken region to Pennsylvania."  Moreover, in the Company's 1Q16 Form 10-Q filed with the SEC on December 9, 2015, Defendants represented, "Bridger Logistics has a transportation and logistics agreement with its *largest revenue customer* pursuant to which it transports crude oil via rail and barge from the Bakken region to the customer's Trainer refinery in Pennsylvania."  Defendants made similar representations in the Company's 2Q16 and 3Q16 Forms 10-Q, filed with the SEC on March 10, 2016 and June 8, 2016, respectively.

92.     In repeatedly making these representations regarding the centrality of the Monroe TLA to the success of Ferrellgas' midstream operations, Defendants concealed the vulnerability of Ferrellgas' continued ability to earn revenues under the Monroe TLA.  Specifically, the economics of transporting Bakken crude oil by rail from North Dakota to Monroe's refinery in Trainer, Pennsylvania depended directly upon the persistence of a favorable differential in the price of Bakken crude oil relative to the price of imported oil.  Namely, the price difference between then lower-priced Bakken crude and then higher-priced foreign crude oil would have to remain great enough to enable the contracting parties to continue to profit from the arrangement. The price differential of Bakken-sourced crude oil to that of imported crude oil is reflected in the West Texas Intermediate to Brent ("WTI-Brent") spread.  When the WTI-Brent spread is large, there is an economic incentive to purchase Bakken crude oil transported by rail to East Coast refineries.  When the WTI-Brent spread is small (or negative) the relatively high cost of rail

transport strongly favors sourcing oil from overseas suppliers that is delivered by tanker to the refineries.

93.     Further, unbeknownst to investors, Ferrellgas' midstream operations' "largest revenue-generating contract" was tenuous because Monroe could suspend the contract any time that deliveries to Monroe's refinery dropped below an average of 35,000 barrels per day. Accordingly, the entire fate of Ferrellgas' midstream rail business—comprising at least 50% of the midstream operations' EBITDA, and the key value component of the Bridger Acquisition— depended upon the parties' continued ability to earn a profit on the spread between the price of Bakken crude and foreign-sourced crude oil.   Thus, contrary to Defendants' repeated representations during the Class Period that Bridger Logistics was insulated from changes in commodity prices, the entire value of the Monroe TLA to Ferrellgas depended wholly upon oil prices.

94.     Despite this fact, throughout the Class Period, Defendants publicly attributed the Company's "enhanced growth trajectory" to the *stability* of Bridger Logistics' take-or-pay contracts which they described as "Bridger's highly contracted, fee-based cash flows."   In fact, Defendant Rios repeatedly touted the stability of this take-or-pay contract scheme, claiming "while a number of organizations in the midstream sector might have exposure to the variations in the market, ***Bridger's contract coverage and the strategic location of our operations result in a business that performs well throughout the commodity price cycles***."   Additionally, Rios stated, "[w]e have contracted with our customers to mitigate that risk under long-term agreements.   It's difficult for me to tell you what our risk could be, because ***I've contracted all of my risk away***."   Continually, Wambold reinforced this view, indicating to investors that the

"durability" of the take-or-pay contracts kept Bridger Logistics insulated from commodity price fluctuations.

95.     The Company's repeated representations that Bridger Logistics' business was insulated from commodity price risk falsely assured investors that Ferrellgas was well positioned to thrive, regardless of oil price changes.  Defendants concealed that the success of Ferrellgas' midstream operations depended upon Monroe maintaining its demand for Bakken crude oil, and that Ferrellgas' contracts to purchase and transload the oil with third parties and affiliates were not only susceptible to market risk, but began to feel the pressure of oil price fluctuation no later than during the fall of 2015.

### B.     Bridger's Contract with Monroe Unravels

96.     Starting in the summer of 2015 and continuing through early December 2015, global crude oil prices changed, narrowing the spread between the price of Bakken crude and foreign-sourced oil, such that Bakken crude was no longer economically favorable for East Coast refineries like Monroe.  Indeed, unknown to FGP Unit investors, Monroe was already purchasing large amounts of imported Nigerian crude by the end of 2015.  As a result, Monroe's demand for Bakken crude oil provided by Bridger (and Jamex Marketing) under the Monroe TLA (and Monroe COSA) substantially decreased without any repercussions to Monroe under its contracts. Consequently, Jamex Marketing, which under the Monroe COSA contracted to purchase set amounts of oil for Ferrellgas to deliver under the Monroe TLA, was forced to purchase less than the requisite minimum volume requirements of crude oil, triggering Jamex Marketing's responsibility to pay large and virtually insurmountable deficiency payments to Bridger Logistics under the Jamex TLA.  By the fall of 2015, Jamex Marketing was so financially strained that it was unable to secure financing that it needed to meet its payment obligations to Bridger Logistics under the Jamex TLA.  Under the terms of the take-or-pay contracts, if Jamex

Marketing defaulted, Ferrellgas would still have to pay BTS' obligations for the reserved capacity of the Eddystone terminal, despite the fact that there was no oil being brought in.

97. By early January 2016, Monroe—with an excess of less expensive imported crude readily available for delivery by tanker—was receptive to Jamex Marketing's and Ferrellgas' plea to terminate performance on their respective Monroe agreements. Similarly, Ferrellgas recognized that Jamex Marketing could not survive much longer if it were to supply Bakken crude at a loss to Monroe or if it had to make continued volume deficiency payments to Ferrellgas' Bridger Logistics subsidiary pursuant to the Jamex TLA. By no later than January 13, 2016, Monroe, Jamex Marketing, and Bridger Logistics (and its BTS subsidiary) were no longer willing or able to meet their respective minimum volume commitments, nor willing or able to make the minimum payments on their obligations. None of these material facts was disclosed to investors.

98. Documents that became publicly available after the end of the Class Period reflect that, as of the end of January 2016, Ferrellgas, Monroe, and Jamex ceased performing under their respective contracts with each other, and not a single drop of crude oil was thereafter purchased, transported, or transloaded from the Bakken region to Monroe's refinery in Trainer, Pennsylvania under the Monroe COSA and Monroe TLA. In fact, volume deficiency payments that BTS owed to ERC totaled $493,134.38 for January 2016 and $3,338,639.50 for February 2016, which represented BTS' total minimum volume commitment under the Monroe TLA and the RFSA for February 2016. Accordingly, Defendants covertly developed a plan to wind down the exposure to Jamex Marketing and to strip BTS of its assets.

99. In mid-January 2016, Bridger Logistics modified its agreements with Jamex Marketing and Monroe to allow them to dissolve their previous arrangements. On January 13,

35

2016, Jamex Marketing, Monroe, and Bridger Logistics entered into a series of letter agreements, including: (i) the "Amendment to Transportation and Logistics Services Agreement Letter Agreement by and between Bridger Logistics, LLC and Monroe Energy, LLC"; and (ii) the "Amended and Restated Crude Oil Supply Agreement Letter Agreement by and between Jamex Marketing, LLC and Monroe Energy, LLC" to suspend their arrangements for the purchase, sale, and transportation of crude oil (the "January 2016 Side Letters"). Defendant Rios directly participated in the January 2016 Side Letters.

100.    CFE3, a former senior manager for Bridger Logistics before and during a portion of the Class Period who was responsible for commercial operations involving the transport of oil for Monroe by rail from North Dakota to Pennsylvania, confirms the aforementioned publically-available facts. CFE3 worked in Bridger Logistics' headquarters in Carrolton, Texas and reported to Daniel Giannini ("Giannini"), the current President of Bridger Logistics, who, in turn, reported directly to Defendant Rios. CFE3 stated that trains delivering crude oil to Eddystone stopped running in January 2016. CFE3 attributes the stoppage to a combination of factors, including that: (i) the declining price of oil meant that the profits for Jamex Marketing and Bridger Logistics to source and transport the oil to Monroe were diminishing; and (ii) Monroe was able to source oil cheaper from another provider. CFE3 recalls a meeting at Bridger Logistics headquarters in the beginning of 2016 with Defendant Rios and likely Giannini wherein Rios gave the order to "park the trains." After this point, Ferrellgas' trains no longer delivered oil to Monroe. CFE3 believes that those trains are "still parked."

101.    CFE2 likewise stated that the price of oil declined rapidly after the Bridger Acquisition and began having a negative impact on Bridger Logistics' performance (trucking and

rail) in the Fall 2015, or possibly late fall, timeframe.  CFE2 also confirmed that the rail cars used to transport the crude oil to Monroe gradually began to idle as the value of oil declined.

102.    CFE1 also stated that Bridger Logistics' business began to falter just months after the Bridger Acquisition when oil prices rapidly declined.

103.    Despite the materiality of these issues to investors in FGP Units, Defendants failed to disclose any of these developments that struck at the heart of the Company's midstream operations.

104.    Further, Defendants recognized that without revenue from the Jamex TLA, the Company would still be responsible for Bridger Logistics' and BTS' obligations for the matching transloading capacity at the Eddystone facility.  Accordingly, Defendants attempted to limit their exposure by creating a plan to avoid paying the volume deficiency payments to ERC under the RFSA.  As part of the January 2016 Side Letters, Ferrellgas' Bridger Logistics subsidiary transferred all of BTS' assets to other Ferrellgas entities, rendering BTS an empty shell.  No longer having any valuable assets, on February 1, 2016, Ferrellgas secretly sold BTS to Ballengee's Jamex, a related party, for the astounding price of **only ten dollars**, and Ballengee renamed the worthless entity "Jamex Transfer Services."  Defendant Rios, in court filings, has now admitted that he directly participated in this secret sale.  In those same papers, Defendant Rios states that "any decision to transfer BTS to other  . . . entities was outside of Rios' authorized and delegated decision making authority."  As such, on information and belief, the decision to secretly transfer BTS was made by Rios' only superior, Defendant Wambold.

105.    Thereafter, because Jamex Marketing was unable to meet its own obligations, it also lacked the ability to continue to make the required payments to ERC, and Jamex Transfer Services defaulted on the RFSA with ERC.  Even though BTS was the key to Bridger Logistics

effectuating performance on the Monroe TLA, Ferrellgas never disclosed to investors that BTS was stripped of its worth and sold to a related party for a mere $10 in order for the Company to avoid paying its obligations to ERC.

106.    With Bridger Logistics' rail and trucking businesses failing at the beginning of 2016, the financial impact was devastating to Ferrellgas' business, rendering the $837.5 million Bridger Acquisition more detrimental than beneficial.   Despite the enormity of these issues, Defendants knowingly and/or recklessly concealed numerous material facts from FGP Unit investors, including:   (i) the substantial decline in Ferrellgas' midstream operations' trucking business; (ii) Ferrellgas' sale of BTS to a related party for $10.00; and (iii) the January 2016 Side Letters pursuant to which Ferrellgas suspended the Monroe TLA and Jamex Marketing suspended the Monroe COSA.   Together, the rail and trucking businesses represented nearly 80% of the EBITDA that Defendants told investors Ferrellgas would derive from its midstream operations.   Rather than reveal the truth, Defendants made material misrepresentations and omissions that concealed that Ferrellgas' rail and trucking midstream operations were essentially dead, burdening the Company with substantial debt and putting FGP Unit investors' cash distributions at risk.

