# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 
DATE FILED. 3/30/18

No. 16 Civ. 7840 (RJS)

IN RE FERRELLGAS PARTNERS, L.P., SECURITIES LITIGATION

MEMORANDUM AND ORDER
March 30, 2018

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs Susan Batai, Joel Brenner, Kevin Gaberlavage, and Lazy Dogs Partnership LLLP ("Plaintiffs") bring this putative class action against Ferrellgas Partners, L.P. ("Ferrellgas"), Ferrellgas, Inc., Stephen L. Wambold, and Julio E. Rios II alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Now before the Court is Defendants' motion to dismiss the Consolidated Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 67.) For the reasons set forth below, Defendants' motion is granted.

## I. BACKGROUND

### A. The Parties

Defendant Ferrellgas is a master limited partnership whose common units ("Units") – the analogue to shares in a public company – are publicly traded on the New York Stock Exchange.[1] (Compl. ¶ 1.) Ferrellgas's primary

lines of business are commercial and residential propane distribution (through, for example, its "Blue Rhino" brand) and crude oil transportation. (*Id.* ¶ 34.) Defendant Stephen L. Wambold served as Ferrellgas's President from April 26, 2006 to September 27, 2016 and its Chief Executive Officer ("CEO") from September 2009 to September 27, 2016. (*Id.* ¶ 37.) Defendant Julio E. Rios served as Ferrellgas's Executive Vice President and as President and CEO of Bridger Logistics, LLC from June 24, 2015 to November 28, 2016. (*Id.* ¶ 38.)

Plaintiffs are investors who purchased Units during the period from June 1, 2015 through

---

[1] The facts set forth below are taken from the Consolidated Amended Class Action Complaint (Doc.

No. 58 (the "Complaint" or "Compl.")), statements or documents incorporated into that complaint by reference, legally required public disclosure documents filed with the SEC, and documents upon which Plaintiffs relied in bringing this action. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 68 ("Mem.")), Plaintiffs' opposition (Doc. No. 70 ("Opp'n")), Defendants' reply (Doc. No. 72 ("Reply")), Plaintiffs' sur-reply (Doc. No. 75 ("Sur-Reply")), and the declarations and exhibits submitted with those briefs.

November 22, 2016 (the "Class Period") and claim to have suffered damages as a result of false or misleading statements made by Defendants. (*Id.* ¶ 1.)

## B. Facts

### 1. The Bridger Acquisition

From 2010 to 2015, Bridger LLC operated as an independent company with two distinct business lines: "crude oil logistics" through its Bridger Logistics division and "crude oil trading and marketing services" through its Bridger Marketing division. (*Id.* ¶ 62.) During the same period, Ferrellgas was engaged in the commercial and residential sale of propane products. (*Id.* ¶ 59.)

In the summer of 2015, in an attempt to diversify its business, Ferrellgas acquired Bridger Logistics for $837.5 million (the "Bridger Acquisition"). The transaction was announced on June 1, 2015. (*Id.* ¶¶ 9, 37, 41.) In connection with the acquisition, the portions of Bridger LLC that were not acquired by Ferrellgas changed their names – Bridger LLC became Jamex LLC, and Bridger Marketing became Bridger Marketing. (*Id.* ¶ 81.)

At the time of the Bridger Acquisition, the entity that became Jamex Marketing was obligated to supply at least 65,000 barrels of crude oil per day from the Bakken Field in North Dakota to a refinery in Pennsylvania owned by Monroe Energy, LLC ("Monroe"). (Doc. No. 69-3 ¶ 2.1(b).) The arrangement was memorialized in a crude oil supply agreement (the "COSA") originally executed on July 1, 2014, but amended on May 26, 2015 to reflect the anticipated corporate name changes associated with the Bridger Acquisition. (Compl. ¶ 6, 81; *see also* Doc. No. 69-3 ¶ 2.1(b).)

Bridger Logistics was not a party to the COSA. Instead, at the time of the Bridger Acquisition, Bridger Logistics (hereinafter

"Bridger") was in the midstream oil logistics business – that is, it transported crude oil by rail and truck to customers in North America. (*Id.* ¶¶ 64–65.) Bridger's two main trucking customers were Shell Oil Company ("Shell") and Occidental Energy Marketing, Inc. ("Occidental"). (*Id.* ¶¶ 9, 70.)

On the same day that the COSA was amended, Bridger, in its capacity as a logistics company, entered into a transportation and logistics agreement ("TLA") with Monroe ("the Monroe TLA"). (Doc. No. 69-5.) Under the Monroe TLA, Bridger was to transport oil from North Dakota to Monroe's refinery in Pennsylvania in exchange for a per-barrel payment. (Doc. No. 69-5 ¶ 6.1.) The Monroe TLA also contained a "take-or-pay" clause, which guaranteed that, even if the volume of oil delivered dropped below 65,000 barrels per day, Monroe would pay "on a minimum volume equal to . . . 65,000 [b]arrels" per day. (*Id.* ¶ 6.4.) However, the TLA provided that Monroe's obligation to make deficiency payments would be suspended if the volume delivered dropped below 35,000 barrels per day. (*Id.*) Essentially, then, if the volume shipped exceeded 65,000 barrels per day, Bridger was to be paid by the barrel; if the volume fell between 35,000 and 65,000 barrels per day, Monroe was to make a deficiency payment equivalent to what Bridger would have earned had it shipped 65,000 barrels; and if the volume fell below 35,000 barrels per day, no deficiency payment was required. (*Id.*)

Because Monroe's facility did not have direct rail access, Bridger Logistics' subsidiary, Bridger Transfer Services ("BTS"), entered into an agreement with Eddystone Rail Company ("ERC") to facilitate transportation of the oil to Monroe's refinery by barge. Specifically, the agreement called for ERC to construct and operate a facility that provided BTS with the ability to transfer oil from barrels shipped by train to barges for shipment down the Delaware River. (Compl. ¶ 46.) As part of this

agreement, BTS guaranteed a minimum volume of, essentially, 65,000 barrels per day until June 2019. (*Id.*) BTS also agreed to pay ERC a per-barrel deficiency charge in the event that the monthly volume fell below the minimum volume requirement. (*Id.*)

On June 1, 2015, Defendants held a conference call to announce the Bridger Acquisition. (*Id.* ¶ 117.) During the call, Rios made several statements regarding the Bridger Acquisition, including:

- "Our business, like I mentioned earlier, is a fully integrated logistics chain. We take no commodity risk. We don't take ownership of that barrel. We just move that barrel for either our producer or end-refinery customers. That insulates us from that commodity fluctuation. . . . Bridger, because we're in the middle, we don't take the commodity. We don't see fluctuations in volumes." (Doc. No. 71-3 at 6; *see also* Compl. ¶ 118 ("Statement 1").)

- In response to a question regarding chief risks to the business, Rios stated, "[l]ike I said, because we have a fully integrated logistics cha[in] we mitigate our risks. We have contracted with our customers to mitigate that risk under long-term agreements. It is difficult for me to tell you what our risk could be, because I've contracted all my risk away." (Doc. No. 71-3 at 9; *see also* Compl. ¶ 119 ("Statement 2").)

Nevertheless, the company's Form 8-K, issued on the same day, stated that Monroe's minimum volume commitment "would be suspended for any month in which [Bridger] delivers less than the average of 35 [thousand barrels] per day for such month to [Monroe]," and cautioned that "[i]f [Monroe's] demand for crude oil drops below that threshold for a material length of time . . . that would adversely

affect [Bridger]'s cash flows." (Doc. No. 69-6 at 7.)

In a press release issued on the same day and a slide show presentation given during the conference call, Ferrellgas stated that Bridger was expected to generate $100 million in earnings before interest, tax, depreciation, and amortization ("EBITDA") over the next twelve months (Compl. ¶¶ 74, 78), which would allow Ferrellgas to increase its annual distribution to shareholders by $0.05 per Unit (*id.* ¶¶ 77, 78). The slide presentation further specified that Ferrellgas expected 30% of the $100 million to come from the trucking portion of Bridger's business (which operated approximately 610 "specialized tractor-trailer units") and 50% to come from the Monroe TLA. (*Id.* ¶ 80; Doc. No. 58-10.)

The Bridger Acquisition closed on June 24, 2015. (Compl. ¶ 37.) That same day, Bridger entered into a TLA with Jamex Marketing (the "Jamex TLA") "whereby [Bridger] would be the exclusive provider of crude oil logistics services to Jamex Marketing to support Jamex Marketing's obligations under the Monroe COSA." (*Id.* ¶ 82.) Like the Monroe TLA, the Jamex TLA called for Bridger to be paid on a per-barrel basis. (Doc. No. 69-4 ¶ 8 & Ex. B.) And – again in parallel to the Monroe TLA – the Jamex TLA also contained a "take-or-pay" clause, but with a twist. (*Id.* ¶ 23.) Under the take-or-pay clause set out in the Jamex TLA, if the volume of oil shipped pursuant to the COSA fell below 35,000 barrels per day, Jamex Marketing was to pay to Bridger the "amount . . . [Bridger] would have received from [Monroe] . . . had 65,000 [b]arrels" been shipped. (*Id.*)

Accordingly, the Monroe TLA and the Jamex TLA operated together to guarantee Bridger payment at least equivalent to what it would earn for shipping 65,000 barrels of oil per day, whether or not any oil was actually transported. When the volume transported per day fell between 35,000 and 65,000 barrels,

Monroe was required to make the deficiency payment. If the volume fell below 35,000 barrels per day, Jamex Marketing would owe the deficiency payment.