### C.    Bridger's Truck Transportation of Crude Oil Declines

107.    According to CFE1 and CFE2, Bridger Logistics' trucking business served two main customers—Shell and Occidental.   According to the Company, at the time of the Bridger Acquisition, crude oil trucking accounted, accounting for 30% of Bridger's NTM EBITDA. However, unbeknownst to investors, shortly after the Bridger Acquisition, the trucking business with Shell began a steady decline.   CFE1 states that at the high point (sometime in 2014), Bridger Logistics' relationship with Shell represented approximately seventy percent of Bridger Logistics' trucking division.   By the time of the Bridger Acquisition, however, that business had

waned to forty or fifty percent of Bridger Logistics' trucking business. Then, by August or September 2015, Bridger Logistics' trucking business with Shell began a steady decline and continued to decline month after month thereafter. CFE1 recalls that during this time, Bridger Logistics first lost Shell's East Texas business and then lost Shell's West Texas business. CFE2 adds that Bridger Logistics lost Shell's West Texas business by April or May 2016.

108.    Among other factors, CFE1 and CFE2 attribute the loss of the Shell business to the declining price of crude oil at the time. Rather than informing investors of the continuing loss to Bridger Logistics' trucking business, in December 2015, Ferrellgas instead attempted to revive its truck transportation of crude oil by acquiring for $10.7 million the crude oil trucking assets of South C&C Trucking, a trucking company with contracts that served Shell. CFE1 and CFE2 both state their belief that the Company acquired South C&C Trucking in late 2015 in an effort to save Bridger Logistics' declining Shell business. This desperate attempt to save the Shell business failed. The contracts between South C&C Trucking and Shell expired in early 2016, and Shell did not renew them. Accordingly, Bridger Logistics was essentially cut out of Shell's crude logistics business, but investors in FGP Units were never informed.

109.    The decline in oil prices in the summer and fall of 2015 likewise affected Bridger Logistics' trucking business with Occidental. CFE1 and CFE2 recall that as the price of oil declined, overall trucking volume decreased and Bridger Logistics was forced to make rate concessions to customers such as Occidental.

110.    Further, the overall decline to Bridger's trucking business was reflected internally, not just in the loss of the Shell business, but also in the dramatic decline of Ferrellgas' midstream operations' trucking activity. According to CFE1, at the time of the Bridger Acquisition, Bridger Logistics utilized approximately 600 contracted truck drivers. By August 2015, that number

dwindled to roughly 350, and further dropped to about 300 by January 2016—nearly half the number of truck drivers at the time of the Bridger Acquisition.

111.    By mid-2015, Defendants were well aware of the dramatic declines in Bridger's trucking business.  CFE1 states that although the Bridger Logistics trucking business was run by Smith and Gamboa, "everything went through Julio," meaning that Rios was the one who ultimately said "yes or no" on matters of importance at Bridger Logistics.  According to CFE1, shortly after the Bridger Acquisition, Wambold received weekly trucking operation status reports from Rios' business development team at Bridger Logistics.  CFE1 recalls that:  (i) the business development team compiled data each day on trucking operations and prepared weekly trucking reports; (ii) CFE1 provided information to the business development team in connection with these weekly trucking reports; and (iii) these weekly reports were submitted to Defendant Wambold.  Despite this knowledge, Defendants concealed the deterioration of the trucking business from investors.

### D.    Defendants Falsely Affirm Bridger's Success

112.    On March 10, 2016, Ferrellgas announced the Company's 2Q16 performance to its investors.  In Ferrellgas' press release filed with the SEC on Form 8-K, its 2Q16 Form 10-Q, and during its conference call with analysts and investors conducted the same day (the "March 10, 2016 Conference Call"), the Company failed to disclose the effective dissolution of the Monroe TLA—the midstream operations segment's largest revenue-generating contract.  Instead Defendants portrayed the opposite.  For example, during the March 10, 2016 Conference Call, Wambold indicated that, despite the pressures the business would generally face, such as weather-related uncertainties and commodity price changes, the Company's midstream operations would thrive.  In this regard, Wambold stated, "[w]ith best-in-class capabilities and durable long-term take-or-pay contracts with blue-chip customers, ***our midstream operations are***

*not dependent on commodity prices*."  Despite the fact that the highly-touted Monroe TLA was no longer generating *any* revenue whatsoever, Rios continued to praise the contract, telling investors "[t]he long-term nature of our agreements, the **stable and consistent revenue** generated by our take-or-pay contracts, and the quality of our key customers **make Bridger uniquely durable and valuable**."

113.    As a result of Defendants' materially false statements and omissions, analysts remained optimistic about Bridger's contributions to the Company.  For example, on March 22, 2016, UBS issued a report stating that "steady contributions from FGP's recently acquired midstream assets helped offset the weakness.  **The Bridger assets remain on track to generate roughly $100MM in Adj. EBITDA in FY16**."

### E.    Defendants Falsely Assure Investors That the Monroe COSA and Monroe TLA Are Still in Place

114.    On June 8, 2016, the Company announced its financial results for its 3Q16, ended April 30, 2016, by filing a Form 10-Q and Form 8-K with the SEC.  In the 3Q16 Form 10-Q, Defendants partially disclosed certain negative issues affecting the Monroe TLA and Monroe COSA, while continuing to conceal the complete truth.  Namely, rather than disclose that (i) Jamex Marketing had ceased performance under the Monroe COSA and (ii) Bridger Logistics had ceased performance under the Monroe TLA nearly five months earlier, the Company stated in its Form 10-Q that "Ferrellgas believes Jamex **may not** have financial resources sufficient to satisfy its payment obligations to Ferrellgas through June 2019, the remaining term of this [Jamex TLA] agreement…. Ferrellgas also believes Jamex **may not** be able to fulfill its crude oil volume commitments to Ferrellgas' customer [Monroe] throughout the remaining term of this agreement, which could cause a termination of the transportation and logistics agreement with that customer."  Further, despite knowing that all parties ceased performing under the Monroe

contracts (Monroe COSA and Monroe TLA) as of February 1, 2016, the Company stated, "Ferrellgas concluded that there was no impairment of the Midstream operations – crude oil logistics reporting unit as of April 30, 2016."

115.    On June 8, 2016, Ferrellgas conducted a conference call with analysts and investors (the "June 8, 2016 Conference Call"), during which Defendants continued to conceal that the Monroe TLA was effectively worthless.  Even though Jamex, Monroe, and Ferrellgas agreed in mid-January 2016 to cease performance under the Monroe contracts (Monroe COSA and Monroe TLA), and *not a single barrel of crude oil had been shipped from North Dakota to Pennsylvania in accordance with those contracts since that date*, Rios repeatedly assured investors that the Company was "continuing to operate within the confines of our contractual arrangements."  Further, having been personally involved in the January 2016 Side Letters to cease performance and knowing that no oil was being delivered at all, Rios misrepresented and concealed the truth:  "***[t]he volume of crude that we're delivering to them is something that is between us and Monroe***, ***but you can rest assured we are still operating within our contractual arrangements.***"  In response to a question from a Citigroup analyst, Rios reiterated, "if the volumes go down below 35,000 barrels a day at any point in time, that does not release Monroe from the contract . . . we are operating within our contractual arrangements with Monroe and with Jamex today, ***and both agreements are in effect.***"  Rios knowingly and/or recklessly misled investors by representing that Ferrellgas was continuing to transport crude oil and receive payment for those shipments in accordance with the Monroe TLA, even though Ferrellgas had stopped delivering oil pursuant to the Monroe TLA several months earlier at his direction.

## VI.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS

116.    As alleged below, during the Class Period, Defendants made a series of false or misleading statements and omissions of material fact concerning, among other things:  (i) the

benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the integration of the Bridger entities into Ferrellgas' business; (iv) the performance of the parties to the inter-related Monroe contracts (Monroe COSA and Monroe TLA) and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck transportation of crude oil to Ferrellgas customers.

### A.    June 1, 2015 Misrepresentations and Omissions

117.    On June 1, 2015, Defendants held a conference call to discuss the Company's 2Q15 financial results and the Bridger Acquisition.  In his remarks, Wambold stated, "[o]f course now we are announcing the acquisition of Bridger.  Quite frankly, this is the deal that we have been looking for since day one."  Wambold further claimed that the Bridger Acquisition, "is a large step forward in our plans to strategically diversify our revenues…[a]ll of this cash flow is fee-based…[i]t's again a dramatic improvement to the FGP growth profile."  Concerning Ferrellgas' EBITDA on a NTM basis, Wambold represented that "the next 12 months' guidance is $100 million" that Ferrellgas would derive from the Bridger Acquisition.

118.    Following Wambold's remarks, Rios stated, in relevant part:  "[Bridger] is a fully integrated logistics chain.  *We take no commodity risk*.  We don't take ownership of that barrel. We just move that barrel for either producer or our end-refinery customers.  *That insulates us from that commodity fluctuation."*

119.    *Height* analyst James Schampel pressed Rios, asking what the chief risks to the business were, to which Rios replied, in relevant part, "[w]e have contracted with our customers to mitigate that risk under long-term agreements.  *It's difficult for me to tell you what our risk could be, because I've contracted all my risk away*."

120.    The statements alleged above in ¶¶ 119, 120 were materially false or misleading because Defendants misrepresented or failed to disclose known or recklessly disregarded adverse information.  Indeed, Bridger Logistics was neither insulated from commodity price risk, nor was that risk contracted away.  Rather, both the Company's crude oil trucking operations and the Monroe TLA—Bridger Logistics's largest revenue-generating contract and a key reason for the Bridger Acquisition—were fully exposed to commodity price risk.  As for trucking, when the price of crude oil declined, so did crude oil production as well as Bridger Logistics' customers' demand for trucking that oil.  In fact, as explained by CFE1 and CFE2, when the crude oil prices began to decline in the summer and fall of 2015, Bridger Logistics' two largest trucking customers, Shell and Occidental, reduced their overall business and demanded rate concessions for the business that remained.  Regarding the Monroe TLA, the contract, in fact, did expose Bridger Logistics to commodity price risk as it permitted Monroe to suspend its performance if Bridger Logistics delivered less than an average of 35,000 barrels per day.  While knowing or recklessly disregarding that Monroe's continued demand for Bakken crude oil under the inter-related Monroe contracts (Monroe COSA and Monroe TLA) depended upon such oil remaining favorably priced relative to alternative crude oil from overseas, Defendants portrayed the Monroe contracts as essentially risk-free.  As Defendants' admitted on September 28, 2016, commodity price changes affecting the Monroe contracts led Defendants to disclose, among other things, that:  (i) Ferrellgas does not anticipate any material contribution to revenue or EBITDA from Jamex or Bridger Logistics' largest customer [Monroe] in the future; and (ii) the Company was forced to take a $628.8 million impairment charge from its midstream operations based upon "the termination of the Jamex TLA and the decline in our trucking operations ***as a***

*result of continued, sustained decline in crude oil prices and resulting decrease in crude oil production* in the regions in which we operate."