### 2. Ferrellgas's Post-Acquisition Representations

On September 29, 2015, Ferrellgas reported its fiscal year 2015 results for the period ending July 31, 2015 in a Form 8-K and Form 10-K filed with the SEC, and held an earnings call to discuss its results. (Compl. ¶ 121; *see also* Doc. No. 69-11.) During that call, Wambold stated that:

- "[Acquiring Bridger] was a big step towards our goal of significantly diversifying beyond our traditional propane space. Frankly, it's been everything we hoped for from a financial and operational standpoint." (*Id.* ¶ 121 ("Statement 3").)

Additionally, Rios stated that:

- Integration of Bridger into Ferrellgas was "smooth and seamless." (*Id.* ("Statement 4").)

- "While a number of organizations in the midstream sector might have exposure to the variations in the market, Bridger's contract coverage and the strategic location of our operations result in a business that performs well throughout commodity price cycles." (*Id.* ¶ 123 ("Statement 5").)

- "Our business here at Bridger is relatively insulated from commodity prices. We're just a transportation business . . . in the midstream space [that] moves the barrel . . . from where it's produced to where it's needed." (*Id.* ¶ 124 ("Statement 6").)

- "Commodity prices don't really impact our business, and as previously stated, our contract coverage in operating areas insulates us from that commodity price risk." (*Id.* ¶ 125 ("Statement 7").)

On December 9, 2015 Ferrellgas reported its first quarter 2016 financial results for the period ending October 31, 2015 in a form 8-K and form 10-Q filed with the SEC, and held another earnings call to discuss the results. During that call, Rios reaffirmed Ferrellgas's total EBITDA guidance (*Id.* ¶ 128) and made several statements regarding the Bridger Acquisition and the midstream oil logistics business, including:

- "One of the many reasons for our success is our fully integrated logistics-focused model which is not dependent on commodity prices. This model has helped us navigate a lower crude price environment." (*Id.* ¶ 129 ("Statement 8").)

- "We benefit from strong customer relationships and contractual agreements. Substantially all of Bridger's EBITDA is fee based and supported by long-term take or pay agreements or acreage dedications." (*Id.* ¶ 130 ("Statement 9").)

Nevertheless, in light of the Jamex TLA, Ferrellgas's 10-Q removed the cautionary language about the consequences of Monroe's demand falling below 35,000 barrels per day contained in the June 8-K and replaced it with a more modest disclosure warning that "[t]he agreement between Bridger . . . and its largest revenue customer [Monroe] may be impacted if a related supply agreement between the customer and a third party is terminated." (Doc. No. 69-12 at 74.) The 10-Q further cautioned that Bridger "do[es] not have any control over the parties to the supply agreement." (*Id.*)

### 3. Global Oil Prices Change and Defendants React

At the same time that Ferrellgas was touting the benefits of the Bridger Acquisition, global oil prices began to shift. "Starting in the summer of 2015 and continuing through early December 2015," the price differential between crude oil produced in the Bakken Field and oil sourced internationally narrowed, such that it became more profitable for East Coast refineries like Monroe to source their oil internationally rather than paying for the cost of transportation by rail from North Dakota. (Compl. ¶¶ 12, 96, 101.) Indeed, Plaintiffs allege that by the end of January 2016, Jamex Marketing and Monroe had ceased transporting oil from the Bakken Field to Monroe's refinery in Pennsylvania. (*Id.* ¶ 98.) As a result, Monroe's obligations to Bridger to make deficiency payments under the Monroe TLA were suspended, and Bridger was owed deficiency payments under the Jamex TLA. (Doc. No. 69-5 ¶ 6.4; Doc. No. 69-4 ¶ 23.) However, Plaintiffs allege that by December 2015, Jamex Marketing's financial condition was such that it was "unable to make its minimum deficiency payments" to Bridger under the Jamex TLA. (Compl. ¶ 142.) At the same time, because no oil was being transferred for delivery to Monroe, BTS began owing volume deficiency payments to ERC in the amounts of $493,134.38 for January 2016 and $3,338,639.50 for February 2016, respectively. (*Id.* ¶ 98.)

Plaintiffs allege that, at this point, Defendants "covertly developed a plan to wind down the exposure to Jamex Marketing and to strip BTS of its assets" (*id.*) through two letter agreements dated January 13, 2016 (the "Side Letters") (*id.* ¶ 99). First, Monroe, Jamex Marketing, and Bridger agreed to amend the COSA (the "COSA Side Letter"). (*Id.*; *see also* Doc. No. 69-7.) This side agreement effectively suspended the COSA for a period of three months beginning February 1, 2016, with automatic three-month renewals of the

suspension if the parties had not terminated the COSA Side Letter. (Compl. ¶ 99; *see also* Doc. No. 69-7.) The COSA Side Letter nevertheless provided that "this Letter Agreement shall not be construed as a termination of the [COSA]." (Doc. No. 69-7 at 4.) Second, Monroe, Jamex Marketing, and Bridger executed a side letter to the Monroe TLA (the "Monroe TLA Side Letter"). (Compl. ¶ 99; *see also* Doc. No. 69-8.) That letter agreement made minor modifications to the Monroe TLA to remove references to ERC. (Doc. No. 69-8.) The Monroe TLA Side Letter also provided that "[o]ther than the amendments and modifications specifically contained herein, the [Monroe] TLA remains in full force and effect." (*Id.* ¶ VI.B.) Significantly, the Jamex Marketing TLA – with its requirement of deficiency payments to Bridger if oil deliveries fell below 35,000 barrels per day – also remained in full force.

Plaintiffs allege that, as part of the Side Letters, Bridger transferred all of BTS's assets to other Ferrellgas entities, and on February 1, 2016, Ferrellgas secretly sold BTS to Jamex LLC for $10. (Compl. ¶ 104.) BTS was subsequently renamed "Jamex Transfer Services." (*Id.*) Plaintiffs allege that Rios directly participated in the negotiation of the Side Letters, and his signature appears on the Monroe TLA Side Letter. (Doc. No. 69-8 at 3.) Plaintiffs also allege that, as a result of the Side Letters, Rios gave an order to "park the trains" (in lieu of transporting oil) under the COSA in a meeting at Bridger's headquarters sometime "in the beginning of 2016." (Compl. ¶ 100.)

The decline in oil prices also affected Bridger's trucking business. (Compl. ¶¶ 107–08.) At the time of the Bridger Acquisition, Bridger's contracts with Shell represented about 40% to 50% of the trucking division's business. (*Id.* ¶ 107.) In December 2015, Bridger acquired South C&C trucking, which also had contracts with Shell. (*Id.* ¶ 108.) However, in early 2016, Bridger lost South C&C's contracts with Shell and its own business with Shell in

East Texas. (*Id.* ¶ 107.) Later in the spring of 2016, it lost Shell's West Texas business. (*Id.*) Plaintiffs allege that Bridger's trucking business with Occidental also suffered. (*Id.* ¶ 109.) As a result of the declining crude oil trucking business, the number of contracted truck drivers utilized by Bridger declined from approximately 600 at the time of the Bridger Acquisition to approximately 350 in August 2015 and to 300 by January 2016. (*Id.* ¶ 110.)

### 4. Ferrellgas's 2016 Representations

On March 10, 2016, Ferrellgas reported its second quarter 2016 financial results for the period ending January 31, 2016 in a Form 8-K and Form 10-Q filed with the SEC. In the Form 8-K, Wambold represented that

- "Bridger continues to exceed our expectations and we are carefully controlling costs to help offset the challenging operating environment for our Propane and related equipment sales segment." (*Id.* ¶ 132 ("Statement 10").)

- "We have ample financial flexibility to drive growth without accessing the capital markets, and we are confident that we have the pieces in place to create significant value for all Ferrellgas unitholders." (*Id.* ¶ 133 ("Statement 11").)

On the same day, Ferrellgas held an earnings call to discuss the second quarter 2016 financial results, during which Wambold stated:

- "[O]ur strategy at Ferrellgas is centered on diversifying our revenues to help mitigate the pressure that this type of quarter historically created for our business. Thanks to strong contributions from our Midstream operations, that strategy worked beautifully, as we were able to deliver a year-over-year increase in adjusted EBITDA. We see this as clear proof that our diversification strategy has positioned us to deliver more consistent financial results and drive future growth." (*Id.* ¶ 134 ("Statement 12").)

- "With best-in-class capabilities and durable long-term take-or-pay contacts with blue-chip customers, our midstream operations are not dependent on commodity prices." (*Id.* ¶ 135 ("Statement 13").)