### B.      September 29, 2015 Misrepresentations and Omissions

121.    On September 29, 2015, Defendants reported Ferrellgas' FY2015 results in a Form 8-K and a Form 10-K filed with the SEC.  The same day, Defendants held a conference call with analysts and investors to discuss the Company's FY2015 results (the "September 29, 2015 Conference Call").  Concerning the Bridger Acquisition, Wambold represented that "[t]his transaction was a big step towards our goal of significantly diversifying beyond our traditional propane space.  Frankly, *it's been everything we hoped for from a financial and operational standpoint*, and a cultural one as well."  Rios similarly claimed that the integration of Bridger into Ferrellgas was "*smooth and seamless*."

122.    Wambold went on to announce Ferrellgas' FY16 adjusted EBITDA guidance of "$400 million to $420 million."  When questioned by a Barclays Capital analyst about whether the "$100 million run rate you referenced on the last call is a good assumption for Bridger?" Wambold responded, "I think the number I gave in guidance contains the answer."

123.    During the September 29, 2015 Conference Call, Rios represented that "while a number of organizations in the midstream sector might have exposure to the variations in the market, *Bridger's contract coverage and the strategic location of our operations result in a business that performs well throughout commodity price cycles*."

124.    When asked about crude price fluctuation, Rios responded, "*[o]ur business here at Bridger is relatively insulated from commodity prices*.  We're just a transportation business and we – just in the midstream space and it moves the barrel that needs to be moved from where it's produced to where it's needed."

125.    Additionally, Rios stated, "[c]ommodity prices don't really impact our business, and as previously stated, ***our contract coverage in operating areas insulates us from that commodity price risk***."

126.    The statements alleged above in ¶¶ 122, 124-126 were materially false or misleading because Defendants misrepresented or failed to disclose known or recklessly disregarded adverse information.  Indeed, Ferrellgas' midstream crude oil logistics segment, Bridger Logistics, was neither insulated from commodity price risk, nor was that risk contracted away.  As Defendants knew or recklessly disregarded, as of August-September 2015, crude oil pricing was negatively impacting the volume and pricing of Ferrellgas' trucking business generally and the Company's trucking business with Shell specifically had begun a sharp decline, such that the Bridger Acquisition was not fairly characterized by Ferrellgas as "everything we hoped for from a financial and operational standpoint," and the integration of Bridger Logistics into Ferrellgas had not been "smooth and seamless."  Moreover, the Monroe TLA—Bridger Logistics' largest revenue-generating contract and a key reason for the Bridger Acquisition—was fully exposed to commodity price risk, as it permitted Monroe to suspend its performance if Bridger Logistics delivered less than an average of 35,000 barrels per day.  While knowing or recklessly disregarding that Monroe's continued demand for Bakken crude oil under the inter-related Monroe contracts (Monroe COSA and Monroe TLA) depended upon such oil remaining favorable priced relative to alternative crude oil from overseas, Defendants portrayed the Monroe TLA as essentially risk-free.  As Defendants' admitted on September 28, 2016, commodity price changes affecting the Monroe contracts led Defendants to disclose, among other things, that:  (i) Ferrellgas does not anticipate any material contribution to revenue or EBITDA from Jamex Marketing or Bridger Logistics's largest customer [Monroe] in the future;

46

and (ii) the Company was forced to take a $628.8 million impairment charge from its midstream operations based upon "the termination of the Jamex TLA and the decline in our trucking operations *as a result of continued, sustained decline in crude oil prices and resulting decrease in crude oil production* in the regions in which we operate."

### C.    December 9, 2015 Misrepresentations and Omissions

127.    On December 9, 2015, Ferrellgas reported its 1Q16 financial results in a Form 8-K and in a Form 10-Q filed with the SEC.  The same day, the Company conducted a conference call with analysts and investors to discuss Ferrellgas' 1Q16 results (the "December 9, 2015 Conference Call").  In his remarks, Wambold stated, in relevant part,

> "As many of you know, for several years now, the Management team at Ferrellgas has been executing a strategy to diversify our revenues to better position the partnership for growth and success, *particularly given our position in the sometimes volatile commodities markets.*  We launched our long term midstream growth initiatives and *sought out best-in-class assets* to develop a platform for the future and then we found Bridger, a crude-focused portfolio of strategic midstream assets with *a top notch Management team*."

128.    Wambold went on to affirm Bridger's previous guidance, indicating, "[w]e continue to expect that Bridger will generate $100 million in adjusted EBITDA for the partnership in FY16 which gives us confidence in reaffirming our total Company adjusted EBITDA guidance of $400 to $420 million."

129.    In discussing Ferrellgas' midstream operations, Rios stated, "*[o]ne of the many reasons for our success is our fully integrated logistics-focused model which is not dependent on commodity prices.  This model has helped us navigate a lower crude price environment*."

130.    Rios also stated, "[w]e benefit from strong customer relationships and contractual agreements.  Substantially all of Bridger's EBITDA is fee based and supported by long-term take or pay agreements or acreage dedications."

131.    The statements alleged above in ¶¶ 130-131 were materially false or misleading because Defendants misrepresented or failed to disclose known or recklessly disregarded adverse information.  Indeed, Bridger Logistics' putative business model was not a reason for "success" in "navigating [the] lower price crude environment."  Nor was Ferrellgas' midstream operations "not dependent on commodity prices."  As Defendants knew or recklessly disregarded, as of August-September 2015, crude oil pricing was negatively impacting the volume and pricing of Ferrellgas' trucking business generally and the Company's trucking business with Shell specifically had begun a sharp decline, such that Bridger Logistics was not successfully navigating crude oil price changes, and its' "strong customer relationship[]" with Shell had disintegrated.  Moreover, the Monroe TLA—Bridger Logistics' largest revenue-generating contract and a key reason for the Bridger Acquisition—was fully exposed to commodity price risk, as it permitted Monroe to suspend its performance if Bridger Logistics delivered less than an average of 35,000 barrels per day.  While knowing or recklessly disregarding that Monroe's continued demand for Bakken crude oil under the inter-related Monroe contracts (Monroe COSA and Monroe TLA) depended upon such oil remaining favorably priced relative to alternative crude oil from overseas, Defendants portrayed the Monroe TLA as essentially risk-free.  As Defendants admitted on September 28, 2016, commodity price changes affecting the Monroe contracts led Defendants to disclose, among other things, that:  (i) Ferrellgas does not anticipate any material contribution to revenue or EBITDA from Jamex or Bridger's largest customer [Monroe] in the future; and (ii) the Company was forced to take a $628.8 million impairment charge from its midstream operations based upon "the termination of the Jamex TLA and the decline in our trucking operations *as a result of continued, sustained decline in crude oil prices and resulting decrease in crude oil production* in the regions in which we operate."

### D.      March 10, 2016 Misrepresentations and Omissions

132.     On March 10, 2016, the Company reported its 2Q16 financial results in a Form 8-K and in a Form 10-Q filed with the SEC.   In the Form 8-K, Wambold assured investors, "***Bridger continues to exceed our expectations*** and we are carefully controlling costs to help offset the challenging operating environment for our Propane and related equipment sales segment."

133.     Additionally, in the March 10, 2016 Form 8-K Wambold represented that "[w]e have ample financial flexibility to drive growth without accessing the capital markets, and we are confident that we have the pieces in place to create significant value for all Ferrellgas unitholders."

134.     The same day, the Company held a conference call with analysts and investors to discuss Ferrellgas' 2Q16 financial results (the "March 10, 2016 Conference Call"), during which Wambold stated, in relevant part,

> our strategy at Ferrellgas is centered on diversifying our revenues to help mitigate the pressure that this type of quarter historically created for our business.  Thanks to ***strong contributions from our Midstream operations***, ***that strategy worked beautifully***, as we were able to deliver a year-over-year increase in adjusted EBITDA.  We see this as ***clear proof that our diversification strategy has positioned us to deliver more consistent financial results and drive future growth.***

135.     During the March 10, 2016 Conference Call, Wambold further represented that: (i) "[w]ith best-in-class capabilities and ***durable long-term take-or-pay contacts*** with blue-chip customers, ***our midstream operations are not dependent on commodity prices***"; and (ii) ***"[w]e continue to navigate the lower crude pricing environment with success*** and expect to capitalize on opportunities created by these lower prices in the future.  Importantly, ***we continue to expect that Bridger will generate $100 million in adjusted EBITDA for the Partnership in FY16***."

136.    During the March 10, 2016 Conference Call, Rios likewise represented that "*we remain on track to deliver adjusted EBITDA in line with expectations for the full fiscal year.*" Moreover, Rios informed investors that "[s]ubstantially all of our EBITDA is fee-based and supported by long-term take or pay agreements, and our customer base comprises top-tier high-quality counterparties. *The long term nature of our agreements, the stable and consistent revenue generated by our take or pay contracts, and the quality of our key customers make Bridger uniquely durable and valuable.*"

137.    The statements alleged above in ¶¶ 133-137 were materially false or misleading because Defendants misrepresented or failed to disclose known or recklessly disregarded adverse information.   Contrary to Defendants' representations concerning the Company's midstream operations' putative insulation from commodity price changes, the key Monroe TLA and the related Jamex TLA had been suspended since mid-January and Ferrellgas had not delivered any oil under the Monroe TLA since then.   In fact, by early January 2016, Defendant Rios had ordered CFE3 and other employees at Bridger Logistics to "park the trains."   Accordingly, contrary to Defendants statements that the long-term take or pay contracts were "durable," "valuable" and "not dependent on commodity prices," changes in commodity prices caused Monroe's demand for Bakken crude under the Monroe contracts (Monroe COSA and Monroe TLA) to drop, resulting in Jamex's inability to fulfill its obligations to Bridger, which, in turn, caused the suspension of the Monroe contracts.   Thus, Defendants knew or recklessly disregarded that they lacked a reasonable basis for representing that Bridger remained "on track" to generate its expected $100 million in EBITDA.   Specifically, Defendants knew or recklessly disregarded that the "largest revenue generating contract" responsible for generating no less than 50% of Ferrellgas' midstream operations' EBITDA, was no longer generating *any* revenue for

the Company as of no later than February 1, 2016.  As for Bridger Logistics' trucking segment, Defendants knew or recklessly disregarded that as of August-September 2015, crude oil pricing was negatively impacting the volume and pricing of Ferrellgas' trucking business generally and that the Company's trucking business with Shell specifically continued its sharp decline and could not be revived by the Company's failed December 2015 acquisition of South C&C Trucking.   Indeed, as was clear in reports prepared shortly after the Bridger Acquisition by Defendant Rios' business development team and forwarded to Defendant Wambold on a weekly basis, Bridger Logistics' trucking segment declined significantly with the number of truck drivers utilized by Ferrellgas decreasing by 50% by January 2016 from the number utilized at the time of the Bridger Acquisition.   Further, Defendants' statements that Ferrellgas' midstream operations were insulated from commodity price changes were materially false or misleading when made because, as Defendants' admitted on September 28, 2016, commodity price changes affecting the Monroe TLA led Defendants to disclose, among other things, that:  (i) Ferrellgas does not anticipate any material contribution to revenue or EBITDA from Jamex or Bridger's largest customer [Monroe] in the future; and (ii) the Company was forced to take a $628.8 million impairment charge from its midstream operations based upon "the termination of the Jamex TLA and the decline in our trucking operations *as a result of continued, sustained decline in crude oil prices and resulting decrease in crude oil production* in the regions in which we operate."