- "We continue to navigate the lower crude pricing environment with success and expect to capitalize on opportunities created by these lower prices in the future. Importantly, we continue to expect that Bridger will generate $100 million in adjusted EBITDA for the Partnership in FY16." (*Id.* ("Statement 14").)

Also on the conference call, Rios stated:

- "[W]e remain on track to deliver adjusted EBITDA in line with expectations for the full fiscal year." (*Id.* ¶ 136 ("Statement 15").)

- "The long term nature of our agreements, the stable and consistent revenue generated by our take or pay contracts, and the quality of our key customers make Bridger uniquely durable and valuable." (*Id.* ("Statement 16").)

On June 8, 2016, Ferrellgas reported its third quarter 2016 financial results for the period ending April 30, 2016 by filing a Form 8-K and a Form 10-Q with the SEC. (*Id.* ¶ 138.) In the Form 10-Q, Ferrellgas disclosed that, as of April 30, 2016, Jamex Marketing was in arrears on its deficiency payments in the amount of $18.6 million. The disclosures also indicated that:

- Jamex Marketing "may not be able to fulfill its crude oil volume sourcing

commitments to [Monroe] throughout the remaining term of [the Monroe COSA]," that Jamex Marketing "may not have the financial resources sufficient to satisfy its payment obligations to Ferrellgas through June 2019, the remaining term of [the Monroe TLA]," and that Ferrellgas was "negotiating alternative contractual arrangements." (*Id.* ("Statement 17").)

In the Form 10-Q, Ferrellgas nevertheless "concluded that there was no impairment of the [m]idstream operations – crude oil logistics reporting unit as of April 30, 2016." (*Id.*) In the Form 8-K, Wambold represented that:

- "Bridger continues to perform well." (*Id.* ¶ 139 ("Statement 18").)

And on an earnings call held that same day, Wambold further represented that

- "Bridger is on pace and fulfilling our expectations of $100 million in adjusted EBITDA for the Partnership in FY16, and we remain confident in the fully integrated [c]rude [o]il [l]ogistics-focused model." (*Id.* ("Statement 19").)

On the same earnings call, Rios said:

- "I want to pause and reiterate that our take-or-pay contracts with Monroe Energy and its supplier remain in place, as does our strong working relationship with them." (*Id.* ¶ 140 ("Statement 20").)

- "The volume of crude that we're delivering to [Monroe] is something that is between us and Monroe, but you can rest assured that we are still operating within our contractual arrangements." (*Id.* ("Statement 21").)

- "I'll reiterate . . . we are operating within our contractual arrangements with

Monroe and with Jamex today, and both agreements are in effect." (*Id.* ("Statement 22").)

During the June 8, 2016 earnings call, Rios also asserted that the Bridger acquisition had been a:

- "smooth transition and seamless integration . . . [and] [o]ne of the many reasons for our success is our fully integrated logistics-focused model, which is significantly less dependent on commodity prices and continues to be a key differentiator for the broader Ferrellgas Partnership. We are pleased this unique model has performed well in this challenging environment." (*Id.* ¶ 141 ("Statement 23").)

That day, the price of Ferrellgas Units dropped by $0.97 per unit, or 5.15% from a closing price of $18.85 on June 7, 2016 to a closing price of $17.88 on June 8, 2016. (*Id.* ¶ 143.)

On September 2, 2016, Ferrellgas filed a form 8-K with the SEC in which it announced that, as of September 1, 2016, it had terminated the Jamex TLA as a result of concerns that Jamex Marketing could not fund its obligations under that agreement. (*Id.* ¶ 144.) Shortly thereafter, on September 13, 2016, "Citi issued an analyst report downgrading" Ferrellgas, and the company's shares fell in price from $18.99 to $18.01 (a decline of 5.16%). (*Id.* ¶ 145.)

On September 28, 2016, Ferrellgas announced its fourth quarter 2016 and fiscal year 2016 financial results for the period ending July 31, 2016 by filing a Form 10-K and a Form 8-K with the SEC. (*Id.* ¶ 147.) In the Form 10-K, Ferrellgas announced an adjusted EBITDA for its midstream operations – crude oil logistics segment of $108.3 million. (Doc. No. 69-2 at 63–64.) However, it also disclosed that it had not delivered oil pursuant to the Monroe TLA since "February 2016," that it concluded in July 2016 that Jamex Marketing would not be able to

continue making payments under the Jamex TLA, and that it had been unable to find an entity to replace Jamex Marketing to source the crude oil necessary to perform under the Monroe TLA. (*Id.*) Accordingly, Ferrellgas announced that "[a]s a result of the expected decline in our future cash flows . . . which resulted from the termination of the Jamex TLA and the decline in our trucking operations," it was recording asset impairment charges of $628.8 million. (*Id.* at 64.) In the Form 8-K, Ferrellgas disclosed a net loss of $665.4 million, largely due to the "one-time non-cash impairment charge of $628.8 million in [its] Midstream operations – Crude [O]il Logistics segment." (Compl. ¶ 147.) The Form 10-K also disclosed that Wambold had resigned as CEO and President on September 27, 2016. (*Id.* ¶ 150.) Ferrellgas's new Interim President and CEO, James Ferrell, indicated in the Form 8-K that "low oil prices have seriously damaged our midstream sector." (*Id.*) Over the next two days, the value of Ferrellgas Units fell from $16.50 to $11.77 (a decline of approximately 28.67%). (*Id.* ¶ 192.)

After the close of trading on October 24, 2016, Ferrellgas filed a Form 8-K stating that it had notified Rios that he should "work independently of the Bridger employees on developing ideas for organic growth opportunities using existing Bridger assets while the Company conducts a broader review of Bridger's operations." (*Id.* ¶ 156.) On that day, Ferrellgas Units lost $0.50 per Unit (approximately 4.76%), closing at $10 per Unit. (*Id.*)

Subsequently, after the markets closed on November 22, 2016 (the final day of the class period), Ferrellgas issued a press release regarding its cash distribution for the first quarter of fiscal year 2017. (*Id.* ¶ 157.) The company declared a distribution of just $0.40 per Unit on an annualized basis – in comparison to a prior-year annualized distribution of $2.05 per unit. (*Id.*) Ferrellgas explained the loss as "result[ing] from 'headwinds in our midstream business primarily due to the loss of our largest customer [Monroe].'" (*Id.*) The next day, the company's stock fell from $7.33 (its November 22, 2016 closing price) to $6.65 per Unit, a loss of 9.28%. (*Id.* ¶ 158.)

As a result of Ferrellgas's instruction that he "work independently," Rios delivered a notice of good reason for resigning, alleging that Ferrellgas had materially diminished his responsibilities and indicating his intention to resign if such diminution was not cured within 30 days. (*Id.* ¶ 156.) He resigned on November 28, 2016. (*Id.* ¶ 167.)

### C. Procedural History

This action was commenced on October 6, 2016. (Doc. No. 1.) On January 19, 2017, the Court granted a motion to consolidate this case with two other putative class action complaints at 16-cv-8850 and 16-cv-9294, appointed lead plaintiffs and lead counsel, and set a schedule for the filing of a consolidated class action complaint and briefing for a motion to dismiss. (Doc. No. 46.) Plaintiffs filed the Consolidated Amended Complaint on March 21, 2017. (Doc. No. 58.) Defendants filed their motion to dismiss on May 19, 2017 (Doc. No. 67), and the motion was fully briefed by September 8, 2017 (Doc. No. 75).

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98. Specifically, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

Moreover, securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). *ATSI Commc'ns*, 493 F.3d at 99. To satisfy Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

The PSLRA, in turn, requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). As for mental state, the statute demands that plaintiffs "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id*. § 78u-4(b)(2)(A) (emphasis added); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). A "strong" inference is one that is "more than merely plausible or reasonable – it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007). Courts "consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 198 (2d Cir. 2009) (citing *Tellabs*). Accordingly, even though courts normally draw reasonable inferences in the non-movant's favor when ruling on a motion to dismiss, the PSLRA imposes a more stringent standard for inferences relating to mental state. *Id.* at 196 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

## III. DISCUSSION

### A. Incorporation of Documents

As an initial matter, Plaintiffs argue that three documents attached to Defendants' motion to dismiss – the COSA (Doc. No. 69-3), the COSA Side Letter (Doc. No 69-7), and the Monroe TLA Side Letter (Doc. No 69-8) – must be disregarded because they are extrinsic documents that Plaintiffs "neither relied upon nor had access to in drafting" the Complaint. (Opp'n 9.) The Court rejects this argument. The Complaint clearly relies on and incorporates these documents by referencing them by name and making their contents central to Plaintiffs' allegations. *See ATSI Commc'ns, Ltd.*, 493 F.3d at 98 (holding that a Court may evaluate documents "known to the plaintiff and upon which it relied in bringing the suit"); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) ("To be incorporated into the complaint by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." (quoting *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002)). What is

more, Plaintiffs themselves reference and rely upon these documents in their Opposition. (*See, e.g.*, Opp'n 7, 19 n.17.) Plaintiffs cannot have it both ways. Accordingly, the Court will consider the three challenged documents in resolving Defendants' motion to dismiss.