### E.    The Previously Misrepresented and Concealed Truth Gradually Emerges

138.    On June 8, 2016, the Company reported its financial results for 3Q16, ended on April 30, 2016 by filing a Form 10-Q and Form 8-K with the SEC.  In its 3Q16 Form 10-Q, Ferrellgas disclosed, among other things, that Jamex Marketing, which was responsible for

51

payments to Ferrellgas and for sourcing crude oil volumes in connection with the Monroe contracts (Monroe COSA and Monroe TLA) (from which Ferrellgas reported that it earned approximately 60% of the midstream operations – crude oil logistics segment's gross margin) "may not have the financial resources sufficient to satisfy its payment obligations to Ferrellgas through June 2019, the remaining term of [the Monroe TLA]."  The Company further disclosed that "[i]f current market conditions persist," Jamex "may not be able to fulfill its crude oil volume sourcing commitments to [Monroe] throughout the remaining term of [the Monroe COSA]."  To address the risk that Jamex would be unable to satisfy its payment obligations in connection with the the Monroe contracts (Monroe COSA and Monroe TLA), Ferrellgas revealed that it was purportedly "negotiating alternative contractual arrangements."  Further, in the 3Q16 Form 10-Q the Company affirmed, "Ferrellgas concluded that there was no impairment of the Midstream operations – crude oil logistics reporting unit as of April 30, 2016."

139.    Despite the partial disclosure of previously misrepresented and concealed facts concerning Ferrellgas' midstream operations set forth in the 3Q16 Form 10-Q, Defendants continued to conceal adverse facts and to falsely assure investors as to the performance of the Company's midstream operations.  For example, in the June 8, 2016 Form 8-K, Defendant Wambold claimed that "***Bridger continues to perform well***."  Moreover, during a conference call with investors and analysts conducted on June 8, 2016 (the "June 8, 2016 Conference Call"), Defendant Wambold represented that "Bridger continues to perform well . . . .  ***Bridger is on pace and fulfilling our expectations of $100 million in adjusted EBITDA for the Partnership in FY16***, and we remain confident in the fully integrated Crude Oil Logistics-focused model."

140.    In response to analyst questions expressing concern over the status of the Monroe contracts (Monroe COSA and Monroe TLA), Defendant Rios provided the following false or

misleading assurances:  "*I want to pause and reiterate that our take-or-pay contracts with Monroe Energy and its supplier remain in place, as does our strong working relationship with them.*"  Similarly, in response to a question from RBC Capital Markets analyst T.J. Schultz as to whether Bridger was currently supplying crude volumes to the Trainer refinery under the Monroe TLA, Rios responded, "*[t]he volume of crude that we're delivering to them is something that is between us and Monroe, but you can rest assured that we are still operating within our contractual arrangements*."  When pressed on the issue of performance under the Monroe TLA by Citigroup analyst Nuraya Zak, Rios stated, "I'll reiterate . . . *we are operating within our contractual arrangements with Monroe and with Jamex today, and both agreements are in effect*."

141.    Echoing his prior statements during the Class Period, Rios claimed that Ferrellgas' acquisition of Bridger continued to benefit from a "*smooth transition and seamless integration*," and further contended that a key reason for Bridger Logistics' putative ongoing success was the insulation of its operations from commodity price fluctuations:  "*[o]ne of the many reasons for our success is our fully integrated logistics-focused model, which is significantly less dependent on commodity prices and continues to be a key differentiator for the broader Ferrellgas Partnership.  We are pleased this unique model has performed well in this challenging environment*."

142.    The statements alleged above in ¶¶ 139-142 were materially false or misleading because Defendants misrepresented or failed to disclose known or recklessly disregarded adverse information.  Contrary to Defendants assertions that they were still "operating within our contractual arrangements," and the contracts "are in effect," in reality, Defendants knew or were reckless in not knowing that the contracts had been amended in mid-January, resulting in all

parties suspending their performance thereunder.  In fact, by early January 2016, Defendant Rios had ordered CFE3 and other employees at Bridger Logistics to "park the trains" in furtherance of the secret amendments, including Ferrellgas' undisclosed agreement to cease performance under the Monroe TLA, such that there was no volume of oil being delivered to Monroe.  Additionally, contrary to Defendants' representation that "Jamex may not have financial resources sufficient to satisfy its payment obligations to Ferrellgas through June 2019," Defendants knew or recklessly disregarded that Jamex Marketing had failed to secure desperately needed financing by December 2015 and since then had been unable to make its minimum deficiency payments, and therefore *currently did not* have the financial resources to satisfy its payment obligations to the Company.  Further, Defendants' reassurances that Bridger Logistics continued to perform well in this "challenging environment" and was "on pace and fulfilling our expectations of $100 million in adjusted EBITDA for the Partnership in FY16" were materially false or misleading when made because Defendants knew or were reckless in disregarding that Ferrellgas had not delivered any oil by rail to Monroe since January 2016.  In fact, by early January 2016, Defendant Rios has ordered CFE3 and other employees at Bridger Logistics to "park the trains." Accordingly, Ferrellgas had not received revenues for oil deliveries under the Monroe TLA—the Company's "largest revenue-generating contract"—since mid-January 2016.  Further, contrary to Defendants statements that the long-term take or pay contracts were a "key differentiator" and "significantly less dependent on commodity prices," changes in commodity prices caused Monroe's demand for Bakken crude under the Monroe contracts (Monroe COSA and Monroe TLA) to drop, resulting in Jamex's inability to fulfill its obligations to Bridger Logistics, which, in turn, caused the suspension of the Monroe contracts.  As for Bridger Logistics' trucking segment, Defendants knew or recklessly disregarded that as of August-September 2015, crude oil

pricing was negatively impacting the volume and pricing of Ferrellgas' trucking business generally and that the Company's crude oil trucking business with Shell specifically continued its sharp decline and could not be revived by the Company's failed December 2015 acquisition of South C&C Trucking.  Indeed, as was clear in reports prepared by Defendant Rios' business development team shortly after the Bridger Acquisition and forwarded to Defendant Wambold on a weekly basis, Bridger Logistics' trucking segment declined significantly with the number of truck drivers utilized by Ferrellgas decreasing by 50% by January 2016.

143.    While Defendants' continuing material misstatements and omissions alleged above in ¶¶ 139-142 helped contain the decline in the price of FGP Units in response to the new information concerning Ferrellgas' midstream operations, the Monroe COSA, and the Monroe TLA, the price of FGP Units, nevertheless, dropped by $0.97 per unit, or 5.15%, from a closing price of $18.85 on June 7, 2016 to a closing price of $17.88 on June 8, 2016 on heavy trading volume.

144.    On September 2, 2016, Ferrellgas filed a Form 8-K with the SEC in which the Company announced that it had terminated the Jamex TLA as a result of concerns over whether Jamex Marketing could continue to fund its obligations thereunder.  According to the September 2, 2016 Form 8-K:

> On September 1, 2016, Bridger and the Partnership entered into a Termination, Settlement and Release Agreement (the "Termination Agreement") with Jamex (together with certain of its affiliates party to the agreement, the "Jamex Entities"), and James Ballengee (the owner of the Jamex Entities) pursuant to which:
>
> ****
>
> (6) The parties agreed to terminate the Jamex TLA and certain other commercial agreements and arrangements between them, and release any claims between or among them that may exist (other than those arising under the Termination

Agreement or the other agreements entered into in connection with the Termination Agreement)[.]

145.   On September 13, 2016, Citi issued an analyst report downgrading the Company from "neutral" to "sell" based upon the stress that Ferrellgas' foundering midstream business was placing on the Company's balance sheet.  In dropping its FGP Unit price target from $15.50 per unit to $14 per unit, Citi indicated that Ferrellgas may cut distributions to FGP Unit holders. In response to the new information concerning the negative impact of the Company's midstream operations on its balance sheet and on FGP Unit distributions, the price of FGP Units declined by $0.98 per unit, or 5.16%, from a closing price of $18.99 on September 12, 2016 to a closing price of $18.01 on September 13, 2016 on heavy trading volume.

146.   On September 15, 2016, RBC Capital Markets issued an analyst report downgrading the Company from Sector Perform to Underperform based upon the termination of the Jamex TLA and the lack of clarity on the Company's midstream business, particularly the Monroe TLA.  Among other things, RBC Capital Markets assumed in this report that the Monroe TLA would end, decreasing Ferrellgas' EBITDA by $60 million per year.  Without the Monroe TLA, the RBC Capital Markets analyst indicated that the Company's leverage would increase, causing Ferrellgas to reexamine its FGP Unit distribution amounts.  In lowering its price target from $17.00 per FGP Unit to $13.00 per FGP Unit, RBC Capital Markets estimated a 40% FGP Unit distribution cut, from $2.05 to $1.25 per FGP Unit per year.  In response to the new information concerning the negative impact of the Company's midstream operations on its balance sheet and on FGP Unit distributions set forth in the RBC Capital Markets report, the price of FGP Units declined by $0.84 per unit, or 4.61%, from a closing price of $18.24 on September 14, 2016 to a closing price of $17.40 on September 15, 2016 on heavy trading volume.

147.   On September 28, 2016, the Company announced its financial results for its 4Q16 and its full fiscal year 2016, ended July 31, 2016, by filing a Form 10-K and Form 8-K with the SEC.   In its FY16 Form 8-K, Ferrellgas disclosed, among other things, a net loss of $665.4 million, primarily consisting of "a one-time non-cash impairment charge of $628.8 million in our Midstream operations – Crude oil Logistics segment."