## B. Alleged Violations of Exchange Act Section 10(b) and SEC Rule 10b-5

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304–05 (2d Cir. 2015) (alteration in original) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b-5 implements this provision of the Exchange Act and explicitly prohibits 'mak[ing] any untrue statement of a material fact'" in connection with the purchase or sale of a security. *Id*. at 305 (quoting 17 C.F.R. § 240.10b-5(b)).[2] To establish liability for securities fraud, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Dura Pharm.*, 544 U.S. at 341–42 (collecting cases). At issue here are the material misrepresentation or omission requirement and scienter.

### 1. Alleged Misstatements and Omissions

To be actionable, a misstatement or omission must be material. The Supreme Court has explained that "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc.*, 485 U.S. at 240. For a misstatement or omission to be material, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. at 231–32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also ECA*, 553 F.3d at 197. Importantly, the Supreme Court has repeatedly eschewed bright-line rules defining materiality, instead favoring a case-by-case determination. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–41 (2011). Thus, materiality is a mixed question of law and fact, and in the context of a Fed. R. Civ. P. 12(b)(6) motion, dismissal on materiality grounds is only appropriate when the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

False factual statements are actionable under Section 10(b) and Rule 10b-5. *See In re Int'l Bus. Machs. Corp. Sec. Litig*., 163 F.3d 102, 107 (2d Cir. 1998); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos*., 75 F.3d 801, 812–13 (2d Cir. 1996). In addition, statements of opinion may be actionable misstatements if (1) "the speaker did not hold the belief she professed," (2) "if the supporting fact[s] she supplied were untrue," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015), or (3) the stated opinion, "though sincerely held and otherwise true as a matter of fact, . . . omit[ted] information whose omission ma[de] the [stated opinion] misleading to a

---

[2] "Judicial interpretation and application, legislative acquiescence, and the passage of time have removed any doubt that a private cause of action exists for a violation of § 10(b) and Rule 10b–5, and constitutes an essential tool for enforcement of the [Exchange Act's] requirements." *Basic Inc. v. Levinson*, 485 U.S. 224, 230–31 (1988).

reasonable investor," *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). If a plaintiff alleges falsity on the third ground, he "'must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* at 209 (quoting *Omnicare*, 135 S. Ct. at 1332). "[M]eeting the standard under *Omnicare* 'is no small task for an investor.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332). Reasonable investors are aware that "opinions sometimes rest on a weighing of competing facts," and they "do[] not expect that *every* fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329.) Instead, investors "read[] each statement within [an SEC filing] . . . in light of all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information," and "take[] into account the customs and practices of the relevant industry." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330). In general, overly optimistic statements about corporate performance do not give rise to securities violations. *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015)). "[T]o be actionable, the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." *In re Duane Reade Inc. Sec. Litig.*, No. 02-cv-6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (quoting *Greenburg v. Churst*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003)), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004).

Omissions, by contrast, are actionable only when the speaker has an underlying duty to disclose the omitted information. *Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

There is thus no freestanding duty to reveal "any and all material information." *Matrixx Initiatives*, 563 U.S. at 44; *see also Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013). As a result, companies may remain silent "[e]ven with respect to information that a reasonable investor might consider material" so long as they do not have an underlying duty to disclose that information. *Matrixx Initiatives*, 563 U.S. at 45; *Kleinman*, 706 F. 3d at 152–53. Nevertheless, a duty to disclose may arise when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or – as relevant here – the company makes a corporate statement that would otherwise be inaccurate, incomplete, or misleading without the disclosure. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–02 (2d Cir. 2015). In other words, if a company chooses to speak on a topic, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). Thus, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market." *Matrixx Initiatives*, 563 U.S. at 45.[3]

Here, Plaintiffs' fraud allegations are based on both misstatements and omissions. The Court organizes Defendants' alleged misstatements and omissions by the subject matter, and addresses each in turn.

---

[3] Moreover, as the Second Circuit recently made clear in *Stratte-McClure*, the *materiality* of an alleged omission must be considered in light of *Basic*'s sliding scale of materiality. 776 F.3d at 103 (holding that *Basic*'s "probability/magnitude test," rather than a regulatory definition, controls the materiality inquiry for claims based on Section 10(b) and Rule 10b-5). Under that test, "the materiality of an allegedly required forward-looking disclosure is determined by 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* at 102–03 (quoting *Basic, Inc.*, 485 U.S. at 238).

## a. Statements and Omissions Regarding Exposure to Commodity Prices

Plaintiffs argue that certain statements made by Defendants – statements 1, 2, 5–9, 13, and 23 – mischaracterized Bridger's protections against fluctuations in the price of oil. Plaintiffs allege that these statements were misleading or false when made because Bridger's crude trucking business risked decline whenever the price of oil declined, and more importantly because the Monroe TLA allowed Monroe to suspend its performance if Bridger delivered less than 35,000 barrels a day – a risk that Plaintiffs assert was correlated to a decline in the price of oil. (Compl. ¶ 120.)

Plaintiffs' focus on Defendants' statements regarding commodity price risk is misplaced. Ferrellgas's financial problems arose only indirectly from the way fluctuations in the price of oil affected its counterparties: the direct cause was Jamex's failure to perform under the Jamex TLA and reduced demand for Bridger's trucking services. As Plaintiffs themselves put it: "[C]hanges in commodity prices caused Monroe's demand for Bakken crude under the Monroe contracts . . . to drop, resulting in [Jamex Marketing's] inability to fulfill its obligations to Bridger, which, in turn, caused the suspension of the Monroe contracts." (*Id.* ¶ 137.) Plaintiffs' theory of fraud apparently assumes that Defendants' statements regarding their own insulation against commodity price fluctuation also pertained to their counterparties' insulation, since the viability of those parties' businesses was essential to Bridger's continued success. However, no reasonable investor would understand Defendants' statements regarding Bridger's insulation from commodity price fluctuation to be guarantees of demand from counterparties like Jamex Marketing, Monroe, or other oil producers who obviously were highly vulnerable to changes in the price of oil.

With regard to the June 1, 2015 statements (Statements 1 and 2), Plaintiffs seize upon the line in Statement 1 that "we take no commodity risk" and the line in Statement 2 that "I've contracted all my risk away," but those statements are accompanied by language explaining how the limited role Bridger played in the logistics chain helped to protect it from fluctuations in the price of oil. The statements are clearly meant to contrast the risk Bridger assumed from its strategic position "in the middle" of the supply chain to the risk its counterparties (the "producer" and "end-refinery customers") assumed at the ends of the chain. Unlike the counterparties, Bridger did not "take ownership of the oil," but only "move[d] that barrel" for the counterparties. Because Defendants did not purport to guarantee that Bridger had removed all exposure to commodity price fluctuation, but only "mitigated" that risk and "insulate[d]" against it, no reasonable investor would take these statements as assurances that Bridger's business was "essentially risk-free" (*id.* ¶ 120) or "impervious to oil price changes" (Opp'n 12), as Plaintiffs insist. *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 100 (S.D.N.Y. 2011) (holding that allegations that "[took] statements out of context by ignoring various other statements" failed to allege actionable misstatements regarding defendant's risk management strategy).

For the same reason, Defendants had no duty to update these prior statements when Bridger's trucking segment's performance began to decline, since the advantages of the take-or-pay contractual scheme and the way it insulated Bridger against commodity price fluctuations had not changed. Unlike the cases cited by Plaintiffs, Defendants' representations did not contradict facts known to them. For example, in *Novak v. Kasaks*, the defendant (a clothing retailer) represented that its inventory was "'under control, 'in good shape,' and at 'reasonable' or 'expected' levels; . . . that 'no major or unusual markdowns were anticipated';

and attribute[ed] rising levels of inventory to growth, expansion, and planned future sales." 216 F.3d 300, 304 (2d Cir. 2000). The Second Circuit held that these statements were actionable because the defendant failed to adhere to its publicly stated inventory policy, knew that a large amount of its inventory was "obsolete and nearly worthless," and violated Generally Accepted Accounting Principles by not marking down certain inventory. *Id.*; *see also id.* at 304–05, 315. Unlike the defendant in *Novak*, Defendants here did not misrepresent a fact of which they had knowledge: they merely described the competitive advantage of their contractual position in general terms. And, unlike the defendants in *In re Ambac Financial Group, Inc. Securities Litigation*, who represented that their underwriting standards were "conservative" without also disclosing that they had actually *lowered* those standards, Defendants never misrepresented facts regarding the contractual provisions that insulated them against changes in commodity prices, nor modified those provisions without alerting the public. 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010); *see also id.* at 271 n.32 (complaint alleged "facts about [defendants'] underwriting practices that directly contradict the affirmative statements of [defendants'] public filings.").

Additionally, Defendants' statements are not misleading in light of the cautionary language contained in the Form 8-K filed on June 1, 2015 – the same day that Statements 1 and 2 were made. That language disclosed that Monroe's minimum volume commitment "would be suspended for any month in which [Bridger] delivers less than an average of 35 [thousand barrels] per day for such month to [Monroe]," and cautioned that "*[i]f [Monroe's] demand for crude oil drops below that threshold for a material length of time . . . that would adversely affect [Bridger's] cash flows.*" (Doc. No. 69-6 at 7 (emphasis added).) Put simply, Plaintiffs' claim that Defendants represented Bridger's business to be "essentially risk-free" (Compl.