148.   Regarding the $628.8 million non-cash impairment charge in Ferrellgas' midstream operations, the FY16 Form 10-K disclosed new information concerning Jamex Marketing and the Monroe TLA, which was responsible for approximately 60% and 80% of Midstream Operations – Crude Oil Logistics segment (Bridger) gross margin and EBITDA, respectively, during FY16.   Among other things, the FY16 Form 10-K disclosed that the Company had not delivered a single barrel of oil under the Monroe TLA since February 2016 and that Ferrellgas had been unable to find another entity that would replace Jamex Marketing in sourcing the crude oil necessary for the Company to continue operating under the Monroe TLA. As a result, Ferrellgas disclosed that it no longer anticipated "any contribution to revenue or EBITDA" from the Monroe TLA.   The Company further revealed that the decline in crude oil prices "significantly impacted our trucking operations during the three months ended July 31, 2016."   For these reasons, the Company reported in the FY16 Form 10-K that it performed impairment testing, which resulted in asset impairment charges of $628.8 million.

149.   In its FY16 Form 10-K, the Company further reported that, primarily as a result of the negative developments in its midstream operations, as well as the debt that Ferrellgas assumed in financing the Bridger Acquisition, the Company's leverage ratio was 5.48x as of July 31, 2016.   The Company disclosed that it was implementing a strategy to reduce its debt to assure compliance with the leverage ratio requirements of its credit and securitization facilities

and that "[t]his strategy may include a reduction in our annual distribution [for FGP Units]," and further indicated that "our board believes it is possible that the annual distribution rate [for FGP units] may be reduced from $2.05 to approximately $1.00 per common unit."

150.    In the FY16 Form 10-K, the Company also revealed that as of September 27, 2016, Defendant Wambold had "resigned" as Chief Executive Officer, President, and Director of Ferrellgas, Inc.  Moreover, new Interim President and Chief Executive Officer, James Ferrell, admitted in the September 28, 2016 Form 8-K that "low oil prices have seriously damaged our midstream sector."

151.    During a conference call conducted with analysts and investors on September 28, 2016 (the "September 28, 2016 Conference Call"), Defendants confirmed that the $628.8 million impairment charge arose from testing conducted "[a]s a result of this decline in future cash flows [from the Monroe TLA], as well as sustained decline in crude oil prices and the resulting decrease in crude oil production in the regions in which we operate"—commodity price fluctuations as to which Ferrellgas had repeatedly claimed its midstream operations were insulated.

152.    In response to this new information, the price of FGP Units declined over the next two trading days by $4.73 per unit, or 28.67%, from a closing price of $16.50 on September 27, 2016 to a closing price of $11.77 on September 29, 2016 on heavy trading volume.

153.    Ferrellgas' September 28, 2016 disclosures surprised investors given the Company's previous affirmations that the Monroe TLA was still in place.  A September 28, 2016 analyst report issued by Janney Montgomery Scott LLC explained, "[w]e had previously expected early this month when the Jamex settlement was announced that the Monroe contract would remain and that FGP would just replace the source of supply and continue to perform

under the contract."   Simmons & Company also reported "the dramatic non-cash impairment charge is representative of how poor the foray into midstream has been for FGP."

154.    On October 3, 2016, S&P Global ratings issued a report downgrading the Company's corporate credit rating from B+ to B and its senior unsecured debt rating from B- to CCC+ based upon the $628.8 million impairment charge in the Company's midstream operations segment and the loss of future revenues and EBITDA from the Monroe TLA.   In response to this new information concerning the negative impact of the Company's midstream operations on its balance sheet and credit rating, the price of FGP Units declined by $0.98 per unit, or 8.42%, from a closing price of $11.64 on September 30, 2016 to a closing price of $10.66 on October 3, 2016 on heavy trading volume.

155.    On October 4, 2016, Moody's Investor Service downgraded the Company's credit rating from B1 to B2 and changed the outlook for the Company from stable to negative.   In issuing the rating downgrade, Moody's noted that it was based upon Ferrellgas' increased leverage resulting from the significant EBITDA loss in the midstream segment, particularly from the loss of the Monroe TLA.   Moody's further noted the change in outlook from stable to negative reflected Ferrellgas' "high leverage and weak midstream business prospects, and that a cut to the FGP Unit distribution amount would likely be required to enable the Company to reduce its debt.   In response to this new information concerning the negative impact of the Company's midstream operations on its balance sheet and credit rating, the price of FGP Units declined by $0.94 per unit, or 8.82%, from a closing price of $10.66 on October 3, 2016 to a closing price of $9.72 on October 4, 2016 on heavy trading volume.

156.    After the close of trading on October 24, 2016, Ferrellgas filed a Form 8-K with the SEC in which the Company stated that:  (i) Ferrellgas, Inc. had notified Rios and Gamboa

that they "should work independently of the Bridger employees on developing ideas for organic growth opportunities using existing Bridger assets while the Company conducts a broader review of Bridger's operations"; and (ii) in response, Rios and Gamboa had "both delivered notice of 'good reason' for resignation to the Company, alleging that the Company had materially diminished their responsibilities and stating their intention to resign if such purported material diminution is not cured within 30 days."   In response to this new information regarding the individuals that Defendants had promoted to investors as "a top notch management team" for Ferrellgas' midstream operations, the price of FGP Units declined by $0.50 per unit, or 4.76%, from a closing price of $10.50 on October 24, 2016 to a closing price of $10.00 on October 25, 2016 on heavy trading volume, thereby removing a portion of the artificial inflation in the price of FGP Units

157.   After the close of trading on November 22, 2016, the Company issued a press release entitled, "Ferrellgas Partners, L.P. Declares First Quarter 2017 Cash Distribution" (the November 22, 2016 Press Release").   In this press release, the Company announced "the declaration of its first quarter cash distribution of $0.10 ($0.40 annualized rate) per partnership common unit," and made clear that the dramatic reduction in FGP investors' distribution amounts, from $2.05 annually down to $0.40 annually, resulted from "headwinds in our midstream business primarily due to the loss of our largest customer [Monroe]."

158.   In response to the news that Ferrellgas was cutting its quarterly and annual distributions to FGP Unit holders by more than 80% as a result of the Company's failed midstream operations, price of FGP Units declined by $0.68 per unit, or 9.28%, from a closing price of $7.33 on November 22, 2016 to a closing price of $6.65 on November 23, 2016 on heavy trading volume.

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

159.    As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Ferrellgas and the Individual Defendants knew or recklessly disregarded that the statements identified above in Section VI were materially false or misleading when made.   Defendants Wambold and Rios were active, culpable, and primary participants in the fraudulent scheme.   In fact, as alleged above, even though the key contracts underlying the Company's midstream operations (Bridger Logistics) segment began to sour almost immediately after the Bridger Acquisition closed, Defendants engaged in a deliberate scheme to defraud Ferrellgas investors by misrepresenting and concealing the true facts concerning the status of operations at Bridger Logistics and the resulting material negative financial impact on the Company during the Class Period, which they knew or recklessly disregarded, including, among other things that:

- The Monroe contracts (Monroe COSA and Monroe TLA) did not include typical take-or-pay provisions and instead permitted Monroe to suspend its performance if Bridger Logistics delivered less than an average of 35,000 barrels per day;

- By the fall of 2015, the price differential between Bakken crude and alternative crude oil sources narrowed, making acceptance of Ferrellgas' rail delivery of Bakken crude economically undesirable to Monroe, and causing Monroe to begin sourcing greater volumes of crude oil from other sources;

- Ferrellgas' midstream operations began to falter just months after the Bridger Acquisition when the price of oil started to drop;

- In early January 2016, Defendant Rios ordered CFE3 and other Bridger Logistics employees to "park the trains" that delivered oil to Monroe;

- By the beginning of February 2016, not a single barrel of crude oil was being transported by Ferrellgas to Monroe;

- In the January 2016 Side Letters, Bridger Logistics, Jamex Marketing and Monroe suspended their agreements (Monroe COSA and Monroe TLA) for the sale and delivery of Bakken crude oil, a suspension that never ended;

- Defendant Rios directly participated in the January 2016 Side Letters;

- The January 2016 Side Letters also provided that, effective February 1, 2016, Ferrellgas would transfer BTS for a mere $10.00 to an entity newly formed by related party Jamex Marketing;

- Defendant Wambold authorized and Defendant Rios directly participated in the sale of BTS to Jamex Marketing;

- On February 16, 2016, ERC billed BTS (to Defendant Rios' direct attention) $493,134.38 for January 2016 volume deficiencies;

- Volume deficiency charges owed to ERC for February 2016 totaled $3,338,639.50.  By the time these charges were billed by ERC, BTS already had been secretly transferred by Ferrellgas to Jamex Marketing;

- Ferrellgas' trucking business with Shell began a steady decline as of August or September 2015 (a steady decline that was reflected in weekly trucking reports Defendant Wambold received from Rios' Bridger Logistics business development team); and

- Shortly after the Bridger Acquisition, Bridger Logistics' trucking segment declined significantly with the number of truck drivers utilized by Ferrellgas decreasing by 50% by January 2016 (a significant decline that was reflected in weekly trucking reports Defendant Wambold received from Rios' Bridger Logistics business development team).

160.    **Defendant Rios' Position in the Company Supports an Inference of His and Ferrellgas' Scienter**.  Defendant Rios was the co-founder, President and CEO of Bridger, LLC from July 1, 2013 to June 23, 2015.  After the Bridger Acquisition, Defendant Rios served as Executive Vice President of Ferrellgas and CEO and President of Bridger Logistics.  In that role, Rios ran Ferrellgas' midstream operations.  The Monroe TLA, from which Ferrellgas repeatedly represented it earned at least 50% of its midstream operations' EBITDA, was overseen and managed by Defendant Rios and Bridger Logistics Vice President of Rail and Maritime.  Defendant Rios directly participated in the unwinding and ultimate termination of the Monroe TLA.  Defendant Rios also participated in the surreptitious sale of BTS to related party Jamex Marketing in February 2016.  While the trucking business with Shell was overseen by Vice President of Logistics, Dan Smith, Defendant Rios was the segment decision-maker and ensured that Smith implemented Rios' decisions.

161.    During the Class Period, Defendant Rios and Gamboa travelled to Ferrellgas'

Kansas City, Missouri headquarters regularly (at a minimum, bi-weekly) to meet with Defendant

Wambold regarding Ferrellgas' midstream operations.  This fact was common knowledge at

Bridger Logistics because Bridger Logistics' headquarter offices were small and open and

employees communicated regularly.