¶ 120) is directly belied by public disclosures made on the same day the Bridger Acquisition was announced.

The September 29, 2015 statements (Statements 5–7) are inactionable for largely the same reasons: Statement 5 simply indicates that, compared to other mid-stream organizations, Bridger's contracts allowed it to "perform[] well throughout commodity price cycles"; Statement 6 explicitly includes hedging language, indicating that Bridger was "*relatively insulated from commodity prices*" (emphasis added); and Statement 7 merely reiterates the points in Statements 1 and 2. Again, no reasonable investor would read these statements as guarantees that Bridger was "impervious to oil price changes" (Opp'n 12), nor confuse them with assurances that Bridger's contract counterparties would never default.

Plaintiffs next argue that, by September 2015, Bridger's trucking business had begun to decline, and that Defendants had a duty to disclose this decline in order to prevent Statements 5, 6, and 7 from being misleading. (Opp'n 15.) However, Rios's statements regarding the strategic position of Bridger's business and its protections against commodity price fluctuations are not statements relating to the performance of any of its segments, truck or rail, and Plaintiffs do not allege that Defendants made any statements regarding Ferrellgas's trucking business during the September 29, 2015 conference call. Accordingly, any alleged omissions regarding Bridger's trucking segment are not "sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) (quoting *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)).

Similarly, the December 9, 2015 statements (Statements 8 and 9) are not actionable because they merely describe Bridger's strategic

contractual positioning without providing anything like a guarantee as to its invulnerability to commodity risk. The March 10, 2016 statement (Statement 13) is not actionable for the same reasons, and consists mainly of vague, optimistic statements that constitute puffery ("best-in-class capabilities and durable long-term take-or-pay contacts with blue-chip customers"). *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (noting that "expressions of puffery . . . do not give rise to securities violations"); *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011) (defining "puffery" as "an 'exaggerated or general statement[] that make[s] no specific claims on which [reasonable persons] can rely'" (quoting *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003))). Plaintiffs stress that the March 10 statement was made after the Side Letters were executed. (Opp'n 16.) But contrary to Plaintiffs' representations, those letters did not affect Jamex Marketing's obligation to pay Bridger deficiency payments; precisely because of the take-or-pay contract scheme, Bridger stood to continue earning revenue even after Monroe's demand for oil declined so long as Jamex Marketing performed under the Jamex TLA.

Finally, the June 8, 2016 statement (Statement 23 (boasting that "our success is our fully integrated logistics-focused model, which is significantly less dependent on commodity prices" and "has performed well in this challenging environment")) simply reiterates many of the points made in the other statements addressed here and in no way could be construed as a guarantee of future performance or risk-free business operations, particularly since the 10-Q issued that same day explicitly disclosed that Jamex Marketing owed Ferrellgas $18.6 million and that Ferrellgas had doubts about Jamex Marketing's ability to "satisfy its payment obligations to Ferrellgas through June 2019." (Compl. ¶ 138) (Statement 17).

Accordingly, Plaintiffs have failed to demonstrate the falsity of Defendants' statements regarding commodity prices and commodity price risk.

### b. Statements and Omissions Regarding Bridger's Performance

Plaintiffs next contend that various statements regarding Bridger's performance – Statements 3, 4, 10–12, 14–16, 18, and 19 – are actionable in light of Defendants' failure to acknowledge (1) the downturn in Bridger's trucking business, (2) the Side Letters, (3) Rios's instruction to "park the trains," and (4) the decision to strip BTS of assets and sell it to Jamex Marketing. These statements were made in securities filings dated September 29, 2015, March 10, 2016, and June 8, 2016, and during conference calls held on those three days. The Court will address them in turn.

#### (i) September 29, 2015 Statements

Plaintiffs contend that Statements 3 (that the Bridger Acquisition "was a big step towards our goal" and has "been everything we hope for") and 4 (that integration "was smooth and seamless"), made during a September 29, 2015 conference call, are materially false and misleading. (Opp'n 14.) But the law is clear that statements which are "too general to cause a reasonable investor to rely on them" are not actionable. *ECA*, 553 F.3d at 206. Here, Statements 3 and 4 are mostly rosy affirmations that do not contain guarantees, and are far too vague to be actionable. *See, e.g.*, *In re Razorfish, Inc. Sec. Litig.*, No. 00-cv-9474 (JSR), 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001) ("'[I]ntegration' is far too loose and uncertain a term on which to premise a claim of securities fraud . . . .").

#### (ii) March 10, 2016 Statements

Plaintiffs also challenge Statements 10–12 and 14–16, which were made in an SEC filing and during a conference call on March 10, 2016

regarding the company's second quarter earnings in fiscal-year 2016. (*See* Opp'n 13–15.) But, like Statements 3 and 4, Statements 10 ("Bridger continues to exceed our expectations") and 16 ("The long term nature of our agreements, the stable and consistent revenue generated by our take or pay contracts, and the quality of our key customers make Bridger uniquely durable and valuable") are non-actionable expressions of generalized confidence. *See Rombach*, 355 F.3d at 174 (noting that "expressions of . . . corporate optimism do not give rise to securities violations" because "[u]p to a point, companies must be permitted to operate with a hopeful outlook"). Statements 11 ("[w]e have ample financial flexibility to drive growth . . . [and] the pieces in place to create significant value"), 12 (that the company's strategy "worked beautifully") and 14 ("we continue to navigate the lower crude pricing environment with success") are similarly non-actionable "statements of hope, opinion or belief about . . . future performance or general market condition" and "[p]redictive statements of opinion and belief." *Duane Reade*, 2003 WL 22801416 at *4.

Statements 14 and 15 ("we remain on track to deliver adjusted EBITDA in line with expectations") fall within the PSLRA safe harbor for forward-looking statements. The PSLRA provides that "a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management," are forward-looking statements. 15 U.S.C. § 78u–5(i)(1)(A) & (C); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (treating statements of opinion and the PSLRA safe harbor as separate defenses). The statute further provides that a defendant is not liable for such forward-looking statements if the statement "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Statements 14 and 15 are clearly forward-facing – they project future results and incorporate language, such as the words "expect" and "expectation," that signal the statements' reference to future results. Plaintiffs have not demonstrated that Defendants had actual knowledge of the falsity of their statements regarding the projected earnings from Ferrellgas's midstream segment as of January 31, 2016 (the end date of the reporting period covered by the company's March 10, 2016 10-Q (Doc. No. 69-10)). As discussed previously, Plaintiffs do not allege facts indicating that Defendants were aware, in March 2016, that Jamex Marketing was on the verge of cancelling or defaulting on the Jamex TLA. As such, Plaintiffs have failed to allege the falsity of these statements at the time they were made.

Although Plaintiffs primarily argue that Statement 16 ("stable and consistent revenue generated by our take or pay contracts") was false when made (Opp'n 14), they also contend that the claim supports liability even if it is viewed as forward-looking (Opp'n 17). Specifically, Plaintiffs assert that Defendants' risk disclosures, which focused on "Monroe's right to suspend the TLA and Jamex's failure to perform under either the Monroe COSA or the Jamex TLA," addressed events which had already occurred "with Defendants' direct knowledge and participation." (*Id.*) But Plaintiffs' reliance on *Sharette v. Credite Suisse Int'l*, 127 F. Supp. 3d 60, 88 (S.D.N.Y. 2015), is misplaced, as Defendants' warning that Monroe might "suspend" the Monroe TLA was made on June 1, 2015 – before Bridger entered into the Jamex TLA, which protected it from the risk of non-payment in the event that the volume of oil

shipped under the COSA dropped below 35,000 barrels per day. Following the execution of the Jamex TLA on June 24, 2015 – which neutralized that risk – Defendants replaced that warning with a more limited statement, indicating merely that risks would attend a termination of the COSA – which had not occurred at the time of the March 10, 2016 statements. (Doc. No. 69-12 at 74.) *Sharette*, which recognized that a disclosure is insufficient if the defendant *knows* that the risk disclosed has already come to pass, is therefore inapposite. 127 F. Supp. 3d at 88. And although Plaintiffs contend that Jamex Marketing had failed to make payments even before the March statements were made, the earnings call and SEC filings were pointedly focused on the results for the quarter and fiscal year ending January 31, 2016. Significantly, Plaintiffs never actually specify how much Jamex Marketing owed as of March 10, 2016 (or earlier), what the debt reflected concerning Jamex Marketing's long-term ability to meet its obligations under the Jamex TLA, and who at Ferrellgas was even aware of those facts. Since such knowledge is a prerequisite to the exception Plaintiffs seek from the law surrounding forward-looking statements, this too is non-actionable.