162.    In addition to the numerous facts known to Rios above, because of Rios' high-

level position at Ferrellgas, Rios controlled the content of the Company's public statements

during the Class Period, particularly as they pertained to Bridger and the midstream segment that

he managed.  Defendant Rios was directly involved in, provided with, or had access to,

information and documents which rendered his public statements about Bridger Logistics and

Ferrellgas' midstream operations false or misleading, and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  Because of his position and access to

material non-public information concerning the Company, Rios knew or recklessly disregarded

that the adverse facts alleged herein had not been disclosed to, and were being concealed from,

the public, and that the representations that were being made to investors were materially false,

misleading, and incomplete.  As a result, Defendant Rios is responsible for the accuracy of

Ferrellgas' corporate statements, and is therefore responsible and liable for the material

misrepresentations contained therein and/or the material facts omitted therefrom.

163.    As the Company's Executive Vice President and Bridger's CEO and President,

Defendant Rios' scienter is imputed to Ferrellgas.

164.    **Defendant Wambold's Position in the Company Supports an Inference of His

and Ferrellgas' Scienter**.  Defendant Wambold was the Company's President and CEO from

the beginning of the Class Period until his immediate "resignation" announced on September 28,

2016.  During the Class Period, Defendant Wambold met regularly (at a minimum bi-weekly) with Defendant Rios and Gamboa who ran the Company's midstream operations.  Defendant Wambold was aware of and is believed to have authorized the surreptitious sale of BTS to related party Jamex Marketing in February 2016.  Defendant Wambold also received from Rios' Bridger Logistics business development team weekly reports on Bridger Logistics' trucking business.

165.    In addition to the facts known to Defendant Wambold above, because of Defendant Wambold's high-level position at Ferrellgas, Wambold controlled the content of the Company's public statements during the Class Period.  Defendant Wambold was directly involved in, provided with, or had access to, the information and documents which rendered his public statements about Ferrellgas' midstream operations false or misleading, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information concerning the Company, Wambold knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were materially false, misleading, and incomplete.  As a result, Defendant Wambold is responsible for the accuracy of Ferrellgas' corporate statements, and is therefore responsible and liable for the material misrepresentations contained therein and/or the material facts omitted therefrom.

166.    As the Company's President and Chief Executive Officer, Defendant Wambold's scienter is imputed to Defendant Ferrellgas.

167.    **Defendants Wambold's and Rios' Terminations from the Company Support an Inference of Scienter**.  The Company announced the abrupt "resignation" of Wambold in its September 28, 2016 FY16 Form 10-K.  While during the September 28, 2016 Conference Call

new Interim Chief Executive Officer and President, James Ferrell, refused to elaborate on Wambold's sudden departure, CFE2 believed that Wambold was, in fact, terminated.   On November 28, 2016, Rios likewise "resigned," after his role in the Company had been materially diminished.

168.    Based on the foregoing, Defendants Ferrellgas, Rios, and Wambold acted with scienter in that they:  (i) knew or recklessly disregarded that the public statements issued or disseminated in the name of the Company were materially false or misleading when made; (ii) knew or recklessly disregarded that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. Defendants Ferrellgas, Rios, and Wambold, by virtue of their receipt of information reflecting the true facts regarding the status of Ferrellgas' midstream operations and the resulting material negative financial impact to the Company, and their control over, and receipt or modification of Ferrellgas' materially false or misleading statements and/or omissions, actively participated in the fraudulent scheme alleged herein.

## VIII.   LOSS CAUSATION

169.    As alleged herein, Defendants engaged in a scheme to deceive investors by misrepresenting and omitting material facts concerning, among other things:  (i) the benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the integration of the Bridger entities into Ferrellgas' business; (iv) the performance of the parties to the Monroe contracts (Monroe COSA and Monroe TLA) and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck transportation of crude oil to Ferrellgas customers.  Defendants' materially false or misleading statements and omissions of material fact,

alleged above in Section VI, caused the price of FGP Units to be artificially inflated, and/or maintained such artificial inflation, during the Class Period, operating as a fraud or deceit upon Lead Plaintiffs and other Class Period purchasers of FGP Units.

170.    Relying upon the integrity of the market price for FGP Units and public information relating to Ferrellgas, Lead Plaintiffs and other Class members purchased or otherwise acquired FGP Units at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.  Lead Plaintiffs and other Class members suffered actual economic loss and were damaged when the foreseeable risks of diminished benefits from the Bridger Acquisition and the Monroe TLA, the resulting negative impact upon the Company's midstream operations and Ferrellgas' debt levels, and decreased FGP Unit distributions created and concealed by Defendants' misstatements and omissions materialized through the public disclosure of new information concerning the Company's midstream – crude oil logistics segment on June 8, 2016, September 13, 2016, September 15, 2016, September 28, 2016, October 3, 2016, October 4, 2016, October 24, 2016, and November 22, 2016.  These partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' fraud caused foreseeable declines in the price of FGP Units by removing portions of the artificial inflation in the price of FGP Units that resulted from Defendants' fraud.  Moreover, the timing and magnitude of the declines in the price of FGP Units in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negate any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraud.

171.    As set forth in ¶¶ 115-116, 139-140 above, on June 8, 2016 the Company announced its financial results for its 3Q16, ended April 30, 2016, by filing a Form 10-Q and Form 8-K with the SEC.  In its 3Q16 Form 10-Q, Ferrellgas disclosed, among other things, that Jamex Marketing, which was responsible under the Jamex TLA for payments to Ferrellgas and for sourcing crude oil volumes in connection with Ferrellgas' Monroe TLA (from which Ferrellgas reported that it earned approximately 60% of the midstream operations – crude oil logistics gross margin) "may not have the financial resources sufficient to satisfy its payment obligations to Ferrellgas through 2019, the remaining term of [the Monroe contracts (Monroe COSA and Monroe TLA)]."  The Company further disclosed that "[i]f current market conditions persist," it believed that Jamex Marketing "may not be able to fulfill its crude oil volume sourcing commitments to [Monroe] throughout the remaining term of [the Monroe COSA]."  To address the risk that Jamex Marketing would be unable to satisfy its payment obligations in connection with the Jamex TLA and Monroe COSA, Ferrellgas further disclosed that it was "negotiating alternative contractual arrangements."

172.    Addressing the partial disclosure of the previously misrepresented and concealed information concerning the Monroe contracts (the Monroe COSA and Monroe TLA) and the Company's midstream operations set forth in the 3Q16 Form 10-Q, Defendant Wambold assured investors in the June 8, 2016 Form 8-K that "Bridger continues to perform well."  Similarly, during the June 8, 2016 Conference Call conducted later that day, Defendant Wambold stated that "Bridger is on pace and fulfilling our expectations of $100 million in adjusted EBITDA for the Partnership in FY16."  Defendant Rios likewise sought to allay concerns over the Monroe contracts:  "I want to pause and reiterate that our take-or-pay contracts with Monroe Energy and its supplier remain in place, as does our strong working relationship with them."  Moreover, in

response to an RBC Capital Markets analyst's question concerning the status of the Monroe contracts, Defendant Rios stated, "you can rest assured that we are still operating within our contractual arrangements."

173.    The disclosure of the uncertain status of the Monroe contracts and their susceptibility to changes in commodity prices, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the June 8, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the June 8, 2016 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

174.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.97 per unit, or 5.15%, from a closing price of $18.85 on June 7, 2016 to a closing price of $17.88 on June 8, 2016 on heavy trading volume, thereby removing a portion of the artificial inflation in the price of FGP Units.

175.    Despite this partial disclosure, the price of FGP Units remained artificially inflated due to Defendants' material misrepresentations and failure to fully disclose known adverse material facts concerning the Company's midstream – crude oil logistics segment and their impact upon FGP Unit distributions.

176.     As set forth in ¶ 146, a second partial disclosure occurred on September 13, 2016, when Citi issued an analyst report downgrading the Company from "neutral" to "sell" based upon the stress that Ferrellgas' foundering midstream business was placing on the Company's balance sheet.  In dropping its FGP Unit price target from $15.50 per unit to $14 per unit, Citi indicated that the increased leverage resulting from Ferrellgas' attempted midstream diversification strategy may cause the Company to cut distributions to FGP Unit holders.

177.     The disclosure of new information reflecting the strain that Ferrellgas' midstream operations was placing on the Company's balance sheet and the likelihood that FGP Unit distributions would be cut based upon the increased leverage resulting from Ferrellgas' failing midstream operations, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the September 13, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the September 13, 2016 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

178.     As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.98 per unit, or 5.16%, from a closing price of $18.99 on September 12, 2016 to a closing price of $18.01 on September 13, 2016 on heavy trading volume.

179.    Despite this partial disclosure, the price of FGP Units remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Company's midstream – crude oil logistics segment and its impact upon FGP Unit distributions.

180.    As set forth in ¶ 147, a third partial disclosure occurred on September 15, 2016, when RBC Capital Markets issued an analyst report downgrading the Company from Sector Perform to Underperform based upon the termination of the Jamex TLA and the lack of clarity on the Company's midstream business, particularly the Monroe TLA.  Among other things, RBC Capital Markets assumed in this report that the Monroe TLA would end, decreasing Ferrellgas' EBITDA by $60 million per year.  Without the Monroe TLA, the RBC Capital Markets analyst indicated that the Company's leverage would increase, causing Ferrellgas to reexamine its FGP Unit distribution amounts.  In lowering its price target from $17.00 per FGP Unit to $13.00 per FGP Unit, RBC Capital Markets estimated a 40% distribution cut, from $2.05 to $1.25 per FGP Unit per year.

181.    The disclosure of new information reflecting the strain that the failure of the Monroe contracts was placing on the Company's balance sheet and the likelihood that FGP Unit distributions would be cut based upon the increased leverage resulting from Ferrellgas' failing midstream operations, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the September 15, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the September 15, 2016 disclosures

also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

182. As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.84 per unit, or 4.61%, from a closing price of $18.24 on September 14, 2016 to a closing price of $17.40 on September 15, 2016 on heavy trading volume.

183. Despite this partial disclosure, the price of FGP Units remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Company's midstream – crude oil logistics segment and its impact upon FGP Unit distributions.

184. As set forth in ¶¶ 148-152, a fourth partial disclosure occurred on September 28, 2016, when the Company announced its financial results for its 4Q16 and its full fiscal year, ended July 31, 2016, by filing a Form 10-K and Form 8-K with the SEC.  In its FY16 Form 8-K, Ferrellgas disclosed, among other things, a net loss of $665.4 million, primarily consisting of "a one-time non-cash impairment charge of $628.8 million in our Midstream operations – Crude oil Logistics segment."