### (iii) June 8, 2016 Statements

Plaintiffs next contend that Statements 18 ("Bridger continues to perform well") and 19 ("we remain confident" in the model), made during the June 8, 2016 earnings call support liability. (Opp'n 13–15.) As with their arguments concerning the March 10, 2016 statements, Plaintiffs are incorrect. First, Statement 18, like Statements 3, 4, 10, and 16, is a vague, optimistic statement that "is far too loose and uncertain" to support liability. *Razorfish*, 2001 WL 1111502, at *2. Second, Statement 19 is merely a non-actionable statement of "hope" and "opinion and belief about . . . future performance." *Duane Reade*, 2003 WL 22801416 at *4.

Moreover, the first clause of Statement 19 – Wambold's assertion that "Bridger is on pace" towards its EBTDA projections – is also a forward-facing statement. *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) ("[A] good-faith statement that [a company] was 'on track' to achieve some goal does not serve as a guarantee that the goal will indeed be achieved"). And like Statements 14 and 15, it was made in the wake of a range of cautionary statements directed at the exact risks that Plaintiffs claim caused Bridger to undershoot its financial targets. For example, on June 8, 2016, Defendants disclosed that Jamex Marketing owed Bridger $18.6 million and that it "may not have the financial resources sufficient to satisfy its payment obligations to Ferrellgas." (Compl. ¶ 138; *see also* Doc. No. 69-9 at 24.) Although Statement 19 was made just months before the $628.8 million impairment charge, Plaintiffs have not alleged facts indicating when or how Defendants knew or should have known that Jamex Marketing was a lost cause or that a $600 million charge was imminent. Accordingly, Plaintiffs' claims fail to set out the required "knowing falsity" with sufficient particularity. *Slayton*, 604 F.3d at 774 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)).

### c. Duty to Update

Plaintiffs next argue that Defendants owed a duty to update their prior representations – specifically statements 1, 2, 5–14, 18, 19, and 23 – on an ongoing basis because (1) during the June 1, 2015 call and in the supporting materials, Defendants represented that Bridger's trucking segment accounted for 30% of the company's estimated EBITDA and indicated that Bridger had "over 610 specialized tractor trailer units"; and (2) Defendants' September 29, 2015, March 10, 2016, and June 8, 2016 statements implicitly addressed trucking. (Compl. ¶ 80; *see also* Doc. No. 58-9; *see also*

Opp'n 15–16.) Contrary to Plaintiffs' assertions, however, a company does not owe a permanent duty to disclose all facts related to a topic merely because it speaks once on that topic. Instead, "a duty to update may exist when a statement, reasonable at the time it was made, becomes misleading because of a subsequent event," but "[t]here is no need to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation." *Int'l Bus. Machs.*, 163 F.3d at 110. Here, Defendants' single 2015 statement about Bridger's fleet of tractor trailers – made on a slide during the announcement of the Bridger Acquisition – was a statement of present fact, and there is no allegation that it was not true when made in June 2015. Similarly, Defendants' representation that the trucking business had a certain number of "tractor trailer units" is hardly the sort of representation that would remain "alive" in the minds of investors. Plaintiffs do not explain, for example, how the sheer number of "units" or drivers is direct evidence of profitability.

Plaintiffs argument about Defendants' obligation to reveal the Side Letters is equally unpersuasive. (*See* Opp'n 16 (challenging Statements 10, 12, 13, and 16).) Specifically, Plaintiffs argue that Defendants' prior statements about the Monroe TLA being Bridger's "largest customer contract" (Compl. ¶ 91) (emphasis omitted) triggered a duty to disclose the Side Letters since Monroe "had ceased all performance" under the Monroe TLA by January 13, 2016 (Opp'n 16). But this argument again mischaracterizes the Side Letters, which suspended neither the Monroe TLA nor the Jamex TLA and did not affect Jamex Marketing's obligation to provide deficiency payments to Bridger. Implicitly acknowledging this fact, Plaintiffs meekly allege in a footnote that "Jamex's potential deficiency payments, however, were no substitute for Bridger's performance under the Monroe TLA." (Opp'n 16 n.12.) But Plaintiffs provide no factual support for that proposition, nor legal support for the assertion that Defendants were obligated to disclose that Bridger had reverted to Jamex's deficiency payments under the Jamex TLA instead of Monroe's obligations under the Monroe TLA.[4] So long as Jamex Marketing was able to meet its obligations under the Jamex TLA, Bridger's revenues were largely guaranteed.

Plaintiffs emphasize that Defendants made these representations in March 2016 despite the fact that, by December 2015, Jamex Marketing "was unable to secure financing that it desperately needed to perform under the Jamex TLA." (Sur-Reply 2; *see also* Compl. ¶¶ 13, 96, 97.) However – critically – Plaintiffs provide no facts to support the allegation that Jamex Marketing was in such dire financial straits by December 2015, much less that Defendants were aware of that fact. This allegation is entirely conclusory, and its repetition throughout Plaintiffs' submissions does not alter the PSLRA's requirement that if a plaintiff's "allegation regarding the statement or omission is made on information and belief, . . . [Plaintiff must] state with particularity all facts on which that belief is formed."[5] 15 U.S.C. § 78u-4(b)(1)(B).

However, even if the Court were to accept at face value Plaintiffs' allegation that Defendants were aware that Jamex Marketing had failed to secure financing, the fact remains that

---

[4] For the same reason, Defendants' decision to "park" the trains did not affect Bridger's income stream from Jamex Marketing.

[5] As for Bridger's decision to wind down and sell BTS, Plaintiffs provide no reason why this decision made other statements misleading. While Plaintiffs argue that the decision demonstrates that Defendants knew that the suspension of the COSA was permanent, they provide no other facts to support this allegation nor a reason why it would even be material in light of the Jamex TLA, which merely shifted Bridger's source of revenue from Monroe to Jamex Marketing.

Defendants had no obligation to publicly speculate as to whether Jamex Marketing, a contractual counterparty to Bridger, would be able to meet its obligations under the Jamex TLA. *See, e.g., Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) ("[W]here an outcome is merely speculative, the duty to disclose does not attach."). Plaintiffs contend that Jamex Marketing "did not have the financial resources to satisfy its payment obligations" to Bridger, but do not allege why or how Defendants knew or should have known about Jamex Marketing's financial condition. Absent more specific allegations, Bridger was not required to speculate as to the possibility that Jamex Marketing would default. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose the potential negative consequences of a failed FDA inspection of a drug manufacturing plant where it was not "a 'foregone conclusion'" that those consequences would occur).

Accordingly, this case in no way resembles *In re Hi-Crush Partners L.P. Securities Litigation*, which Plaintiffs cite for the proposition that Defendants had a duty to disclose the Side Letters and Jamex Marketing's alleged financial woes. No. 12-cv-8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013). In *Hi-Crush*, the defendants repeatedly advertised their contractual relationship with a company called Baker Hughes, even after Baker Hughes repudiated its contracts with Hi-Crush. *Id.* at *3, 13. Although defendants argued that Hi-Crush had no duty to disclose the repudiation, as Hi-Crush believed Baker Hughes' repudiation was invalid under the contract, the court disagreed, noting that "the repudiation letter at the very least evidenced a major dispute between Baker Hughes and Hi–Crush." *Id.* at *14. The court reasoned:

> Though the contract dispute with Baker Hughes had not yet escalated to litigation at the time of the investor presentation, Baker Hughes had already asserted a breach of contract and tried to terminate the contract. . . . [E]ven if Hi-Crush believed in good faith that it had not breached the agreement with Baker Hughes and was correct in its belief, a new fact had come to light: Baker Hughes disagreed. Baker Hughes had also acted on this belief and sent a letter to Hi-Crush . . . purporting to terminate the agreement.

*Id.* at *15–16. The court thus concluded that "Hi–Crush had a duty to disclose the repudiation because this 'secret information render[ed][] public statements materially misleading.'" *Id.* at *16 (alteration in original) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

Here, unlike *Hi-Crush*, Plaintiffs provide no factually-supported allegation that Defendants were aware that Jamex Marketing was unable or unwilling to abide by the Jamex TLA at the time Defendants made the March 10, 2016 statements, much less that they had been provided a notice of termination or repudiation of the Jamex TLA. The mere fact that the company's June 8, 2016 filing disclosed the possibility that Jamex Marketing might default does not support a conclusion that Defendants should have speculated *earlier* about Jamex Marketing's ability to continue making deficiency payments through the conclusion of the Jamex TLA or "somehow guessed the outcome of the ongoing negotiations" with Jamex Marketing with respect to the Jamex TLA. *In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017). Without more details about what Defendants knew and when they knew it, it simply cannot be said that Defendants had a *duty* to hazard such a guess. As a result, their failure to do so does not give rise to a claim for fraud.