185. The Company's FY16 Form 10-K provided details underlying the $628.8 million non-cash impairment charge in Ferrellgas' midstream operations.  Among other things, the Company provided previously concealed information concerning Jamex Marketing and the Monroe contracts (the Monroe COSA and Monroe TLA), as to which Ferrellgas stated, "[d]uring the year ended July 31, 2016, approximately 60% and 80% of Midstream Operations – Crude oil Logistics segment (Bridger) gross margin and EBITDA, respectively, was generated from its

largest customer [Monroe Energy] and Jamex, that customer's supplier under take-or-pay arrangements."

186.   Concerning its midstream operations and the Monroe contracts (the Monroe COSA and Monroe TLA), the Company further disclosed in the FY16 Form 10-K:

> ***During February 2016, Jamex ceased sourcing barrels for delivery to the [Monroe] refinery*** and since that time Bridger had been billing Jamex directly in accordance with the pay provisions of the Jamex TLA.  During July 2016, we determined Jamex would not resume sourcing barrels for delivery to the refinery or be likely to continue to make payments under the pay provisions of the Jamex TLA.  As a result, we began negotiating a settlement with Jamex, and the Jamex TLA was terminated on September 1, 2016. While  the  agreement  with  the refinery owner was not terminated as a result of the execution and delivery of the Jamex Termination Agreement, Bridger has been unable to negotiate a revised transportation and logistics agreement with that customer; ***accordingly it is unlikely that Bridger will continue to make any deliveries under the existing agreement [with Monroe].  Consequently, Ferrellgas does not anticipate any material contribution to revenue or EBITDA from Jamex or Bridger's largest customer [Monroe] in the future.  Additionally, the continued, sustained decline in crude oil prices and resulting decrease in crude oil production in the regions in which we operate significantly impacted our trucking operations*** during the three months ended July 31, 2016, a trend we anticipate will continue into fiscal 2017 and beyond.

187.   Based upon its determination that it would no longer earn revenue from the Monroe TLA, "and the decline in our trucking operations as a result of continued sustained decline in crude oil prices and resulting decrease in crude oil production in the regions in which we operate," the Company reported in the FY16 Form 10-K that it performed impairment testing, which resulted in asset impairment charges of $628.8 million.

188.   In its FY16 Form 10-K, the Company further reported that its secured credit facility and accounts receivable securitization facility required the operating partnership to maintain a leverage ratio of no more than 5.5x, and that primarily as a result of the negative developments in its midstream operations, as well as the debt that Ferrellgas assumed in

financing the Bridger Acquisition, the Company's leverage ratio was 5.48x as of July 31, 2016. While the Company indicated that it had amended the leverage ratio terms of both its secured credit facility and its accounts receivable securitization facility, it nevertheless stated that it was "embarking on a strategy to reduce our debt."  In this regard, the Company disclosed that "*[t]his strategy may include a reduction in our annual distribution [for FGP Units]*," and further indicated that "*our board believes it is possible that the annual distribution rate [for FGP units] may be reduced from $2.05 to approximately $1.00 per common unit*."

189.    In the FY16 Form 10-K, the Company further disclosed that as of September 27, 2016, Defendant Wambold had "resigned" as Chief Executive Officer, President, and Director of Ferrellgas, Inc., and that as of the same date, James Ferrell would serve as Interim Chief Executive Officer and President of Ferrellgas, Inc.  Moreover, contrary to Defendants' prior representations that Ferrellgas' midstream operations were insulated from the risks of commodity price fluctuations, new Interim President and Chief Executive Officer, James Ferrell, stated in the September 28, 2016 Form 8-K that "*low oil prices have seriously damaged our midstream sector.*"

190.    During the September 28, 2016 Conference Call with analysts and investors, Defendants reiterated the representations regarding the Company's midstream operations made in the FY16 Form 10-K, including that the impairment testing that the Company conducted resulting in the $628.8 million impairment charge was performed "[a]s a result of the decline in future cash flows [from the Monroe TLA], as well as the sustained decline in crude oil prices and the resulting decrease in crude oil production in the regions in which we operate"—commodity price fluctuations as to which Ferrellgas had repeatedly claimed its midstream operations were insulated.

191.   The Company's September 28, 2016 disclosure of:  (i) the loss of future revenues under the Monroe TLA; (ii) the impact of declining crude oil prices on the Company's midstream operations, including "the decline in our trucking operations as a result of continued sustained decline in crude oil prices"; (iii) the $628.8 million midstream operations asset impairment charge; (iv) the resulting increase in the Company's debt leverage ratio and anticipated FGP Unit distribution cut to reduce debt; and (v) the "resignation" of Defendant Wambold, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the September 28, 2016 disclosure revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  This disclosure partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the September 28, 2016 disclosure also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

192.   As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined over the next two trading days by $4.73 per unit, or 28.67%, from a closing price of $16.50 on September 27, 2016 to a closing price of $11.77 on September 29, 2016 on heavy trading volume, thereby removing a portion of the artificial inflation in the price of FGP Units.

193.   Analysts issued reports concerning the surprising new information regarding the Company's midstream operations revealed on September 28, 2016.  These reports confirmed that

74

the negative investor inferences drawn from the previously misrepresented and concealed information disclosed on September 28, 2016, resulting in the 28.67% decline in the price of FGP Units on extremely heavy trading volume on September 28-29, 2016, were caused by disclosure of this new information and/or a foreseeable materialization of the risk concealed by Defendants' material misrepresentations and omissions.  For example:

- JPMorgan's September 28, 2016 report stated that the $628.8 million "non-cash asset impairment charge in the crude oil logistics segment, versus the Bridger acquisition purchase price of [$837.5 million], effectively writ[es] down the majority of the value.  We believe this impairment to be far greater than what the market expects."   Regarding Defendant Wambold's "resignation," JPMorgan noted that the "[u]nexpected CEO transition adds to sense of uncertainty."

- UBS Securities LLC's September 28, 2016 report noted that, "[w]ith the stock's reaction today following the possibility of a distribution cut, we do not think that it was priced in."

- In its September 28, 2016 report, Janney Montgomery Scott LLC stated: "[r]elated to the Bridger business' Jamex/Monroe contract situation, we had previously expected early this month when the Jamex settlement was announced that the Monroe contract would remain and that FGP would just replace the source of supply and continue to perform under the contract. Disclosures in the 10-K now indicate that Bridger has been unable to negotiate a revised transportation and logistics contract with the customer.  As such, we are now revising our 2017E/2018E to exclude approximately $55-60mm of adjusted EBITDA we had previously expected to be retained."

- Simmons & Company's September 28, 2016 report noted that "[t]he dramatic non-cash impairment charge is representative of how poor the foray into midstream has been for FGP."

194.    Despite this partial disclosure, the price of FGP Units remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Company's midstream – crude oil logistics segment and its impact upon FGP Unit distributions.

195.    As set forth in ¶ 155, a fifth partial disclosure occurred on October 3, 2016 when, after the close of trading that day, S&P Global ratings issued a report downgrading the Company's corporate credit rating from B+ to B and its senior unsecured debt rating from B- to

CCC+ based upon the $628.8 million impairment charge in the Company's midstream operations segment and the loss of future revenues and EBITDA from the Monroe contracts.

196.    The disclosure of new information reflecting the strain that the failure of the Company's midstream operations, particularly the Monroe contracts, was placing on the Company's balance sheet were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.   Moreover, the October 3, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.   These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.   Thus, the October 3, 2016 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

197.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.98 per unit, or 8.42%, from a closing price of $11.64 on September 30, 2016 to a closing price of $10.66 on October 3, 2016 on heavy trading volume.

198.    Despite this partial disclosure, the price of FGP Units remained artificially inflated due to Defendants' failure to fully disclose known adverse material facts concerning the Company's midstream – crude oil logistics segment and its impact upon FGP Unit distributions.

199.    As set forth in ¶ 156, a sixth partial disclosure occurred on October 4, 2016 when, after the close of trading that day, Moody's Investor Service downgraded the Company's credit

rating from B1 to B2 and changed the outlook for the Company from stable to negative.  In issuing the rating downgrade, Moody's noted that it was based upon Ferrellgas' increased leverage resulting from the significant EBITDA loss in the midstream segment, particularly from the loss of the Monroe contracts.  Moody's further noted the change in outlook from stable to negative reflected Ferrellgas' "high leverage and weak midstream business prospects," and that a cut to the FGP Unit distribution amount would likely be required to enable the Company to reduce its debt.

200.    The disclosure of new information reflecting the strain that the failure of the Company's midstream operations, particularly the Monroe contracts, was placing on the Company's balance sheet were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the October 4, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the October 4, 2016 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

201.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.94 per unit, or 8.82%, from a closing price of $10.66 on October 3, 2016 to a closing price of $9.72 on October 4, 2016 on heavy trading volume.

202.     As set forth in ¶ 157, a seventh partial disclosure occurred on October 24, 2016, when, after the close of trading that day, Ferrellgas filed a Form 8-K with the SEC in which the Company stated that:  (i) Ferrellgas, Inc. had notified Rios and Gamboa that they "should work independently of the Bridger employees on developing ideas for organic growth opportunities using existing Bridger assets while the Company conducts a broader review of Bridger's operations"; and (ii) in response, Rios and Gamboa had "both delivered notice of 'good reason' for resignation to the Company, alleging that the Company had materially diminished their responsibilities and stating their intention to resign if such purported material diminution is not cured within 30 days."

203.     The disclosure of new information reflecting the Company's efforts to marginalize the continuing participation of Rios and Gamboa, who Defendants previously claimed were "a top notch management team" who would manage the Company's midstream operations, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the October 24, 2016 disclosures revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.  Thus, the October 24, 2016 disclosures also partially (but incompletely) revealed the materialization of the known foreseeable risks surrounding the Company's midstream operations that Defendants knowingly and/or recklessly concealed from investors.

204.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.50 per unit, or 4.76%, from a closing price of $10.50 on October 24, 2016 to a closing price of $10.00 on October 25, 2016 on heavy trading volume, thereby removing a portion of the artificial inflation in the price of FGP Units.

205.    As set forth in ¶¶ 158-159, an eighth and final partial disclosure occurred on November 22, 2016, when the Company issued a press release after the close of trading that day entitled, "Ferrellgas Partners, L.P. Declares First Quarter 2017 Cash Distribution" (the November 22, 2016 Press Release").   In this press release, the Company announced "the declaration of its first quarter cash distribution of $0.10 ($0.40 annualized rate) per partnership common unit," and made clear that the dramatic reduction in FGP investors' distribution amounts resulted from "headwinds in our midstream business primarily due to the loss of our largest customer [Monroe Energy]."

206.    The disclosure of the massive 80% cut in the annual distribution payments to FGP Unit holders, which Defendants attributed "primarily" to the loss of the Monroe contracts, was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions of material facts concerning the Company's midstream operations.  Moreover, the November 22, 2016 Press Release revealed new information that was previously concealed by Defendants' misstatements, omissions, and fraudulent course of conduct.  This disclosure revealed the remaining relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions concerning the Company's midstream – crude oil logistics segment.