#### d. Remaining June 8, 2016 Statements

Plaintiffs also challenge Statements 17 and 20–22, made on June 8, 2016. Plaintiffs argue that Statement 17, which reveals that Jamex Marketing might not be able to satisfy its obligations to Ferrellgas through the remaining term of the Jamex TLA, is misleading in light of the fact that Defendants in fact *knew* that Jamex Marketing could not satisfy those obligations. (Compl. ¶ 142.) Again, Plaintiffs provide no facts to support the allegation that, by June 8, 2016, Defendants knew that Jamex Marketing would be unable to perform for the duration of the Jamex TLA. Rather than leap to conclusions, Defendants disclosed facts, including that as of April 30, 2016, Jamex Marketing owed Bridger $18.6 million. (Doc. No. 69-9 at 24.) Indeed, on the June 8, 2016 call with investors, an analyst pointedly asked about that debt, whether Bridger was mitigating its exposure to Jamex Marketing, and what steps it was taking to "renegotiat[e] that take-or-pay" (Doc. No. 69-14 at 6.) It is therefore clear that reasonable investors were aware that Jamex Marketing's ability to satisfy its obligations to Bridger was in jeopardy, but Plaintiffs have provided no facts demonstrating that things were actually worse than Defendants let on, much less that Defendants possessed such information.

Plaintiffs next assert that Statements 20 ("our take-or-pay contracts with Monroe Energy and its supplier remain in place"), 21 ("we are still operating within our contractual arrangements [with Monroe]"), and 22 ("we are operating within our contractual arrangements with Monroe and with Jamex today, and both agreements are in effect"), made on June 8, 2016, were false and/or misleading in light of the Side Letters. However, Plaintiffs mischaracterize the Side Letters, which did not suspend any of Bridger's contracts with either Monroe or Jamex Marketing. That Bridger was not delivering oil to Monroe at the time the statements were made does not mean that it was

no longer operating within its agreements with Monroe and Jamex Marketing: rather, it only meant that the source of revenue from the take-or-pay scheme had shifted from Monroe to Jamex. That is, the source of revenue had shifted from "take" to "pay." These statements were literally true, and the disclosures clearly put investors on notice that things could get worse. No further statements were necessary, nor is it clear what additional information the Side Letters would have provided.

\* \* \*

The Court thus concludes that Plaintiffs have not pleaded a material misstatement or omission, which alone warrants dismissal of their claim for securities fraud under Section 10(b) and Rule 10b-5. The Court nevertheless turns to scienter, which provides an alternate basis for dismissal.

#### 2. Scienter

As discussed above, a plaintiff alleging fraud under Section 10(b) must state "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2), defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). Thus, Plaintiffs "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Id.* at 328 (emphasis in original). Moreover, the Court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314. In this Circuit, a plaintiff may establish a "strong inference" of scienter by pleading particularized facts that either: "(1) show[] that the defendants had both motive and opportunity to commit the fraud, or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where "[a] plaintiff has failed to demonstrate that defendants had a motive to

defraud[,] . . . he must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Plaintiffs have not attempted to argue that either Rios or Wambold had a motive or opportunity to commit fraud and instead rely upon allegations of conscious misbehavior or recklessness. (Compl. ¶ 159.) Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308 (internal citation omitted). Recklessness, on the other hand, has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks and citations omitted; ellipsis in original). This standard requires a plaintiff to raise an inference of "conscious recklessness – *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence," *id.* at 312, and to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements," *id.* at 308. "[S]cienter may [also] be found where there are specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks omitted). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

Here, Plaintiffs argue that a strong inference of scienter arises from Defendants' reckless disregard of facts concerning the status of operations at Bridger. (Compl. ¶ 159.) Specifically, Plaintiffs contend that Defendants

were aware of Jamex Marketing's fragile financial position, the Side Letters, and the decline in Bridger's trucking segment, thereby contradicting Ferrellgas's public statements. (*Id.*) Plaintiffs also contend that the resignations of Wambold and Rios in 2016 support a showing of scienter. (*Id.* ¶¶ 167–68.) The Court will address each of these arguments in turn.

a. Defendants' Knowledge of Jamex
Marketing's Financial Status

Plaintiffs conclusorily assert that "Defendants knew or recklessly disregarded that Jamex Marketing had failed to secure desperately needed financing by December 2015 and since then had been unable to make its minimum deficiency payments." (*Id.* ¶ 142.) But as noted above, they provide no details regarding what this financing was or how Defendants would have come to know about it; and they certainly have not "specifically identif[ied] the reports or statements" from which Defendants learned that Jamex Marketing would not be able to meet its obligations under the Jamex TLA. *Novak*, 216 F.3d at 309. Construed generously, Plaintiffs' argument boils down to an assertion that Jamex Marketing's dire financial situation could be inferred from the existence of the Side Letters, which Defendants helped negotiate. However, Plaintiffs offer no detail concerning what was disclosed by Jamex Marketing prior to the negotiation of the Side Letters. Moreover, since the Side Letters did not amend Jamex Marketing's pertinent obligations to Bridger, they provide no support for the inference that those agreements revealed Jamex Marketing's financial woes.

Absent factual allegations of Defendants' knowledge that Jamex Marketing would not be able to fulfill its obligations under the Jamex TLA, Plaintiffs rely on Rios and Wambold's positions in the company to support an inference of scienter. (Compl. ¶¶ 162, 165.) However,

these allegations are pleaded without any particularity whatsoever, and merely allege:

> [B]ecause of [their] high-level position[s] at Ferrellgas, [Rios and Wambold] . . . . [1] [were] directly involved in, provided with, or had access to, information and documents which rendered [their] public statements about Bridger Logistics and Ferrellgas's midstream operations false or misleading . . . . [and] [2] knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made to investors were materially false, misleading, and incomplete.

(*Id.*) But "[a]ccusations" such as these, which are "founded on nothing more than a defendant's corporate position[,] are entitled to no weight." *Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-cv-2282 (KPF), 2017 WL 751155, at *16 (S.D.N.Y. Feb. 27, 2017) (quoting *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015)); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015). Accordingly, to the extent Plaintiffs argue that Defendants' knowledge of Jamex Marketing's financial status may be inferred from the information that was available to them as officers of a *different* company, that argument is unpersuasive and incapable of raising a strong inference of scienter. *Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.")[6]

Put simply, Plaintiffs have offered nothing to suggest that Defendants were aware, back in December 2015 or March 2016, of the facts disclosed in the June 8, 2016 10-Q. Absent such facts, Plaintiffs are clearly unable to establish a strong inference that Defendants had the intent to defraud investors.

### b. Defendants' Secret Side Deals

Plaintiffs also rely on *In re Bristol Myers Squibb Co. Securities Litigation* for the proposition that the Side Letters and the BTS sale constituted "secret" side agreements that support scienter. 586 F. Supp. 2d 148, 152–54 (S.D.N.Y. 2008). This argument is misplaced. In *Bristol Myers Squibb*, the defendant had announced the existence, but not the terms, of a settlement with a rival drug maker over patent-infringement litigation that had not yet received antitrust approval from the Federal Trade Commission or all fifty states' attorneys general as required by a consent decree from an earlier case. *Id.* at 152–54. When the settlement was rejected by the attorneys general, the defendants secretly negotiated an amended settlement with additional concessions that was submitted to the authorities from whom approval was required. However, the parties *also* negotiated secret side-agreements that were *not disclosed* to those authorities and that contained terms that were previously rejected by the attorneys general in the earlier settlement. *Id.* at 155. Defendants never disclosed the rejection or renegotiation of the settlement, nor the existence of the side-agreements, but did make representations that they would "vigorously pursue" enforcement of their patent rights despite the fact that they had negotiated away many of those rights in the settlement and side agreements. *Id.* at 154. In a separate criminal case, the defendants eventually pleaded guilty to two counts of making false statements in connection with the secret side agreements. *Id.* at 157. In assessing

---

[6] Plaintiffs likewise provide no facts to show that Defendants were aware of the sale of BTS. In any event, the sale of BTS – with or without its ongoing obligations to ERC – provides no insights as to Defendants' knowledge regarding future prospects for the COSA, the Jamex TLA, or Jamex Marketing's ability to meet its obligations under the Jamex TLA.

scienter in the parallel securities fraud case, Judge Crotty emphasized the fact that the defendants pleaded guilty to making false statements – which "provid[ed] strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 168.

This case is easily distinguishable. First, neither the Side Letters nor the sale of BTS materially altered the duties owed to Bridger under any of the relevant agreements. Second, Defendants did not make any representations that were inconsistent with the Side Letters or the sale of BTS. Third, the Side Letters were not illegal, and there is no basis for thinking that Defendants were engaging in fraud. Plaintiffs' real argument is that the Side Letters and the sale of BTS provide evidence that the Defendants knew that Jamex Marketing was or would soon be unable to meet its deficiency payment obligations under the Jamex TLA. However, at the risk of again repeating what has become a mantra in this case, Plaintiffs provide no evidence – no email, no document, no allegation supported by fact – indicating that Defendants were aware of Jamex Marketing's long-term inability to meet its deficiency-payment obligations under the Jamex TLA prior to June 2016. Accordingly, Plaintiffs provide no reason to believe that the Side Letters constituted circumstantial evidence that Defendants were engaged in fraud or had reckless disregard for the status of Bridger's operations.

c. Defendants' Knowledge of the Decline in Bridger's Trucking Segment

Plaintiffs have also failed to provide specific allegations of Rios's or Wambold's knowledge of the decline in Bridger's trucking segment. The Complaint refers to confidential employees ("CFE1" and "CFE2") who both worked in Bridger's headquarters in Carrolton, Texas, where Rios also worked (Compl. ¶¶ 63, 71.) CFE1 claims that these offices were small and that employees communicated regularly, (*id.*

¶ 69), that Rios travelled bi-weekly to meet with Wambold in Kansas City, Missouri (*id.*), that "everything went through" Rios (*id.* ¶ 111), and that Wambold received weekly trucking operations status reports compiled by the business development team (*id.*). CFE2 claims that he reported to Dan Smith, Vice President of Trucking, whom CFE2 "believed reported directly" to Rios. (*Id.* ¶ 71.) But neither CFE1 nor CFE2 identifies a statement, report, meeting, or email from which Rios would have learned of the decline in Bridger's trucking segment, nor do Plaintiffs provide specific allegations regarding what was discussed when Rios met with Wambold or what the weekly reports contained.