207.    As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of FGP Units declined by $0.68 per unit, or 9.28%, from a closing price of $7.33 on November 22, 2016 to a closing price of $6.65 on November 23, 2016 on heavy trading volume, thereby removing a portion of the artificial inflation in the price of FGP Units.

208.    Analysts issued reports concerning the surprisingly steep FGP Unit distribution cut announced in the November 22, 2016 Press Release.   These reports confirmed that the negative investor inferences drawn from the previously concealed information disclosed on November 22, 2016, resulting in the 9.28% decline in the price of FGP Units on extremely heavy trading volume on November 23, 2016, were caused by disclosure of this new information and/or a foreseeable materialization of the risk concealed by Defendants' material misrepresentations and omissions.   For example, in its November 22, 2016 report, UBS Securities LLC noted that "we do not think that a cut [of] this magnitude is fully being priced in by investors."   Similarly, Janney Montgomery Scott LLC's November 23, 2016 report observed that the "the cut was deeper than we expected."

209.    The material misrepresentations and omissions detailed above caused the prices for FGP Units to be artificially inflated, and/or maintained such artificial inflation, throughout the Class Period.   Lead Plaintiffs and other Class members purchased or otherwise acquired FGP Units at prices that were artificially inflated as a result of Defendants' misrepresentations and omissions of material fact alleged herein.

210.    Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members.   Throughout the Class Period, the prices at which Lead Plaintiffs and other Class members purchased FGP Units were artificially inflated as

a result of Defendants' materially false or misleading statements and omissions of material fact concerning among other things: (i) the benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the integration of the Bridger entities into Ferrellgas' business; (iv) the performance of the parties to the Monroe contracts (the Monroe COSA and Monroe TLA) and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck transportation of crude oil to Ferrellgas customers. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired FGP Units at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts and risks from the public would cause the prices of FGP Units to be artificially inflated. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of FGP Units to decline, as the inflation resulting from Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the price of FGP Units.

211.    Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiffs and to the other members of the Class who purchased or otherwise acquired FGP Units during the Class Period.

212.    The economic losses, i.e., damages, suffered by Lead Plaintiffs and other Class members are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact, which caused the price of FGP Units to be artificially inflated, and/or maintained such artificial inflation; and (ii) the subsequent significant decline in

the price of FGP Units when the truth was gradually revealed and/or the risks previously concealed by Defendants' fraud gradually materialized on June 8, 2016, September 13, 2016, September 15, 2016, September 28, 2016, October 3, 2016, October 4, 2016, October 24, 2016, and November 22, 2016, removing portions of the artificial inflation from the price of FGP Units.

## IX. THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

213.    At all relevant times, the market for FGP Units was efficient for the following reasons, among others:

    i.  FGP Units met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient electronic stock market, under the symbol "FGP";

    ii.  As a registered and regulated issuer of securities, Ferrellgas filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

    iii.  Ferrellgas regularly communicated with public investors via established market communication mechanisms, including conference calls, regular disseminations of press releases on the national circuits of major newswire services, the Company's website, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    iv.  Ferrellgas was followed by securities analysts employed by major brokerage firms, including RBC Capital Markets, UBS Securities LLC, and Janney Montgomery Scott LLC, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

214.    As a result of the foregoing, the market for FGP Units promptly digested current information with respect to Ferrellgas from publicly-available sources and reflected such information in the price of these securities.  Under these circumstances, all purchasers of FGP Units during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

215.     Further, at all relevant times, Lead Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FGP Units at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

216.     The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged in this Complaint.

217.     None of the statements complained of herein was a forward-looking statement.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

218.     To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

219.     To the extent that the statutory safe harbor may apply to any materially false and/or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false and/or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false, or the statement was authorized and/or approved by an executive officer of Ferrellgas who actually knew that the statement was false.

220.     Moreover, to the extent that Ferrellgas and/or the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had materialized and/or the Ferrellgas Defendants and the Individual Defendants had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## XI.     CLASS ACTION ALLEGATIONS

221.     Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired FGP Units between June 1, 2015 and November 22, 2016, inclusive, and who were damaged thereby.  Excluded from the Class are: (i) Defendants (as set forth herein); (ii) present or former executive officers and directors of Ferrellgas, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii))); (iii) any of the foregoing entities' and individual's legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Ferrellgas.

222.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FGP Units were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can

only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of members in the proposed Class.  As of July 31, 2016, Ferrellgas had approximately 98 million common Units outstanding and available for trading on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Ferrellgas and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

223.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired FGP Units during the Class Period at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of herein.

224.    Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiffs have no interests that are adverse or antagonistic to the interests of other Class members.

225.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Lead Plaintiffs know of no difficulty that will be encountered in managing this litigation that would preclude maintaining it as a class action.

226.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

i.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

ii.   Whether Defendants' statements to the investing public during the Class Period misrepresented and/or omitted material facts;

iii.  Whether and to what extent the market prices of FGP Units, were artificially inflated and/or distorted during the Class Period due to the misrepresentations and/or omissions of material fact complained of herein;

iv.   Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

v.    Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the *Affiliated Ute* presumption; and

vi.   Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

227.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

228.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XII.   CAUSES OF ACTION

### <u>COUNT I</u>
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated<br>Thereunder Against Ferrellgas and the Individual Defendants**

229.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought against Ferrellgas and the Individual Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and all other members of the Class.

230.    During the Class Period, Ferrellgas and the Individual Defendants, while in possession of material adverse, non-public information, disseminated or approved the false or misleading statements and/or omissions alleged herein, which each defendant knew or recklessly disregarded were misleading in that they misrepresented material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants carried out a plan, scheme and course of conduct that:  (i) deceived the investing public, including Lead Plaintiffs and other Class members, as alleged herein, regarding the intrinsic value of FGP Units; (ii) caused the price of FGP Units to be artificially inflated; and (iii) caused Lead Plaintiffs and other members of the Class to purchase FGP Units at artificially inflated prices that did not reflect their true value.  In furtherance of this unlawful scheme, plan and course of conduct, Ferrellgas and the Individual Defendants took the actions alleged herein while using the means and instrumentalities of interstate commerce and the facilities of a national securities exchange.

231.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they, individually and in concert, directly and indirectly, knowingly and/or recklessly: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiffs and other members of the Class in connection with their purchases of FGP Units in an effort to maintain artificially high market prices during the Class Period for FGP Units in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  As alleged herein, the

material misrepresentations contained in, or the material facts omitted from, Defendants' public statements included, but were not limited to, materially false and/or misleading representations and omissions during the Class Period regarding, among other things: (i) the benefits of the Bridger Acquisition to the Company and its midstream operations; (ii) the effect of commodity prices on the Company's midstream operations; (iii) the integration of the Bridger entities into Ferrellgas' business; (iv) the performance of the parties to the Monroe contracts (the Monroe COSA and Monroe TLA) and the corresponding financial benefits that Ferrellgas would derive; and (v) the status of the Company's truck transportation of crude oil to Ferrellgas customers.

232.    Defendants are liable for all materially false or misleading statements and omissions of material fact alleged above in Section VI.  By virtue of their high-level positions at the Company during the Class Period, the Individual Defendants were authorized to make public statements, and made public statements during the Class Period on Ferrellgas' behalf.  The Individual Defendants were privy to and participated in the creation, development, and issuance of the materially false or misleading statements alleged herein, and they and the Company disseminated information to the investing public that they either knew, or were reckless in not knowing, was materially false or misleading.

233.    In addition to the duties of full disclosure imposed on Defendants as a result of making affirmative statements and reports to the investing public, Defendants also had a duty to disclose information required to update and/or correct their prior statements, misstatements, and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the

Company's operations, so that the market price of FGP Units would be based on truthful, complete, and accurate information.

234.   Defendants' material misrepresentations and/or omissions were made knowingly, recklessly, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of FGP Units.   By concealing material facts from investors, Defendants created and maintained artificially inflated prices for FGP Units throughout the Class Period.

235.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FGP Units was artificially inflated throughout the Class Period.   In ignorance of the fact that market prices of FGP Units were artificially inflated, and relying directly or indirectly on the false or misleading statements made by Ferrellgas and the Individual Defendants or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Ferrellgas and the Individual Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired FGP Units during the Class Period at artificially inflated prices and were damaged thereby.

236.   At the time of the material misrepresentations and/or omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class known the truth and the intrinsic value of FGP Units, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired FGP Units at the artificially inflated prices that they paid.

237.   By virtue of the foregoing, Ferrellgas and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   As a direct and

proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their purchases and/or acquisitions of FGP Units during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against Ferrellgas, Inc. and the Individual Defendants**

238.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against Ferrellgas, Inc. and the Individual Defendants on behalf of Lead Plaintiffs and all other members of the Class.

239.    During the Class Period, Ferrellgas, Inc. and each of the Individual Defendants was a controlling person of Ferrellgas within the meaning of Section 20(a) of the Exchange Act.  During the Class Period, Ferrellgas was controlled by Ferrellgas, Inc. and the Individual Defendants, who performed all management functions and conducted and directed the Company's day-to-day operations.

240.    By reason of their high-level positions at Ferrellgas and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants, together with Ferrellgas, Inc., had the power to influence and control and did influence and control, directly or indirectly, the day-to-day decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiffs contend were materially false or misleading.  The Individual Defendants and Ferrellgas, Inc. exercised day-to-day control over the Company and had the power and authority to cause Ferrellgas to engage in the wrongful conduct complained of herein.  In this regard, Ferrellgas, Inc. and the

Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

241.    Ferrellgas, Inc. and each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period.  Accordingly, Ferrellgas, Inc. and each of the Individual Defendants was a culpable participant in the underlying violations of Section 10(b) alleged herein.

242.    As alleged herein, Ferrellgas violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Ferrellgas and, as a result of their own aforementioned conduct, Ferrellgas, Inc. and each of the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Ferrellgas is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired FGP Units during the Class Period at artificially inflated prices.

243.    As a direct and proximate result of Ferrellgas, Inc.'s and the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of FGP Units during the Class Period.

**XIII.  PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

244.   As a direct and proximate result of Ferrellgas, Inc.'s and the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of FGP Units during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.   Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated:  March 20, 2017

Respectfully submitted,

Johnston de F. Whitman, Jr.
Kimberly A. Justice (admitted *pro hac vice*)
Daniel C. Mulveny (admitted *pro hac vice*)
Megan Koneski (admitted *pro hac vice*)
**KESSLER TOPAZ MELTZER**
    **& CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

*Lead Counsel for Lead Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

_____
Kimberly A. Justice