The closest the Complaint comes to a specific allegation is that the weekly reports, at some point, contained information indicating that the number of truck drivers utilized by Ferrellgas decreased by 50% between June 2015 and January 2016. (*Id.* ¶ 142.) But these allegations are insufficient to raise an inference that Defendants had access to facts contrary to Defendants' June 1, 2015 public statements. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (finding that allegations that failed to specify "which reports revealed" contradictory information, "what information those reports contained, and whether the reports contradicted the public declarations of [d]efendants" were insufficient to plead scienter). Put simply, "Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations" concerning Bridger's trucking segment. *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010). "[W]ithout more to tie the . . . Defendants to specific information contradicting the substance of their statements," these allegations are "insufficient to give rise to a strong inference of scienter." *Shemian v. Research in Motion Ltd.*, No. 11-cv-4068 (RJS),

2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

At bottom, Plaintiffs' allegations amount to a "core operations" theory of scienter: because Rios was allegedly in charge of Ferrellgas's midstream segment, and because Rios and Wambold were generally knowledgeable about Ferrellgas's business, they must have been familiar with the status of Bridger's trucking segment. But Plaintiffs' resort to the core operations theory of scienter fails for two reasons. First, as Plaintiffs acknowledge, Bridger's trucking segment comprised approximately 30% of Bridger's business, and likely less as that segment of the business declined over time. However, "[c]ourts applying the core operations doctrine generally require[] that the operation in question constitute nearly all of a company's business before finding scienter." *Thomas v. Shiloh Indus., Inc.*, No. 15-cv-7449 (KMW), 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (internal quotation marks and citations omitted). Second, as this Court has previously noted, the core operations doctrine is of questionable applicability since the passage of the PSLRA, which requires that "facts supporting the scienter inference to be 'state[d] with particularity.'" *In re Wachovia*, 753 F. Supp. 2d at 353 (quoting 15 U.S.C. § 78u–4(b)(1)). Accordingly, while allegations regarding core operations may factor into a court's holistic assessment of scienter allegations, they are not "independently sufficient to raise a strong inference of scienter." *Shemian*, 2013 WL 1285779, at *18.

### d. Defendants' Resignations

Finally, Plaintiffs argue that Rios and Wambold's resignations from Ferrellgas support an inference of scienter. (Opp'n 25.) But, once again, Plaintiffs make no attempt to identify facts indicating that the resignations were "highly unusual and suspicious," *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) (quoting *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)), or that the resignations were tied to the alleged fraud. The mere fact that Rios and Wambold resigned, without more, is simply insufficient to establish the required inference of scienter. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (finding resignations, without "additional factual allegations linking [defendant's] resignation . . . to the alleged fraud . . . insufficient to raise a strong inference of scienter").

### e. Holistic Assessment

Even though the Court has rejected all of Plaintiffs' scienter arguments individually, it must still consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322–23. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Taken as a whole, Plaintiffs' Complaint fails to meet this standard, and the Court has little difficulty concluding that a reasonable investor would deem the inference of scienter far less compelling than an inference of, at most, non-actionable mismanagement and negligence. Put simply, the most plausible inference is that Ferrellgas's business was overwhelmed by a sustained, "market-wide downturn impacting . . . various businesses," including Bridger's counterparty, Jamex Marketing. *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *21 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). In other words, Defendants, without a motive to defraud, simply failed to anticipate the impact that a "continued,

sustained decline in crude oil prices and [a] resulting decrease in crude oil production" would have on their business. (Compl. ¶ 120.) But whether bad luck or bad business acumen, Defendants' failure does not give rise to an inference of knowing fraud.

Accordingly, the Court concludes that Plaintiffs have failed to adequately allege scienter and that their claim under Section 10(b) and Rule 10b-5 must be dismissed.

## C. Alleged Violations of Exchange Act Section 20(a)

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78t(a)). Because Plaintiffs' Section 20(a) claim "is necessarily predicated on a primary violation of securities law," and the Court has determined that Plaintiffs have failed to plead a primary violation, Plaintiffs' Section 20(a) claim "must also be dismissed." *Rombach*, 355 F.3d at 177.

## D. Required Findings as to the Parties' Compliance with Rule 11

The PSLRA mandates that, at the end of any private securities action, the district court must "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of" Federal Rule of Civil Procedure 11(b). 15 U.S.C. § 78u-4(c)(1); *see also Rombach*, 355 F.3d at 178 (remanding for findings under Rule 11 because the PSLRA "mandates" such findings and "the imposition of sanctions" if "the court finds that any party or lawyer violated Rule 11(b)"). Although the Court does not hesitate in granting Defendants' motion to dismiss the Consolidated Amended Complaint, the Court ultimately concludes that

no party has violated Rule 11(b) and that sanctions are not warranted.

## IV. Leave to Amend

Finally, the Court considers Plaintiffs' request for leave to amend. (Opp'n at 25.) "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the [Court] to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). In addition, the Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying suggested amended pleading. *See, e.g.*, *City of Pontiac*, 752 F.3d at 188 (affirming denial of leave to amend where plaintiffs already had one opportunity to amend their complaint and had "identified no additional facts or legal theories" to support their request to amend); *Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (affirming district court's denial of leave to amend where plaintiff requested leave to amend "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted").

Here, in the final sentence of their Opposition to Defendants' motion to dismiss, without any legal or other support, Plaintiffs state: "If the Court grants any part of Defendants' Motion, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a)(2) to cure the perceived deficiencies." (Opp'n at 25.) Significantly, Plaintiffs offer no basis for their request for leave to amend nor do they attach a proposed amended complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)

(noting that a court may deny leave to amend, on notice grounds, "where the request gives no clue as to how the complaint's defects would be cured" (quoting *Porat*, 464 F.3d at 276)). Moreover, this is not the first complaint in this action, since Plaintiffs filed the Consolidated Amended Complaint after their appointment, supplanting the initial complaint and two other complaints in related actions that were consolidated with this one.

As Judge Lynch aptly noted when he was on the district court, "[w]hile pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, Nos. 06-cv-643, 07-cv-8686, 07-cv-8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (citations and internal quotation marks omitted); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that courts can deny leave to amend where there has been "repeated failure to cure deficiencies by amendments previously allowed" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *NRW, Inc. v. Bindra*, No. 12-cv-8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of having another bite at the proverbial apple." (internal quotation marks omitted)). Accordingly, because Plaintiffs have failed to attach a proposed amended complaint and have not even attempted to explain why an additional opportunity to amend would cure the Complaint's deficiencies, the Court denies Plaintiffs' request for leave to amend.

## V. CONCLUSION

Despite the array of issues presented and discussed above, Plaintiffs' claims essentially boil down to an assertion that Defendants misrepresented the inherent risks of their business and improperly delayed disclosure of the deteriorating condition of a key customer, to the detriment of investors. Although such assertions may, in the abstract, be enough to sustain a claim for securities fraud, Plaintiffs have simply failed to allege facts to support those broad accusations here. On the facts alleged, no reasonable investor would have understood Defendants' statements as assurances that Bridger's business was "essentially risk-free" and "impervious to oil price changes," nor have Plaintiffs provided sufficient facts to suggest that Defendants were aware of, and hid, Jamex Marketing's deteriorating condition in the months before June 2016. Because the federal securities laws do not allow such fraud-by-hindsight pleading, Plaintiffs' claims must be dismissed.

Accordingly, for the reasons stated above, Defendant's motion to dismiss is granted. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 67 and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2018
New York, New York

\*       \*       \*

Lead Plaintiffs Susan Batai, Joel Brenner, Kevin Gaberlavage, and Lazy Dogs Partnership LLLP are represented by Naumon A. Amjed, Kimberly A. Justice, Megan Koneski, Daniel C. Mulveny, and Johnston de Forest Whitman , Jr.,

of Kessler Topaz Meltzer & Check, LLP, 280 King of Prussia Road, Radnor, PA 19087.

Defendants Ferrellgas Partners, L.P., Ferrellgas, Inc., Stephen L. Wambold, and Julio E. Rios II are represented by Thomas J. Giblin, Miles N. Ruthberg, and Jamie L. Wine of Latham & Watkins, LLP, 885 Third Avenue, New York, NY 10022.